# Media Analysis & Communications Research

Marilyn A. Lashner, PhD

EXHIBIT A

## ANALYSIS OF THE PORTRAYAL OF PHILLIP WILEY

## IN THE BOOK ENTITLED, *THE LAST RUN*,

## AS AUTHORED BY TODD LEWAN,

## AND DISTRIBUTED BY HARPERCOLLINS PUBLISHERS

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

Analysis and Report by Marilyn A. Lashner, Ph.D.

*Marilyn A. Lashner*
—————————————
Marilyn A. Lashner, Ph.D.

*March 10, 2006*
—————————————
Date

Suite 14C-45
2401 Pennsylvania Avenue
Philadelphia, PA 19130-3047

(215) 765-0165 telephone
(215) 765-0875 facsimile

# **CONTENTS**

Page

Introduction ............................................................. 1

Research Design ......................................................... 3

Conclusions / Rationale ................................................. 9

    1.    Defamation ...................................................... 9

    2.    Defamation Specified ........................................... 9

    3.    Invasion of Privacy ........................................... 12

    4.    Creative Nonfiction ........................................... 12

    5.    Dialogue without Corroboration ................................ 13

    6.    Phillip Wiley as Touchstone and Constants ..................... 16

    7.    Departure from Standards of Another Author ................... 17

    8.    Criminality ................................................... 18

    9.    Reckless Disregard ............................................ 19

Endnotes ................................................................ 20

## ANALYSIS OF THE PORTRAYAL OF PHILLIP WILEY
## IN THE BOOK ENTITLED, *THE LAST RUN,*
## AS AUTHORED BY TODD LEWAN,
## AND DISTRIBUTED BY HARPERCOLLINS PUBLISHERS

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

Analysis and Report by Marilyn A. Lashner, Ph.D.

Under a copyright date of 2004, Defendant publisher HarperCollins and Defendant author

Todd Lewan issued a book entitled, *The Last Run: A True Story of Rescue and Redemption on the

Alaska Seas.*[1] The book is presented as a nonfiction account of the voyage and ultimate sinking of

the Alaskan fishing vessel *La Conte,* due to a hurricane-force Arctic storm on January 30, 1998, and

of the subsequent heroic rescue of four members of its five-man crew by three different teams of the

United States Coast Guard. Included in the book are vivid descriptions of the boat's crewmen,

characterized on the book's jacket as "end of the roaders from different parts of the United States

[who] had come together in Alaska to fish one of the world's most treacherous patches of ocean in

the dead of winter." The portraits presented of the men ranged the gamut of their character and

personality and included tales of their successes, failures, backgrounds, and dreams. Said

portraitures were effected through third-person descriptions by Lewan in addition to such language

as dialogue, banter, and first person accounts placed in the mouths of the individual crewmen.

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

Of the five crewmen sailing on the ill-fated *La Conte,* two emerged as the central characters in the overall tale: Bob Doyle, a hard-drinking former member of the United States Coast Guard and Mike DeCapua, a hard-drinking and experienced commercial fisherman. According to the book, the pair had worked together briefly on the *Min E* , a commercial fishing schooner owned and operated by the plaintiff in this action, Phillip Wiley. Notwithstanding the brevity of their joint experience with skipper Wiley, Doyle and DeCapua--as portrayed in Lewan's book--would engage in dialogue that continually made reference to skipper Wiley and/or his boat. In fact, throughout the book, from the earliest pages to the last, skipper Wiley and his boat were the focus of much dialogue between the two. This despite the fact that Phillip Wiley and his boat had no role whatsoever in the events surrounding the sinking of the *La Conte* or the dramatic rescue of its crew.

Upon authorization by the attorney for Phillip Wiley, the plaintiff in the above-captioned case, I have undertaken to perform a research project that included scientific content analysis of HarperCollins' and Todd Lewan's book, *The Last Run,* with respect to such references as were contained therein that named Phillip Wiley and/or his fishing vessel, the *Min E.* The purposes of this project were to identify and describe: (a) how Defendants HarperCollins and Todd Lewan portrayed plaintiff Phillip Wiley and/or his fishing vessel, the *Min E* in the book described above; (b) the extent to which HarperCollins and Todd Lewan used the persona of Phillip Wiley as touchstones and constants throughout the book; (c) the extent to which HarperCollins' and Todd Lewan's portrayal of Phillip Wiley was gratuitous or unnecessary to the book's story line; and (d) the extent to which HarperCollins' and Todd Lewan's book departed from the reporting practices of another author's recounting of the same event.

MEDIA ANALYSIS & COMMUNICATIONS RESEARCH

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

## RESEARCH DESIGN

To analyze Harper Collins' and Todd Lewan's book, *The Last Run,* as it referred to Phillip Wiley, selected passages of the book were subjected to rigorous, systematic and objective content analysis.  The passages selected for analysis included all passages in the above-named book that contained particular identification markers relevant to the plaintiff  (i.e., a version of the name "Phillip Wiley" or that of his boat, the *Min E).*   Such identification markers included:  "Phillip Wiley," "Phil Wiley," "Wiley," "Phil," "Mr. Wiley" and the *"Min E, "*

For background only,[2] review was made of pleadings, answers, affidavits, case law, judicial opinions, transcripts of interviews with Todd Lewan and of the plaintiff's investigators with relevant persons figuring  in *The Last Run;*[3]  relevant newspaper articles,[4] and Spike Walker's book, *Coming Back Alive,*[5] which also reported on the sinking of the *La Conte* and the rescue mission following.

Based on classic principles of logic, rhetoric, English syntax, and communication theory, the content analysis procedures were designed to identify the full range of explicit and implicit meanings, such as were communicated by HarperCollins and Todd Lewan about Phillip Wiley and/or Wiley's boat, the *Min E,* and such as would have been understood by the average reader. To this end, the analysis focused on the relevant passages in terms of their words, phraseology, grammar, rhetorical devices, juxtapositions, and such other factors of the contextual environment as would give insight into the information contained therein.

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

For purposes of this research, information was defined in terms of statements, inferences and innuendoes; and communication was defined in terms of meanings exchanged between the writer/publisher of the message and the average reader. Inferences and innuendoes were recognized as capable of being generated from a variety of mechanisms and rhetorical devices, among which are: context, including order and arrangement of parts; transitional terms; qualification; connotations; figures of speech; syntactical usage; and logical structure.

To proceed with the analysis, HarperCollins' and Lewan's entire book was examined wherein passages were selected on the basis of the presence of particular identification markers identified above--where "passage" was defined for this research as a single, complete and uninterrupted expression designated in Todd Lewan's book, *The Last Run*, with one or more of the following identification markers: "Phillip Wiley," "Phil Wiley," "Wiley," "Phil," "Mr. Wiley," and the *"Min E,"* Passages selected for analysis contained one or more of the above-named identification markers in combination with surrounding language that completed the thought and that also may have used such pronominal references as "he," "him," "it," "skipper," or "the boat." There were twenty-one such passages in the book.

The focus of content analysis is on mutually exclusive and independent categories which represent an exhaustive array of the topics being discussed in the communications at issue and which, in operational terms, are pigeonholes into which the content units are to be classified. In this present analysis, the following ten mutually exclusive and independent categories, focusing on the plaintiff in this action, were designated as relevant and formed the basis of the research:

4

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*


Re:     <u>Phillip Wiley</u>

(1)     CHARACTER
(2)     INTEGRITY
(3)     ABILITY AS A SKIPPER
(4)     RELATIONSHIP WITH CREW
(5)     ACTIONS
(6)     EFFECT OF HIS ACTIONS
(7)      SEXUAL ORIENTATION
(8)     REPUTATION
(9)     SOUNDNESS OF HIS BOAT
(10)    CRIMINALITY


Each of the selected relevant passages contained within the book was dissected into an exhaustive set of assertions, each assertion physically placed within its relevant category.[6] For purposes of this research, "assertion" was defined as a linguistic construction comprising a single item of relevant information; and "relevant information" was defined as information focusing on one or more of the ten content categories identified above. A single sentence in a passage may harbor multiple items of information and thereby generate multiple assertions. Assertions may represent statements, inferences or innuendoes; and, according to the present research design, each assertion was identified in terms of its explicit/implicit status, source and attribution. Such assertions as were subsumed within each category were then counted and reviewed for patterns of content, gist and overall character; and within this framework, conclusions relevant to the research questions were formulated. At all times during the research process, particular attention was paid to accuracy, objectivity, validity and reliability.

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

The intra-coder reliability coefficient is a measure of the reliability of the coding procedures.[7] Coding reliability presupposes that repeated measures with the same instrument on a given communication should yield similar results. An intra-coder reliability coefficient for the assertion-identification procedures used in this research was calculated to be: 98 percent.[8]

Accompanying and essential to the instant document, "Analysis of the Portrayal of Phillip Wiley in the Book Entitled, *The Last Run,* as Authored *by* Todd Lewan, and Distributed by HarperCollins Publishers" are a *Lexicon* which presents definitions of selected terms used in the book and a *Coding Manual* which provides definitions for the category labels and explicit rules for the various procedures used in the analysis. Because this detailed explanation is available in the *Coding Manual*, only the barest description of the procedures is offered in this document. The *Coding Manual* serves to enhance reliability of the research project and to assure replicability. It is presumed that subsequent researchers, following the rules and procedures set forth in the *Coding Manual* would arrive at similar results. The three documents—the *Coding Manual*, the *Lexicon,* and the instant document-- comprise the full report on the research project and are to be considered as a unit.

MEDIA ANALYSIS & COMMUNICATIONS RESEARCH

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

For purposes of this analysis, I was asked to assume[9] that, according to Alaska law, "defamation" is defined as follows:

> A communication is "defamatory" if it tends to harm reputation of another so as to lower him or her in estimation of community or to deter third persons from associating or dealing with him or her.
>
> *Briggs v. Newton*
> 984 P.2d 1113
> Alaska, 1999

> For publication to be "libel per se," words used must be so unambiguous as to be reasonably susceptible of only one interpretation, that is, one which has natural tendency to injure another's reputation.
>
> *Odom v. Fairbanks Memorial Hospital*
> 999 P.2d 123
> Alaska, 2000

> One who publishes slander that imputes serious sexual misconduct to another is subject to liability to other without proof of special harm.
>
> *Restatement (Second) of Torts*
> Section 574

I was also asked to assume that "privacy" is defined as follows:[10]

> Privacy is the right of a person to be free from the unwarranted intrusion on his or her solitude or seclusion or of his or her private affairs or concerns.

> Privacy is the basic right of a person to live one's life in seclusion without being subjected to unwarranted and undesired publicity, the right to be left alone.
>
> *Restatement (Second) of Torts*
> Section 652(B)

MEDIA ANALYSIS & COMMUNICATIONS RESEARCH

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

And finally, I was asked to assume[11] the following with respect to regulations as to fishing for black cod, more accurately known as sablefish:

- That black cod seasons are established by Federal law for non-State waters (three miles from shore). The State black cod fisheries for the Sitka area occur between May and November, including 1997 and 1998. State water openings and Federal water for any place Wiley/DeCapua/Doyle could have fished for black cod was mid-March to mid-November.

- That seasons for black cod are well-known by those living in Southeast Alaska, as well as commercial fishermen who fish Alaska, Washington or Oregon, as well as those who fish halibut off Canada, Washington or Oregon since halibut is regulated similarly to sablefish by the same entity (International Halibut Commission).

- That Wiley was only allowed to fish for black cod in one area of Southeast State waters (a person needs a limited entry permit to do so) or in Federal waters near Sitka (a person needs limited individual fishing quotas issued by the federal government).

- That the Federal dates delineating the seasons for black cod fishing are very well known because they apply to halibut as well as black cod.

- That State violations in this regard are all criminal,[12] with penalties ranging from one year in jail, $10,000 fine, or forfeiture of state permit amounting to $300,000. Additionally, where authorized by Statute, seizure of the entire catch or its value, and seizure of vessel and/or gear, may apply even on first violations.

- That Federal violations in this regard are all criminal in nature.[13] That Federal regulations specifically outline penalties for catching 100 to 1,500 pounds of sablefish over IFQ rights that include $15,000 to $50,000 fines plus forfeitures or reductions of IFQ's (Individual Fishing Quotas) and for failure to timely report said violations fines ranging to $80,000, seizure of the entire catch or its value, and seizure of vessel and/or gear.

MEDIA ANALYSIS & COMMUNICATIONS RESEARCH

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

## CONCLUSIONS

1.     On the basis of my research and analysis, it is my conclusion that, in their book entitled, *The Last Run: A True Story of Rescue and Redemption on the Alaska Seas*, defendant publisher HarperCollins and defendant author Todd Lewan defamed plaintiff Phillip Wiley in terms of his personal and business persona, including such aspects as: character, integrity, actions, effect of his actions, ability as a skipper, relationship with his crew, sexual orientation, reputation, soundness of his boat, and criminality. This defamation was projected through statement, inference and innuendo and with information that was couched to give the appearance of having been extensively researched and supported, and of having a verifiable basis in both disclosed and undisclosed facts. Said defamation represented an extensive and pervasive attack on the plaintiff and would have been so understood by the average reader.

2.     Among the items of published information by which defendants HarperCollins and Todd Lewan defamed plaintiff Phillip Wiley were the following:

a)     CHARACTER:  that Phillip Wiley is hard-hearted, inconsiderate, mean, exploitive, opportunistic, lazy, devious, sly, tyrannical, unresponsive to the plights of others, reckless about the safety of his crew, and is otherwise a contemptible, detestable and self-serving man.

b)     INTEGRITY:  that Phillip Wiley was dishonest, corrupt and deceitful;  that he routinely kept back money he owed;  and that, on at least one occasion, he shortchanged his entire crew after a trip.

9

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

c)    ABILITY AS A SKIPPER:   that Phillip Wiley was not an able, beloved, or successful fisherman;  that he routinely subjected his men to a meager catch and dangerous conditions;  that he regularly demonstrated his incompetence and ineffectiveness;  and that he would otherwise employ management decisions in ways that would shortchange his crew while being of benefit to himself.

d)    RELATIONSHIP WITH CREW:   that Phillip Wiley's relationship with his crew was astonishingly uncaring and cruel;  that he played favorites with crew members; that he was not always equitable with his crew;  that he was reckless about the safety of his crew;  that he did not inspire loyalty among his crew;  that regularly and purposefully he would saddle his crew with unsatisfying and needless busy work that was of little value;  and that he routinely refused to pay crewmembers the money owed for work performed with respect to true catch numbers.

e)    ACTIONS:   that Phillip Wiley would subject his crew to humiliating busy-work; that he did not allow crewmen to leave for the holidays;  that he shortchanged at least one crewman out of $300;  that regularly and intentionally he would work his crew just enough to get a small catch to cover his own expenses with never enough left over for the crew to get a good paycheck;  that he would routinely hold back the retro pay of deckhands  that he reveled when crewmen groveled or otherwise acted with fear and in a servile way;  and that he vindictively retaliated against a deckhand who blew the whistle about needed boat repairs and safety abuses.  And with respect to fishing for Black Cod: that Phillip Wiley fished for Black Cod on January 15, a date outside of the permissible season for Black Cod fishing;  that he returned from a fishing trip with one thousand pounds of Black Cod, an amount clearly in excess of his IFQ rights;  that he possessed and/or presumably sold one thousand pounds of Black Cod with no annual quota share, no IFQ or CDQ, or no registered buyer permit;  and that presumably he failed to provide timely notice of said violations.

f)    EFFECT OF HIS ACTIONS:   that Phillip Wiley's management decisions and obvious incompetence caused his crew to be cranky and in an increasingly evil mood;  that his actions caused frustration, vindictiveness, spite and malice among his crew in addition to premature leave-taking by some;  and that his work schedule and inherent laziness were such as to never allow enough money left over for the netting of a good paycheck by his crew.

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

g)   SEXUAL ORIENTATION:  that Phillip Wiley had a romantic attraction for crewman Bob Doyle;  that Wiley may have been a practicing homosexual;  and that he may have had a private sexual escapade with Bob Doyle.

h)   REPUTATION:  that skipper Phillip Wiley and his boat, the *Min E,* were relatively unknown among the local fishing community;  that Phillip Wiley was recognized as a high risk by the insurer of his boat;  and that he had a reputation for rehiring wayward crew if they apologized and groveled.

i)   SOUNDNESS OF HIS BOAT:  that Phillip Wiley's boat, the *Min E,* was unsafe; that it had a mast that was unsteady, a deck that was loose from the rails;  that it needed extensive hull work that was not being done;  that he was advised by the insurance company that unless repairs were effected, the boat would no longer be insured;  and that it was only because of a deckhand's whistle blowing in conjunction with coercion from the insurance company, that Wiley made the numerous much-needed repairs to his boat.

j)   CRIMINALITY:  that Phillip Wiley—

- by fishing for Black Cod on January 15 (a date outside of the permissible season for Black Cod fishing);

- by returning from a fishing trip with one thousand pounds of Black Cod (an amount clearly in excess of his IFQ rights);

- by possessing and/or presumably selling one thousand pounds of Black Cod with no annual quota share, no IFQ or CDQ, or no registered buyer permit;

- and by presumably failing to provide timely notice of said violations--

<u>was in felonious violation of Federal Regulations and State Statutes</u>
(e.g., 50 C.F.R. Parts 300, 600, and 679;  5AAC 28.110;  NOAA Administrative Penalty Schedule;  Interjurisdictional Fisheries Act;  and Alaska Department of Fish and Game, Division of Commercial Fisheries, Report NO. 1Jo4-03) <u>and thereby was subject to penalties ranging from one year in jail,  $10,000 to $80,000 in fines,  forfeiture of his fishing permit (at a cost of $300,000), seizure of the entire catch or its value,  and seizure of his vessel and/or gear.</u>

11

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

3      It is also my conclusion that, in their book entitled, *The Last Run: A True Story of Rescue and Redemption on the Alaska Seas*, defendant publisher HarperCollins and defendant author Todd Lewan blatantly invaded the privacy rights of plaintiff Phillip Wiley in terms of his personal and business persona, including such aspects as: character, integrity, actions, effect of his actions, ability as a skipper, relationship with his crew, sexual orientation, reputation, soundness of his boat, and criminality--with such specificity as is indicated in conclusion # 2 above. This blatant invasion of privacy was projected through statement, inference and innuendo and with information that was couched to give the appearance of having been extensively researched and supported, and of having a verifiable basis in both disclosed and undisclosed facts. Said invasion of privacy represented an extensive and pervasive attack on the plaintiff and would have been so understood by the average reader.

4.      It is also my conclusion that, despite the author's credentials as an Associated Press correspondent, despite the claim that *The Last Run* is a work of nonfiction, "an absolutely true book [wherein] nothing beyond what was verifiable and documentable has been added,"[14] defendant publisher HarperCollins and defendant author Todd Lewan actually presented a work of Creative Nonfiction—a popular and trendy genre that embellishes true stories with invented scenes, fabricated dialogue, refined wordplay, innovative descriptions and other techniques usually employed by poets and fiction writers.

> **Rationale:**    Creative Nonfiction--also known by such other names as: Narrative Nonfiction; Literary Journalism; New Journalism; the Literature of Reality; the Art of Fact; the Art of Truth; Gonzo Journalism; and Neo-gonzo Journalism—is the latest name for fact-based writing that is the union of storytelling and journalism. It combines reportage with narrative telling, fictional and poetic techniques, and portraiture and self-reflection.[15]

MEDIA ANALYSIS & COMMUNICATIONS RESEARCH

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

Objective reporting and true nonfiction is bound by the rigors of fact; it creates an expectation of accuracy, objectivity, clarity and simplicity. The dance of words is the last thing the reader of objective reporting expects. Perfuming the truth with inventive writing, originality in presentation, or innovation in voice amounts to an irritation. It gets in the way and is contrary to the purpose of the piece.[16] Not so with Creative Nonfiction which allows a writer to employ the diligence of a reporter, the shifting voices and viewpoints of a novelist, the refined wordplay of a poet and the analytical modes of the essayist.[17]

The upsurge in popularity of Creative Nonfiction is demonstrated by the fact that the search engine Google lists 2,390,000 hits for the term; Amazon.com lists 772 books; the existence of learned journals, (*e.g.*, *Creative Nonfiction: The Journal Devoted Exclusively to the Creative Nonfiction Genre*); university degree programs (*e.g.*, Master of Fine Arts in Creative Nonfiction, Goucher College); and literary prizes (*e.g.*, The William Allen Creative Nonfiction Prize offers $500 and publication of the winning essay in the upcoming issue of *The Journal)*.

5.    It is also my conclusion that, despite the author's claim that *The Last Run* is "an absolutely true book"[18] and that "dialogue was reconstructed as carefully and completely as possible using official reports, court papers, personal letters, diaries and audiotapes, and by cross-checking the recollections of people who took part in the conversations,"[19] defendant publisher HarperCollins and defendant author Todd Lewan actually ascribed dialogue to key characters that differs diametrically from the recalled memories of those characters as per recorded interviews conducted post-publication by the plaintiff's investigator.

**Rationale:**    In *The Last Run*, Mike DeCapua characterized Phillip Wiley as: a "cocksucker,"[20] a man with a "crush" on Bob Doyle,[21] a "lazy prick,"[22] who decided never "to bust his ass,"[23] as a skipper who works his crew "just enough to get a small catch to cover some expenses he's got…with never enough left over for me to get a good paycheck,"[24] and as a skipper who illegally sailed on "January 15… worked the lower half of the Chatham Strait and returned to Sitka with one thousand pounds of black cod."[25]

MEDIA ANALYSIS & COMMUNICATIONS RESEARCH

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

<u>In an interview held by the plaintiff's investigator Steve Will on 8/10/05, Mike DeCapua made the following declarations regarding the book in general:</u>

"A lot of the dialogue in that book is stretched. The physical locations are absurd. There is no bar in Elephant Cove. There wasn't a restaurant in Elephant Cove at the time we were there. ..There is a restaurant there that has a liquor license now, but at the time we were there, there was nothing there. There wasn't even a fucking grocery store. There was the shop and some boats. You couldn't even buy fuel there…and he's got us hangin' out in a bar that don't exist. It's like *Star Wars* for cryin' out loud."[26]

"That's entirely the author's conception of a conversation. That's not the way the conversation went down."[27]

<u>And with regard to Phillip Wiley, Mike DeCapua made the following declarations:</u>

"Heck, I love Phil. He's a great guy…I never had a single complaint about Phil's calculations…He was always very thorough with the pay…I kept fishing with him for years. So, you know, that should tell you, you know, how the pay thing went."[28]

"As far as safety, you know, or anything to do with being a skipper, Phil is topnotch…He's a producer too. Look at his tickets. You know, he's got a history behind him, fish tickets like crazy."[29]

"He's a proficient and effective fisherman. Look at his catch history. I made a lot of money with Phil."[30]

[<u>Regarding fishing for black cod in Chatham Strait on January 15</u>]

"No way. Absolute falsehood. That is very illegal. Phil would never do that, I would never do that. The cold storage would never buy those fish. I mean, you're accusing the person that bought those fish of buying illegally caught black cod as well. This—black cod in state waters is a valued resource. The State of Alaska does not take that shit lightly, you know. You lose your ability to participate in any fishery when you fuck around with that kind of stuff, you know. Nobody does that."[31]

[<u>Regarding statement in book "This is how the *Min-E* could have produced if Phil had ever decided to bust his ass…That lazy prick."</u>]

"No, no, never happened. Phil is not lazy."[32]

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

<u>In an interview held by the plaintiff's investigator Glen Cutting  on 9/30/05,
Bob Doyle made the following declarations regarding the book in general:</u>

[Where would the author get this from?}  "From his fucking foolish imagination."[33]

"Fuck no.  There ain't a soul at that house would agree to his bullshit."[34]

[So that's another case of the author taking…]  "Extreme liberties."[35]

"That's all a figment of his imagination."[36]

"I feel fucking used…half-truths."[37]

<u>[Regarding Mike DeCapua's comments in book that "Phil's got a crush on
you"  and "licking the skipper's ass so much Doyle must like the taste."]</u>

"No.  [DeCapua didn't say that]  Not that I recall."[38]

"No.  [That was never said?  If it was printed it was untrue?}  Yeah."[39]

"Not true."[40]

"And of course the crush thing, that's horseshit."[41]

<u>[Regarding other comments in the book regarding Phillip Wiley]</u>

"This is portraying Mike DeCapua and Phil as being adversaries.  I didn't see that.
Phil was a businessman and Mike was an asset."[42]

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

6.    It is also my conclusion that defendant publisher HarperCollins and defendant author Todd Lewan used the persona of Phillip Wiley as touchstones and constants throughout the book; that their singling out Phillip Wiley for repeated references throughout the book was gratuitous and unnecessary to the book's story line; and that, as the product of the author/publisher's editorial creativity which reflected unbridled use of imagination, and literary license--such repeated references were exploitive of plaintiff Phillip Wiley at the same time as they engendered misrepresentation and fabrication of critical information about him.

**Rationale:**    Research demonstrates that Todd Lewan's book, *The Last Run*, contained 32 mentions of some version of the name "Phillip Wiley" or that of his boat (*i.e., "Min E,"* "Phil Wiley," "Wiley," "Phil," or "Mr. Wiley.") All told, there were 21 passages throughout the book using one or more of the above-named identification markers. The total number of words in these passages was 1,177. And in a book of 368 pages, the first passage to mention Phillip Wiley was on Page 45; the last such passage was on Page 354.

The extent to which Phillip Wiley was mentioned in *The Last Run* is remarkable given that—as Bob Doyle asserted in his interview, Phillip Wiley had "Nothing. Absolutely nothing" to do with the sinking of the *La Conte* or of the subsequent rescue of her crew.[43] Also, note Mike DeCapua's comments in this regard: "It has nothing to do with the story...I mean, in any fashion, it has nothing to do with the story. I don't understand why Phil is even mentioned."[44]

Furthermore, Mike DeCapua noted in his interview that, over the years, he had fished on between ten and twenty boats with as many different skippers [45]

Clearly, the singling out of one former employer, Phillip Wiley, for repeated references throughout the book was the product of the author's own editorial creativity—a rhetorical device designed to imbue the book with cohesion, unity, familiarity, and a tone of glibness. Unfortunately, the author's unbridled use of imagination and literary license, in his exploitation of Phillip Wiley's persona, necessarily engendered misrepresentation and fabrication of critical information regarding plaintiff Phillip Wiley—along with rampant invasion of privacy. (See Conclusions above).

16

MEDIA ANALYSIS & COMMUNICATIONS RESEARCH

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

7        It is also my conclusion that defendant publisher HarperCollins and defendant author

Todd Lewan demonstrated extreme departure from the standards of reporting adhered to by another

publisher's and author's recounting of essentially the same event.

> **Rationale:**      In their book, *Coming Back Alive: The True Story of the Most
> Harrowing Search and Rescue Mission Ever Attempted on Alaska's High Seas,*
> publisher St. Martin's Griffin and author Spike Walker crafted what they called a
> "true account of the *La Conte's* final voyage and the relationship between Alaskan
> fishermen and the search and rescue crews who risk[ed] their lives to save them"[46]
> According to the blurb on the cover, the book was "meticulously researched through
> hundreds of hours or taped interviews with the survivors."[47]
>
> Similarly, defendant publisher HarperCollins and defendant author Todd Lewan
> reported that their book, *The Last Run :A True Story of Rescue and Redemption on
> the Alaska Seas* took four years for researching and writing;  and that official reports,
> court papers, personal letters, diaries and audiotapes were the sources for the facts
> reported.
>
> In both books, Bob Doyle and Mike DeCapua were featured as central characters.
> Though Todd Lewan noted that "For clarity, consistency and tempo, a number of
> less significant places, people, observations and impressions have been left out,"[48] he
> nevertheless chose to report--even emphasize—Phillip Wiley's role in the back story.
> Spike Walker made a diametrically different choice.
>
> While Todd Lewan's book contained 32 mentions of some version of the name
> "Phillip Wiley" which accounted for 21 passages containing some 1,177 words
> sprinkled throughout the book--Spike Walker's book never mentioned Phillip
> Wiley's name at all.   To refer to Doyle/DeCapua's former employers, Spike Walker
> used the following neutral and unrevealing language:
>
> > Doyle soon found a job fishing for shrimp on board the
> > F/V *Quicksilver,* working for Eric Calvin out of
> > Tenakee Springs…When those seasons expired, he
> > found work aboard another, less successful fishing
> > boat, a vessel that shall remain nameless.  (Emphasis
> > added)[49]
> >
> > As is the custom on fishing boats, the first thing the
> > next morning, Doyle and DeCapua gathered their
> > belongings, stuffed them into their navy bags, and
> > moved off their respective boats and former places of
> > employment. .  (Emphasis added)[50]

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

8.    It is also my conclusion that, by reporting the following information:

> The *Min E* sailed again on January 15. Bob Doyle and Mike
> DeCapua were on it. They worked the lower half of the
> Chatham Strait and returned to Sitka with one thousand
> pounds of black cod.[51]

defendant publisher HarperCollins and defendant author Todd Lewan recklessly ascribed criminal

behavior to Phillip Wiley, such as would have been recognized readily by persons living in

Southeast Alaska, as well as by commercial fishermen who fish Alaska, Washington, Oregon, or

Canada; for the seasons for black cod are well known particularly when the accusation is fishing

black cod in January, a time two months after and two months before any possible legal opening. .

> **Rationale:**    Black cod is the name commonly used for what are more accurately
> known as sablefish. The regulations usually refer to black cod as sablefish. Black
> cod seasons are established by Federal law for non-State waters (three miles from
> shore). The State black cod fisheries for the Sitka area occur between May and
> November, including 1997 and 1998, the period during which the critical events
> depicted in *The Last Run* took place. State water openings and Federal water for any
> place Wiley/DeCapua/Doyle could have fished for black cod were mid-March to
> mid-November.[52]
>
> The seasons for black cod are well known, particularly when the accusation is
> fishing black cod in January, a time two months after and two months before any
> possible legal opening. The Federal dates are very well known because they apply to
> halibut as well. The illegality of fishing for black cod in January would have been
> recognized readily by those living in Southeast Alaska, as well as by commercial
> fishermen who fish Alaska, Washington or Oregon, as well as those who fish halibut
> off Canada, Washington or Oregon since halibut is regulated similarly to sablefish by
> the same entity (International Halibut Commission).[53]
>
> Research demonstrated that Wiley was only allowed to fish for black cod in one area
> of Southeast State waters (a person needs a limited entry permit to do so) or in
> Federal waters near Sitka (a person needs limited individual fishing quotas issued by
> the federal government).[54]
>
> A main consumer of black cod is Japan. The Japanese will be very aware of the
> black cod seasons because of the popularity of black cod, the absence of other
> sources or substitute fish and absence of fresh black cod during, and for several
> weeks before and after, holiday seasons.[55]

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*


9.    And, finally, because of their publication of defamatory information about

Phillip Wiley;   because of their publication of information that blatantly invaded the privacy rights

of Phillip Wiley;   because of their attribution of defamatory dialogue to key characters that differed

diametrically from the recalled memories of those characters;   because of the use of Phillip Wiley's

persona for repeated references throughout the book in ways that were patently exploitive of him;

because of their ascription of criminal behavior to Phillip Wiley such as would have been

recognized readily by persons living in Southeast Alaska and elsewhere;   and because of their

knowing and intentional publication of information about Phillip Wiley that was reflective of

misrepresentation and fabrication -- it is the opinion of this researcher that defendant publisher

HarperCollins and defendant author Todd Lewan:   a) demonstrated reckless disregard for whether

the information they published about plaintiff Phillip Wiley was false or not;   and b) demonstrated

reckless disregard for the privacy rights of Phillip Wiley.

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

<br>

## ENDNOTES

<br>

[1] Lewan, Todd, *The Last Run: A true story of rescue and redemption on the Alaska seas,* (New York: HarperCollins, 2004).

[2] Documents reviewed for background were not subjected to scientific content analysis and, therefore, were not included in the content analysis data base.

[3] Radio interview of 8/23/04 between Todd Lewan and Susan Page of NPR; Interview of 8/10/05 between Mike DeCapua and Steve Will, private investigator working for plaintiff Phillip Wiley; Interview of 9/30/05 between Bob Doyle and Glen Cutting, private investigator working for plaintiff Phillip Wiley; and Interview of 10/16/05 between Bob Doyle and private investigator Glen Cutting.

[4] "Fisherman sues publisher and author for libel," by Michael Armstrong, *Homer News,* March 24, 2005, p.3. and "Fisherman sues publisher and author," *Pacific Fishing,* p. 13.

[5] Walker, Spike, *Coming Back Alive: The True Story of the Most Harrowing Search and Rescue Mission Ever Attempted on Alaska's High Seas,* (New York: St. Martin's Griffin, 2001).

[6] In Content Analysis parlance, the assertion was the "recording unit" for the analysis.

[7] An "Intra-Coder Reliability Coefficient" is a measure of the reliability of repeated exercises on the same material by a single coder. In research projects where multiple coders are employed, an "Inter-Coder Reliability Coefficient" would be used to test the reliability of results by multiple coders on the same material.

[8] Calculated by means of a "Coefficient of Reliability" formula presented in Ole R. Holsti, *Content Analysis for the Social Sciences and Humanities* (Reading, Mass.: Addison Wesley, 1969) p. 140.

[9] At my request, C. Michael Hough, counsel for the plaintiff, provided the information cited.

[10] *Ibid.*

[11] As per "The Southeast Alaska northern Southeast Inside Sablefish Fishery Information Report With Outlook to the 2004 Fishery," REGIONAL INFORMATION REPORT NO. 1J04-03 by Beverly Richardson and Victoria O'Connell, Alaska Department of Fish and Game Division of Commercial Fisheries, Juneau Alaska. [Provided by C. Michael Hough at my request]

[12] 50 C.F.R.PARTS 300, 600, and 679.

[13] *Ibid.*

[14] "Author's Note" Todd Lewan, *The Last Run,* (New York: HarperCollins, 2004).

[15] Chip Scanlan, "Chip on Your Shoulder," *Poynteronline*, , http://www.poynter.org.

[16] "Help with your writing," *Black Moss Press,* http://www.blackmosspresss.com.

[17] Lee Gutkind, "What is Creative Nonfiction?" *Creative Nonfiction*, , http://creativenonfiction.org.

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

---

[18] "Author's Note," See Note above.

[19] *Ibid.*

[20] Lewan, *The Last Run*, See note above, p. 46-47.

[21] *Ibid.*

[22] *Ibid.*, p. 149.

[23] *Ibid.*

[24] *Ibid.*, p. 48

[25] *Ibid.*

[26] Mike DeCapua Interview, see note above, p. 21.

[27] *Ibid.*, p. 25.

[28] *Ibid.*,, p. 4.

[29] *Ibid.*, p. 8.

[30] *Ibid.*, p. 30.

[31] *Ibid.*, p. 26.

[32] *Ibid.*, p. 29.

[33] Bob Doyle Interview, see note above, p. 25.

[34] *Ibid.*

[35] *Ibid.*, p. 26.

[36] *Ibid.*, p.27.

[37] *Ibid.*, p. 32.

[38] Ibid., p. 11.

[39] *Ibid.*, p. 20.

[40] *Ibid.*, p. 22.

[41] *Ibid.*, p. 26.

[42] *Ibid.*, p. 31.

[43] *Ibid.*, p. 21.

**MEDIA ANALYSIS & COMMUNICATIONS RESEARCH**

Re: *Phillip Wiley vs. HarperCollins Publishers, Inc. and Todd Lewan*

---

[44] Mike DeCapua Interview, see note above, p. 21-22.

[45] *Ibid.,* p. 5.

[46] Cover blurb of paperback version of: Spike Lee, *Coming Back Alive,* (New York: St. Martin's Griffin, 2001)

[47] *Ibid.*

[48] "Author's Note," See Note above.

[49] *Ibid.,* p. 108.

[50] *Ibid.,* p. 109.

[51] Lewan, See note above, p. 48.

[52] Letter of November 22, 2005 sent to Marilyn A. Lashner by C. Michael Hough, Esquire.

[53] *Ibid.*

[54] *Ibid.* See particularly Paragraph A:2:[c] where Attorney Hough writes the following: "Wiley is really only allowed to fish for black cod in one are of Southeast State waters (a person needs a limited entry permit to do so) or in Federal waters near Sitka (a person needs limited individual fishing quotas issued by the federal government), but I covered any place a reader could have believed Wiley et al. fished black cod in 1998. I eliminated any commercial sablefish (black cod) fishery, anywhere in Alaska or off Alaska in Federal waters, with any type of gear even though Wiley et al were using longline gear (as opposed to pots, which are similar to lobster traps in function)".

[55] *Ibid.*