Jon S. Dawson
Eric J. Jenkins
Davis Wright Tremaine LLP
701 W. 8th Avenue, Suite 800
Anchorage, Alaska  99501
(907) 257-5300

Attorneys for HarperCollins Publishers, L.L.C.
  and Todd Lewan

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| PHILLIP WILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:05 - cv - 00118 (TMB) |
| vs. | ) | |
| | ) | |
| HARPER COLLINS PUBLISHERS, INC. | ) | |
| and TODD LEWAN, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF PHILLIP WILEY

Defendants HarperCollins Publishers, LLC ("HarperCollins") and Todd Lewan

("Lewan") move for summary judgment against Plaintiff Phillip Wiley ("Wiley") on

Wiley's remaining[1] claims for defamation and false light.

_____

[1] Defendants have previously moved to dismiss all other claims asserted by Wiley for failure to state a
claim upon which relief can be granted.  That motion is currently ripe for decision.  In the event that any
of those claims are not dismissed, the Defendants reserve the right to move for summary judgment as to
those claims.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

I.    <u>INTRODUCTION</u>

Lewan and HarperCollins are the author and publisher respectively of <u>The Last Run</u>.  <u>The Last Run</u> is a true account of the 1998 sinking of the Alaska fishing vessel La Conte and the heroic efforts of the U.S. Coast Guard to rescue its crew.  More than simply an account of a maritime tragedy, <u>The Last Run</u> chronicles the sometimes troubled lives of the La Conte's five-man crew, and traces the circumstances that brought these men together to fish a notoriously dangerous patch of ocean in the middle of winter.

Wiley is a retired fisherman who employed two of the La Conte crewmen, Robert Doyle ("Doyle") and Mike DeCapua ("DeCapua"), immediately prior to their service on the La Conte.  Although Wiley has never actually read <u>The Last Run</u>, he contends the book is defamatory and portrays him in a false light.  In particular, Wiley claims that comments ascribed to DeCapua imply that Wiley is homosexual; that he once failed to pay a crewman; that he did not properly maintain his vessel; and that he was not a successful fisherman.  However, he cannot point to a single person who believes any of these things, or who now thinks less of him, as a result of having read <u>The Last Run</u>.  Indeed, apart from his attorney, the only person who has ever mentioned the book to him is his girlfriend.  Wiley likewise admits that he cannot identify any financial harm that he has suffered as a result of the book.

An examination of the undisputed facts shows that none of the statements of which Wiley complains will support a claim for defamation or false light.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 2
ANC 88555v13 3960028-6

II.     <u>BACKGROUND</u>

The events described in <u>The Last Run</u> took place over eight years ago and culminated in the January 1998 sinking of the F/V La Conte and the rescue of her crew by the U.S. Coast Guard.  At that time, Wiley was engaged in commercial fishing as the skipper of the F/V Min E.  DeCapua had worked off-and-on for Wiley since the early 1990s.  In late 1997, after a hiatus of a couple of years, DeCapua returned to work for Wiley as a deckhand and was soon joined by Doyle.  DeCapua Depo. at pp. 20-23.

Doyle and DeCapua made two fishing trips with Wiley in January 1998, neither of which produced large catches.  Frustrated by their lack of success, and needing to make money, Doyle and DeCapua left Wiley to work on the La Conte.  <u>Id</u>; Doyle Depo. at pp. 48-50.  <u>The Last Run</u> describes Doyle and DeCapua's decision to leave Wiley, and their initial hopes for greater success with the more ambitious skipper of the La Conte.

A.     <u>The Statements About Wiley and the Min E in The Last Run</u>.

Wiley is first mentioned in Chapter 7 of <u>The Last Run</u> as part of a scene in which DeCapua joins Doyle and another friend in one of their local hangouts:

> It was a slow time of the year for fishing, and Mike DeCapua was getting a little cranky about having to stay put in port and do boat repairs – busywork he called it – while his skipper waited for a window of clear weather between blows.  The boat he'd been on, a longliner called the Min E, hadn't been pulling much and he was in an increasingly evil mood.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

TLR at p. 45.  Wiley admits that the facts conveyed by this paragraph are essentially correct.  Excerpts from the Deposition of Philip Wiley ("Wiley Depo.") filed herewith at pp. 21-24.

The next passage in The Last Run describes Doyle going to work for Wiley after being informed by DeCapua that there was an opening on the boat:

> DeCapua told him that one of the deckhands on the Min E had gotten into a scrap with the skipper over holiday time.  The skipper was not letting crewmen go for the holidays.  So the deckhand split . . . .
>
> "When does the boat leave?"
>
> "New Year's."

TLR at p. 46.  Wiley denies that one of his crewman quit under these circumstances, but he admits he required crewmen to work on holidays when there was an opening, and that the Min E did make a trip fishing on New Years Day in 1998.  Wiley Depo. at p. 142.

The New Years Day fishing trip was a frustrating experience for everyone:

> For two days they untangled snarls in longline gear, stocked up on fuel, groceries, and tweaked the engine.  Before daybreak on the first day of January 1998, the day of a rockfish opening, the Min E sailed out of Sitka Sound.
>
> It sailed right back one night later.  The rockfishing was horrible; after thirty-two hours of haulbacks, they'd barely pulled three hundred pounds.

**Davis Wright Tremaine LLP**
Law Offices
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

TLR at p. 46.  Wiley does not allege that these statements are false, with the possible

exception that he is unsure whether there were in fact snarls in the gear.  He also asserts

that the statement would be erroneous insofar as it could be read to suggest that someone

other than Wiley "tweaked" the engine.  Wiley Depo. at pp. 25-26.  Wiley does not deny

that the Min E caught less than 300 pounds of fish on the trip.  Id. at p. 25.

DeCapua was not pleased with the results of the fishing trip and is portrayed in

The Last Run as having given Doyle a hard time about being happy just to have

completed his first commercial fishing trip without incident:

> Bob Doyle was not nearly as upset as the others.  He had
> made it through his first commercial fishing trip without a
> major screwup.  And he felt he had hit it off with the skipper,
> Phil Wiley.  After they had tied up, Wiley walked up to him
> and invited him to stay on another month, and to sleep on the
> boat, too, if he liked.
>
> "Phil's got a crush on you," DeCapua said.  He and Bob
> Doyle were walking back from the ANB to the Basement.
> "What you do, anyway?  Give him something special in his
> rack?"
>
> "He's a good guy." [by Doyle]
>
> "He's a cocksucker." [by DeCapua]
>
> Wiley, he explained, had shortchanged him out of three
> hundred dollars after a trip the previous year . . .

TLR at pp. 46-47.  Wiley contends that this passage falsely accuses him of being

homosexual.  Wiley Depo. at pp. 15-16; 201.

DeCapua's denunciation of Wiley as a "cocksucker" was in response to a dispute that DeCapua had previously had with Wiley regarding pay:

> "He's a cocksucker." [by DeCapua]
>
> Wiley, he explained, had shortchanged him out of three hundred dollars after a trip the previous year. Once they had beached and the rest of the crew had split their shares and gone to the Pioneer Bar, DeCapua pulled Wiley aside. He told him, "Okay, I don't care what you do to the rest of the crew. They're not here. It's just you and me."
>
> "Go on."
>
> "You owe me three hundred dollars. I want my three hundred dollars. You give me my three hundred dollars and I keep my mouth shut and go home. You don't give me my three hundred dollars and I'm going to the crew. First I'll tell them what a retro check is. Then I'll tell them you owe them a retro check. Don't think I won't. I got all the catch figures. I want my money and I want it now."
>
> Wiley looked blankly at him. "Is that it?"
>
> "That's it."
>
> "Fuck off." [by Wiley]

TLR at p. 47. Wiley admits he had a dispute with DeCapua regarding retro pay, but denies he was wrong to withhold pay. Wiley Depo. at pp. 38-40. DeCapua claims Wiley deducted pay for the loss of gear that the vessel found while fishing—that is, gear which Wiley had gotten for free. DeCapua stated he has told the retro pay story to a number of people in Sitka over the years. Id. at pp. 46-48, 57.

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 6
ANC 88555v13 3960028-6

1

2

3    DeCapua told Doyle that he retaliated against Wiley by contacting Wiley's

insurance company and telling the company that the Min E was in need of repairs.

4    So Mike DeCapua marched back to the Basement, pulled out
a phone book and called every marine insurance company
5    listed in the yellow pages until he found Wiley's.  He told the
agent that his client was a high risk.

6

7    The agent asked him why.

8    "Well your guy is not paying the crew, which makes the crew
mad.  And they're going to retaliate by hurting the vessel
9    when Mr. Wiley is not around.  And you are the ones who are
insuring him."

10

11    "I see."

12

13    "You guys are going to wind up paying off the boat to the
bank because it's going to get lost at the dock sometime
because of his behavior."

14

15    "I see," the agent said.

16

17    "And what's more, the vessel ain't safe.  Her mast is
unsteady, her deck is loose from the rails, and she needs
extensive hull work.  And he ain't doing it."

18

19    Three days later, a marine architect showed up to inspect the
Min E.  He took some notes, made out a report and sent a
20    letter to Phil Wiley not long after.  It said that unless repairs
were affected, the boat would no longer be insured.

21

22    TLR at 47.  DeCapua went on to state that Wiley performed the repairs required by his

23    insurance company and that those repairs "set Phil Wiley back a bundle."  Id. at 48.

24

25

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Wiley admits that DeCapua called his insurer, and that the Min E had some problems, but denies that the conditions noted by DeCapua affected the seaworthiness of the vessel. Wiley Depo. at pp. 45, 51-55.

Although Wiley disputes that the Min E had serious problems in the years prior to 1998, there is no dispute that vessel surveyors have since voiced serious concerns about the vessel. A 2001 survey of the Min E revealed several problems that, in the opinion of a vessel surveyor hired by Wiley's insurer, affect the seaworthiness of the vessel. Id. at pp. 77-79 and Exh. 2 thereto. These conditions led Wiley's insurer to threaten to cancel his insurance if they were not repaired. Id. at p. 84. In fact, Wiley was prohibited from taking the vessel outside Sitka Harbor until one particularly serious condition was corrected. Id. at p. 85. Wiley admits these facts, but claims that the vessel surveyor who discovered the problems, Jim Steffen, is "just a hard-headed person," and always inspected the vessel when Wiley was not ready. Id. at pp.70-71. However, Wiley admits that, had he complied with Steffen's 1996 recommendation to install a watch alarm on the Min E, it might have prevented him from falling asleep at the wheel and running into an island in 1999. Id. at pp. 98-99.

The final passage in Chapter 7 concludes the dialogue between DeCapua and Doyle with DeCapua opining that Wiley was getting back at him for contacting the insurance company by catching less fish – an allegation Doyle dismisses as nonsense:

"But he sure made me pay," DeCapua muttered.

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 8
ANC 88555v13 3960028-6

"How do you mean?" [by Doyle]

"Well, when Phil takes me out, we work just enough to get a small catch, to cover some expenses he's got, and then we come right back in.  There's never enough left over for me to get a good paycheck."

"Oh."

"He can be a bastard, all right."

The Min E sailed again on January 15.  Bob Doyle and Mike DeCapua were on it.  They worked the lower half of the Chatham Strait and returned to Sitka with one thousand pounds of black cod.

"That bastard," DeCapua muttered.  He and Bob Doyle were walking up the dock.  "That fucking bastard did it to me again."

"Listen Mike," Bob Doyle said.  "I don't know if he's doing it on purpose, I mean, I don't see the sense in it."

"In what?"

"In shooting himself in the foot," Bob Doyle said.  "I mean, why would he do that?"

Mike DeCapua laughed.

"People do it all the time," he said.

Id.  Wiley denies that he tried to spite DeCapua.  He also claims that the reference to him catching black cod on the January 15, 1998 trip is false, and that it would have been illegal for him to retain black cod during that period.  Wiley Depo. at pp. 122-24.  Wiley contends that the Min E was fishing for rockfish.  Id. at p. 126.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Lewan called Wiley in 2003 while writing <u>The Last Run</u> and inquired about the events described in Chapter 7 of the book. Wiley's response to DeCapua's remarks was included in a footnote at the end of Chapter 7:

> In a phone interview in November 2003, Phil Wiley said he vaguely recalled a dispute with Mike DeCapua over retro pay and said his deckhand did contact the company that insured the Min E, to lodge a complaint about the boat. However, Wiley said any allegations that his vessel was not seaworthy or that he slighted crewmen of pay were false. The skipper said the Min E was a fine boat with a sturdy hull that required only routine maintenance, and that at no time could he recall any insurance inspectors finding otherwise. Though he could not remember any details about his disagreement with DeCapua, Wiley did say it was not uncommon for skippers in Alaska to hold back the retro pay of deckhands who jumped ship or left a vessel before it had been adequately cleaned and retooled after a fishing trip.

<u>TLR</u>. at p. 48. Wiley admits the substance of this footnote. Wiley specifically admitted he had only a vague recollection of his dispute with DeCapua and could not recall any details. Wiley Depo. at pp. 42-43; 105-06.

Wiley is mentioned in only a couple of places outside of Chapter 7 of the book, and he concedes that these passages do not convey any false facts. In Chapter 10, Doyle and DeCapua discuss whether to stay with Wiley or go to work aboard the La Conte:

> "Well," Bob Doyle said, "it could be just what we need to get us through the winter."
>
> A smirk flickered across DeCapua's lips. "It would be something to see Phil's face after we tell him that we're splitting."

<u>TLR</u> at 51.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 10
ANC 88555v13 3960028-6

1    "I guess we'll stick with Phil then,"  Bob Doyle said.

2    "Like hell we will," said DeCapua.

3

4    TLR at 63.   Wiley concedes that there is nothing false about either of these statements.

5    Wiley Depo. at pp. 33-34.

6    After leaving Wiley, DeCapua and Doyle initially experienced no more success

7    fishing aboard the La Conte than they had aboard the Min E.  This state of affairs led

8    DeCapua to pay Wiley a backhanded compliment:

9

10    "This is make-work.  Make-work for the crew.  Hell, I just
      quit Phil Wiley.  This is Phil crap all over again.  Except

11    when I was with that Phil, I made money.  This is Phil Junior,
      and he don't make money."

12

13    TLR. at 132.  Wiley agrees that this statement likewise conveys no false facts.  Wiley

14    Depo. at p. 35.

15    The La Conte's luck did later improve when her skipper made the reckless

16    decision to take the La Conte out to the Fairweather Grounds.  Shortly before the La

17    Conte floundered, and two of her crew were lost, DeCapua suggested that the Min E

18    could have done just as well if Wiley had been more aggressive:

19

20    "This," DeCapua told Bob Doyle in the bait shed, "is how the Min E
      could have produced, Bob, if Phil had ever decided to bust his ass."

21

22    "Think so?"

23

24    "Oh, I know so.  That lazy prick."

25

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 11

ANC 88555v13 3960028-6

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

TLR at p. 149.  Although Wiley denies he is lazy, or is a "prick," he admits such statements are simply matters of opinion.  Wiley Depo. at pp. 30-32.  The Last Run closes with a much-chastened DeCapua deciding that he is going to attempt to mend fences with Wiley and get back on the crew of the Min E.  DeCapua tells Doyle that Wiley may take him back if DeCapua "grovel[s] enough."  TLR at p. 354.

The foregoing passages contain all of the statements in the book that mention Wiley or the Min E.  Lewan drafted these passages, and reconstructed the dialogue, based upon interviews that he conducted with Doyle and DeCapua.  As set forth in the Declaration of Todd Lewan ("Lewan Decl.") filed herewith, each of the statements regarding Wiley is taken essentially verbatim from interviews with Doyle and DeCapua.

B.     Effect of Statements in The Last Run on Wiley's Reputation.

Although Wiley pleads that he is now a "shunned, discredited, and mentally troubled man," the only persons who have ever mentioned the book to him are his attorney and girlfriend.  Second Amended Complaint at para. 65.

> Q.     So it's safe to say that you haven't talked with anybody about this book?
> A.     No.
> MR. HOUGH:          Object
> BY MR. DAWSON:
> Q.     You can still answer the question.  Is that correct, you haven't talked with anybody other than your attorney about this book?
> A.     Not really.  Just - - what I told you at the first with Vikki, and that was it.  Otherwise, I haven't discussed it with anyone . . .

Wiley Depo. at pp. 18-19.  Wiley himself has not even read the book, apart from a few passages that his attorney asked him to read.  Id. at pp.12-13.

Wiley has no evidence that anyone thinks less of him as a result of having read The Last Run:

> Q.    Do your friends think less of you because of what was written in the book?
> A.    Very well could be.
> Q.    That wasn't my question.  Have any of your friends said, you know, Phil, now that I've read this book, I think less of you?
> A.    Nobody has said that, no.
> Q.    Have any fishing captains said they think less of you because of this book?
> A.    No, none has said that.
> Q.    Have any crew said they think less of you because of this book.
> A.    No, I haven't talked with anybody about it.

Wiley Depo. at p. 18.

Wiley claims that DeCapua's reference to him as a "cocksucker" will lead people to conclude that he is homosexual.  However, Wiley cannot point to a single person who now believes that he is gay:

> Q.    So you believe people think you're a homosexual now?
> A.    I don't believe that all people think that, but I believe some people probably do.
> Q.    But nobody has actually ever come up to you and said, I think you're a homosexual.
> A.    No, no, they haven't . . .
> Q.    In fact, nobody has ever gone up to any of your friends and said, we now think Mr. Wiley is a homosexual; that hasn't happened either, has it?
> A.    Not that I know of . . .
> . . .

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 13

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Q.    So you don't know of anyone anywhere that has said, I read that book and I now think that Phil Wiley is gay; nobody has ever said that, as far as you know?

A.    As far as I know, I don't think so . . .

Wiley Depo. at pp. 16-17

Wiley likewise is not aware of anyone who thinks that he failed to properly maintain his vessel, or wrongfully withheld pay from his crew:

Q.    Yeah.  Nobody has said to you that as a result of reading <u>The Last Run</u>, they think you've failed to maintain your boat, correct; nobody's told you that?

A.    Nobody's actually said that.  I've had people be kind of picky about certain things that ordinarily wouldn't be.

Q.    Do you know if they read the book before they got picky?

A.    I don't know.  I don't know.  I never - - It's kind of like - - I don't know.  That's - - just not sure.

Q.    And nobody has told you that they won't work for you because of the book; nobody has said that to you?

A.    No, not directly.

Q.    In fact, you haven't heard it from anybody else that somebody told them that they won't work for you because of the book?

A.    No. . .

. . .

Q.    You haven't heard anyone tell you or tell somebody else that as a result of reading the book they think you cheat crewman; you haven't heard anybody say that to you?

A.    I haven't - - I haven't - - I keep to myself pretty much anymore.  I don't - - I don't know.

Q.    But the answer is no, you haven't heard anybody say that?

A.    No.  I actually haven't.

Wiley Depo. at pp. 107-10.

Nor can Wiley point to any person who believes he fished black cod out of season:

Q.    . . . The question is, as far as you know, nobody believes that you fished illegally based on what's written in <u>The Last Run</u>?

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 14
ANC 88555v13 3960028-6

> A.     I don't know.  I haven't talked to people, and I don't know if
> they do or not.

Wiley Depo. at p. 132.  Given the complexity of the fishing regulations, and the fact that

boats are sometimes permitted to fish off-season for black cod, both Wiley and DeCapua

stated that they would probably have to review regulations to confirm that a boat could

not have legally fished for black cod during January 1998.  Id. at pp. 128-29; DeCapua

Depo. at pp. 197-98.  Wiley admits that he twice fished illegally during the early 1990s as

a result of misreading regulations.  Wiley Depo. at pp. 135-39.

C.     Pecuniary Effect of Statements in The Last Run.

Just as Wiley is unable to prove any harm to his reputation, so too is he unable to

demonstrate that The Last Run has caused him any pecuniary loss:

> Q.     Mr. Wiley, sitting here today, can you point to even a single
> item of economic loss that you think you've suffered as a
> result of The Last Run?
>     . . .
> THE WITNESS:     Loss, you mean a financial loss?
> BY MR. DAWSON:
> Q.     Yes.
> A.     Never thought about that.  Let me think about that.  Well, I
> don't know.  That's a tough one to answer.  I don't know.
> Very well could be, but I can't - - at this time I haven't drawn
> it up.

Wiley Depo. at p. 186.

Wiley sold his Individual Fishing Quota Shares ("IFQs") in 2002, two years prior

to publication of The Last Run, and is now essentially retired from the fishing business.

Wiley Depo. at p. 167.

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 15
ANC 88555v13 3960028-6

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

1        Q:     So you're basically getting out of the business of fishing on

2                your own - - I mean, fishing your own boat?

        A.     Yeah, I'm getting close to 70.  If I live much longer I would

3                like to be able to spend some time with people I like.

4    Wiley Depo. at p. 163.

5

6        Wiley's only remaining IFQ is a temporary permit that he works in partnership

7  with another vessel owner using that person's boat:

8        Q.     All right.  So you paid the house off with the proceeds of your

9                IFQs, and so the only permit you have now is the Chatham

                Strait permit?

10       A.     Yeah.  And it really isn't a permanent one . . .

     . . .

11       Q.     So you're basically out of the business?

12       A.     Basically except I got the Chatham permit that supplements

                me and it takes three or four days with a good boat to go over

13              there and get it.

        Q.     And you're fishing that with Mr. Esmeiler?

14       A.     That's what I plan to this year . . .

15   Wiley Depo. at pp. 167-69.  Wiley admits that he just "just go[es] along for the ride," and

16

17  that <u>The Last Run</u> has had no effect on his ability to partner with Mr. Esmeiler to work

18  his Chatham IFQ.  <u>Id</u>. at p. 162, 164.

19        After Wiley sold his IFQs, he began purchasing salmon and reselling it in the

20  Lower 48.  Wiley has since gotten out of that business as well, and admits that his

21

22  decision was not based on anything published in <u>The Last Run</u>.

23        Q.     Your decision to get out of the business of buying and selling

                product, that had nothing to do with <u>The Last Run</u>, did it?

24       A.     I don't think so . . .

25  Wiley Depo. at p. 171.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 16

ANC 88555v13 3960028-6

Wiley has had no positive income from his fishing operations since the year 2000, four years prior to publication of The Last Run in 2004.  Id. at p. 32.

III.    ARGUMENT

The law of defamation is concerned with harm to reputation and does not provide a remedy simply because someone objects to what is written about him or her.  Wiley must show that the defendants made a false statement of fact, with fault at least amounting to negligence, and that Wiley's reputation was injured as a result.  In addition, because none of the statements about Wiley are defamatory per se under Alaska law, Wiley must prove tangible economic loss, i.e., special damages, that flow directly from the publication of the false facts.  As shown below, Wiley's defamation claim fails because one or more of the required elements for a defamation claim is lacking with respect to each and every statement about him in the book.

Wiley's false light claim fails as a matter of law for the same reasons as does his defamation claim, and for the additional reason that Wiley cannot demonstrate that defendants acted with actual malice.  Lewan based The Last Run on detailed interviews with persons who were at the heart of the events portrayed in the book.  There is absolutely no evidence that the defendants entertained serious doubts about the truth of any of what they published.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 17
ANC 88555v13 3960028-6

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Lastly, because Wiley's claim for punitive damages requires a finding of actual malice, that claim fails as a matter of law even if Wiley's claims for defamation or false light should survive summary judgment.

A.    Wiley Cannot Establish All Required Elements of a Claim for Defamation.

A plaintiff bringing a claim for defamation bears the burden of proving:

> (1) a false and defamatory statement;
> (2) an unprivileged publication to a third party;
> (3) fault amounting at least to negligence on the part of the publisher; and
> (4) the existence of either "per se" actionability or special harm.

Briggs v. Newton, 984 P.2d 1113, 1120 (Alaska 1999).  The First Amendment imposes the additional requirement that allegedly defamatory statements be capable of being reasonably understood to convey actual facts about the plaintiff.  Sands v. Living Word Fellowship, 34 P.3d 955, 960 (Alaska 2001).  If a statement is purely the opinion of the speaker, and does not imply that the speaker is basing his or her opinion on undisclosed facts, then it is not actionable.  Kinzel v. Discovery Drilling, Inc., 93 P.3d 427, 440 (Alaska 2004).

"[B]ecause of the importance of free speech, summary judgment is the 'rule,' and not the exception, in defamation cases."  Guitar v. Westinghouse Electric Corporation, 396 F.Supp. 1042, 1053 (S.D.N.Y. 1975).  If authors or publishers faced the threat of lawsuit every time they published something to which a person objects, "the exercise of First Amendment rights could be seriously chilled because those who do not have the

money to litigate or merely wish to remain cautious and avoid litigation will employ self-censorship." <u>Michigan United Conservation Clubs v. CBS News</u>, 485 F.Supp. 893, 896 (W.D.Mich. 1980). For this reason, "courts must carefully scrutinize the pleadings and grant summary judgment in favor of the defamation defendant where appropriate." <u>Fornshill v. Ruddy</u>, 891 F. Supp. 1062, 1074 (D. Md.), <u>aff'd</u>, 89 F.2d 828 (4th Cir. 1996). As in the dozens of defamation cases in which summary judgment has been granted by courts within the Ninth Circuit,[2] summary adjudication is appropriate in the instant case.

    1.     <u>The Undisputed Facts Confirm That Most of the Statements at Issue are Substantially True.</u>

Truth is an absolute defense to any defamation claim. <u>Fairbanks Publishing Company v. Pitka</u>, 376 P.2d 190, 192-93 (Alaska 1962). To be considered true, a statement need not be accurate in all details. So long as "the gist, the sting, of the statement is substantially true, the defendant is not liable." <u>Nichols v. Moore</u>, 396 F.Supp.2d 783, 788 (E.D.Mich. 2005).

> If a false accusation cannot do any incremental harm to the plaintiff's deserved reputation because the truth if known would have demolished his reputation already, he has not been harmed *by the false accusation* and therefore has no remedy.

---

[2] Courts in this Circuit frequently grant and affirm summary judgment in defamation cases. <u>See</u> <u>e.g.</u>, <u>Knievel v. ESPN</u>, 393 F.3d 1068 (9th Cir. 2005) (affirming dismissal of defamation claim); <u>Flowers v. Carville</u>, 161 Fed.Appx 697 (9th Cir. 2005) (affirming summary judgment on defamation claim for failure to show actual malice); <u>D.A.R.E. America  v. Rolling Stone Magazine</u>, 101 F. Supp. 2d 1270 (C.D. Cal. 2000), <u>aff'd</u>, 270 F.3d 793 (9th Cir. 2001); <u>Dodds v. ABC, Inc.</u>, 145 F.3d 1053 (9th Cir. 1998); <u>Underwager v. Channel 9 Australia</u>, 69 F.3d 361 (9th Cir. 1995), and other cases.

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 19

ANC 88555v13 3960028-6

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Desnick v. American Broadcasting Companies, Inc., 44 F.3d 1345, 1350 (7th Cir. 1995)

(emphasis in original).  See Pitka, 376 P.2d at 192 n.8 ("[a] statement is substantially true

if its effect on the mind of the ordinary reader is no different than the effect which would

have been produced by the exact literal truth.").  Thus, it is incumbent upon Wiley to

demonstrate "that the published statements were more injurious than the truth."  Miles v.

Ramsey, 31 F.Supp.2d 869, 879 (D.Colo. 1998).

> a.     Wiley admits that several of the statements about him in the book do
> not convey any false facts.

Wiley concedes that several of the statements in The Last Run that mention him or

the Min E are substantially true.  In particular, Wiley admits that (1) the statements on

pages 45-46 that the Min E was performing poorly during early January 1998 are true; (2)

the conversations on pages 51 and 63 of The Last Run in which Doyle and DeCapua

discuss leaving Wiley to work on the La Conte do not convey any false facts; and (3)

DeCapua's gripes about "make-work" on page 132 of the book are not false.  Wiley

Depo. at pp. 21-26, 30-35.  Since Wiley does not contend that any of these statements are

false, they cannot give rise to a claim for defamation.  Briggs, 984 P.2d at 1120.

> b.     Wiley concedes that the "gist" or "sting" of the remark that Wiley
> required crew to fish on holidays is substantially true.

Wiley contends that page 46 of The Last Run makes him out to be a hard-hearted

skipper by falsely stating that one of his deckhands quit because Wiley was not letting his

crew off for the holidays.  Opposition to Motion to Dismiss (filed 8/19/2005) at p.40.

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 20
ANC 88555v13 3960028-6

Although Wiley denies that such an incident occurred, he admits that the negative connotations that this passage supposedly conveys are true. Wiley did fish on holidays when he was a commercial fisherman – as do most other fishermen when there is an opening – and the Min E did make a fishing trip on New Years Day of 1998. Wiley Depo. at pp. 21, 142. Wiley further admits that if someone wanted to work for him, he or she might well have to work on holidays. Wiley Depo. at p. 142. DeCapua echoed this sentiment, and stated that working on holidays is common in the fishing industry. DeCapua Depo. at p. 70. Consequently, nothing about the statement that Wiley made crew work on holidays could hurt his reputation, but even if it could, the "sting" of the statement is true and therefore is not actionable. Ramsey, 31 F.Supp.2d at 875.

> c.    The actual facts regarding the condition of the Min E are worse than what is portrayed in the book.

The Last Run recounts an incident that occurred sometime prior to 1998 in which DeCapua called Wiley's insurer in retaliation for Wiley's refusal to issue him a retro check. DeCapua is quoted as stating that he told Wiley's insurer that there were various problems with the Min E and that, following an inspection of the Min E, Wiley was sent a letter stating that his insurance would be cancelled unless repairs were made. DeCapua goes on to state that Wiley performed the repairs and they "set him back a bundle." TLR at p. 48. Since The Last Run portrays these events as having occurred prior to Doyle and DeCapua working on the La Conte, the book makes clear that any problems with Wiley's boat were repaired prior to 1998. Id. at 47.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

1
2
3
4
5
6
7
8
9

Wiley agrees that nothing in the book suggests that the Min E experienced problems after 1998, but nonetheless contends that this passage suggests that he operates an unsafe vessel. Wiley Depo. at pp. 61-62, 64. However, there is no evidence that anyone believes this as a result of reading the <u>The Last Run</u>: Wiley admits he cannot point to anyone, and DeCapua and Doyle each testified that neither they nor other crewman would hesitate to work aboard a ship simply because repairs were made over six years before. <u>Id</u>. at pp. 107-08; DeCapua Depo. at p. 63; Doyle Depo. at pp. 63-64.

10
11
12
13
14
15

The actual facts about Wiley's vessel are far more damaging than any suggestion that the Min E required repairs eight years ago. Wiley has been involved in two vessel accidents since 1998, running into an island in 1999, and hitting another vessel in 2004. Wiley Depo. at pp. 94-96. Wiley admits that he might have avoided the first accident had he complied with a 1996 recommendation that he install a watch alarm. <u>Id</u>. at 98-99.

16
17
18
19
20
21
22
23
24
25

In 2001, Wiley's insurer required a periodic survey of the Min E. That survey revealed several conditions that, in the opinion of the vessel surveyor, affected the seaworthiness of the vessel. <u>Id</u>. at pp. 66, 70-71, 73-75, 78-79 and Exh. 2 thereto at p. 6 of 7 (Bates No. 000032). Just as stated in the book, Wiley's insurer threatened to cancel his insurance if Wiley did not correct a list of conditions noted by the surveyor. <u>Id</u>. at p. 84 and Exhs. 4 & 6 thereto. One of these items was deemed sufficiently serious that Wiley's insurer forbade Wiley from taking the Min E outside of Sitka harbor until repairs were made. <u>Id</u>. at p. 85 and Exhs. 4 & 5 thereto.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 22

In contrast to <u>The Last Run</u>, which at most suggests that the Min E had some problems that were repaired over 8 years ago,[3] the actual facts are that the Min E has had serious safety problems within the last couple of years – the period of time most relevant to Wiley's reputation today, and of greatest concern to potential crew. Since the actual facts about Wiley's vessel are more injurious than any statements in <u>The Last Run</u>, the remarks about Wiley's vessel in the book are not actionable. <u>Desnick</u>, 44 F.3d at 1350 (no defamation claim if the actual facts are as injurious as the alleged falsehoods).

        d.    <u>Any references to Wiley being lazy or a "prick" are mere opinion</u>.

DeCapua is quoted on page 149 of <u>The Last Run</u> as saying that the Min E could have done just as well as the La Conte if Wiley had decided to "bust his ass," and that Wiley is a "lazy prick." Wiley denies that he is lazy or a "prick" but admits that these are simply matters of opinion. Wiley Depo. at p. 31. The courts agree, and have held that references to someone as being "lazy," "burnt out," or "resting on her laurels" are merely statements of opinion that cannot be reasonably understood as objectively provable statements of fact. As such, these statements cannot support a claim for defamation. <u>Lifton v. Board of Educ. of City of Chicago</u>, 318 F.Supp.2d 674, 679 (N.D.Ill. 2004). The same is true of a statement that someone is a "prick." No matter how pernicious, "[t]he law provides no redress for harsh name-calling." <u>Flowers v. Carville</u>, 310 F.3d

_____

[3] Wiley also had significant problems with his vessel in the years prior to 1998. Wiley concedes that he received warnings from the U.S. Coast Guard in 1994 for a variety of safety violations. Wiley Depo. at p. 101. A 1996 survey of his vessel likewise revealed safety issues that the surveyor concluded affected seaworthiness. Wiley depo. at pp. 72-74 and Exh. 2 thereto at p. 14

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

1118, 1127 (9th Cir. 2002). <u>See also</u> <u>Leidholdt v. LFP. Inc.</u>, 860 F.2d 890, 894 (9th Cir.

1988), <u>cert. denied</u>, 489 U.S. 1080 (1998) (terms "pus bloated walking sphincter,"

"wacko," "twisted," and "vengeful hysteria" as applied to plaintiff not actionable).

e.    <u>DeCapua's opinion that Wiley was purposely limiting the vessel's catches is not an actionable statement of fact.</u>

DeCapua is portrayed in <u>The Last Run</u> as having told Doyle in January 1998 that

he felt that Wiley was purposely choosing not to fish as long or as hard in retaliation for

DeCapua's phone call to his insurer. Wiley does not deny that the Min E obtained only

small catches during January 1998, and he further concedes that he "wasn't that hot on

going fishing," during this period. Wiley Depo. at pp. 25, 27, 34. In light of their past

retro pay dispute, DeCapua formed the belief that Wiley must be trying to get back at him

for calling Wiley's insurer by catching less fish. DeCapua Depo. at p. 40. The book

quotes Doyle as telling DeCapua that this made no sense, and that Wiley would be

shooting himself in the foot were he not trying to maximize the vessel's catches. <u>TLR</u> at

p. 48.

Viewed in the context in which they are presented, DeCapua's remarks are merely

his opinion of Wiley's actions, and as such are not actionable:

> A statement of opinion based on fully disclosed facts can be
> punished only if the stated facts are themselves false and
> demeaning . . . The rationale behind this rule is
> straightforward: When the facts underlying a statement of
> opinion are disclosed, readers will understand they are getting
> the author's interpretation of the facts presented . . . an
> opinion which is unfounded reveals its lack of merit when the

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 24

1
2
3

> opinion-holder discloses the factual basis for the idea; readers
> are free to accept or reject the author's opinion based on their
> own independent evaluation of the facts.

4    Standing Committee v. Yagman, 55 F.3d 1430, 1439 (9th Cir. 1995).  The Last Run

5    discloses, and Wiley does not deny, that Wiley and DeCapua had a dispute over retro

6    pay, that DeCapua called Wiley's insurer, that Wiley was not fishing aggressively during

7    January 1998, and that the Min E was making only small catches.  TLR at pp. 46-48.

8    DeCapua's opinion based on these facts was that Wiley must be trying to spite him.

9    Doyle reached a very different conclusion based on the same facts.  TLR at p. 48.  Since

10   DeCapua's opinion is based on facts that are disclosed in the book, these remarks cannot

11   form the basis of a claim for defamation.  Yagman, 55 F.3d at 1439.

12            f.      DeCapua's reference to Wiley as a cocksucker is not actionable.

13            Shortly after this case was filed, the Defendants moved to dismiss Wiley's

14   defamation claim on the pleadings, arguing that the passage in which DeCapua calls

15   Wiley a "cocksucker" was not capable of defamatory meaning because it could not be

16   construed to convey actual facts about Wiley.  Although the Court denied that motion, it

17   specifically stated that a fuller development of the factual record might support summary

18   judgment.  Order (dated 9/15/2005) at p.2.  The factual record that has now developed

19   reveals no evidence that DeCapua's remarks are reasonably capable of being construed as

20   asserting that Wiley is homosexual.  Wiley cannot identify a singe person who now

21   believes he might be gay, and the only persons who Wiley claims interpreted

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

"cocksucker" to mean homosexual are Wiley and his girlfriend.  Wiley Depo. at pp. 16-17, 116-17.

Courts have repeatedly held that the term "cocksucker" is merely an abusive term that cannot be construed as a literal statement that someone performs fellatio.  Grillo v. John Alden Life Insurance Co., 939 F.Supp. 685, 688 (D.Minn. 1996) (alleged description of plaintiff as "a 'cocksucker' with a 'two inch dick,' although uncomplimentary, does not suggest verifiably false facts about plaintiff"); Bebo v. DeLander, 632 N.W.2d 732, 739 (Minn.App. 2001) ("[t]he first two statements, 'a--hole' and 'c---sucker' are pure vulgarity and have no basis in fact"); Crawford v. United Steel Workers, AFL-CIO, 335 S.E.2d 828, 839 (Va. 1985) ("[t]o call a person a 'cocksucker' does not, under the circumstances of this labor dispute, convey the false representation that the individual engaged in sodomy").  There is no evidence in this case from which a trier of fact could find that the statement in The Last Run was, or could be, understood any differently.  As such it is a mere statements of opinion, and is not actionable.  Flowers, 310 F.3d at 1127; Leidholdt, 860 F.2d at 894.

      2.      <u>There is No Basis for Finding that Lewan Violated the Applicable Standard of Care by Stating that Wiley Caught Black Cod in January 1998; or Publishing DeCapua's Account of the Retro Pay Dispute.</u>

The preceding argument dispatches of all but the following two statements about Wiley:  (1) the misidentification of the Min E's January 15, 1998 catch as black cod; and

**Davis Wright Tremaine LLP**

LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

(2) DeCapua's contention that Wiley once failed to pay him a retro check. With respect to these two statements, Wiley cannot prove the requisite level of fault.

For Wiley to state a claim for defamation he must prove not only that the statements in the book about him are false, but also that Lewan was at least negligent in making those false statements. Briggs, 984 P.2d at 1120. While the Defendants deny Wiley can meet his burden with respect to any statements in The Last Run, it is clear that Wiley fails to meet that burden with respect to the reference to Wiley having caught black cod, or the publication of the retro pay dispute.

    a.    <u>Lewan violated no duty of care by relying upon Doyle's identification of the Min E's catch as black cod</u>.

Chapter 7 of The Last Run indicates that the Min E returned to port with 1,000 pounds of black cod at the conclusion of the January 15, 1998 fishing trip. TLR at p. 48. Wiley claims that he in fact caught rockfish, and that this incorrect reference to fish species paints him as a criminal who fished black cod out of season. However, Wiley admits the book gives no indication that Wiley was committing a criminal act, nor does Wiley know of anyone who believes he fished illegally. Wiley Depo. at pp. 125, 132.

Although the Defendants deny that The Last Run portrays Wiley as having committed a criminal act, such a statement would be a matter of public concern: "The commission of a crime . . . [is] without question [an] event of legitimate concern to the public . . ." Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 492 (1975). Accordingly, Wiley cannot recover for defamation based on such a statement unless he shows actual

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

malice:   "We further protect the free exchange of ideas by applying the actual malice

standard to publications on issues of public interest and concern, even if the defamation

plaintiff is not a public figure."  Mt. Juneau Enterpr. v. Juneau Empire, 891 P.2d 829, 837

(Alaska 1995).  As discussed more fully in Section B below, the actual malice test is a

subjective one and requires proof that the defendant "in fact entertained serious doubts as

to the truth of his publication."  Id., at 838.

There is no evidence to suggest that Defendants entertained serious doubts as to

the truth of the statement that Wiley caught black cod in January 1998.  At most, Lewan

made a mistake, and "[a] mistake is clearly insufficient to support a finding of actual

malice."  Medure v. The Vindicator Printing Co., 273 F.Supp.2d 588, 598 (W.D.Penn.

2002).

Furthermore, even if the statement is not a matter of public concern, and even if

negligence is the applicable standard of care, there is no basis from which a court could

conclude that Lewan was negligent.  Lewan's reference to black cod is based on

information provided by Doyle.  Doyle described the Min E as a "black cod boat" during

interviews with Lewan.  Doyle Depo. at p. 92.  Lewan's notes indicate, consistent with

his recollection, that Doyle told him that the Min E caught 1,000 pounds of black cod on

the later of the two January 1998 fishing trips.  Lewan Decl. at para. 14 and Exh. F

thereto at p.2.  Doyle acknowledges that Lewan took copious notes during their

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

1  interviews, and agrees that it was possible that he mistakenly told Lewan that the catch

2  was black cod.  Doyle Depo. at pp. 93-94.

3       Wiley agrees that a person such as Lewan, who is not a fisherman, would have no

4  reason to know that catching black cod in January of 1998 might be illegal.  Wiley Depo.

5  at p. 124.  Indeed, DeCapua stated that it is difficult even for commercial fishermen to

6  make sense of fishing regulations.  DeCapua Depo. at pp. 69-70.  Wiley himself admits to

7  having inadvertently fished illegally on two occasions in the early 1990s because he was

8  unaware that his actions were illegal.  Id. pp. 135-39.  Lewan relied upon information

9  provided by a commercial fisherman who was on board the Min E at the time of the catch

10 for his statement that the Min E caught black cod.  Lewan cannot be deemed negligent

11 for having failed to research fishing regulations from eight years ago to confirm

12 information he had no reason to believe was false.

13       b.     There is no basis for finding that Lewan was negligent in
                publishing DeCapua's account of the retro pay dispute.

14       Lewan likewise cannot be deemed negligent for his presentation of the retro pay

15 dispute between Wiley and DeCapua.  The account of the retro dispute between Wiley

16 and DeCapua that appears in The Last Run is taken from an interview that Lewan

17 conducted with DeCapua in 1999.  DeCapua Depo. at pp. 46-48 and Exh. 14 thereto at pp

18 23-24 (Bates No. 3788).  In November 2003, Lewan called Wiley to cross-check the

19 story against Wiley's recollection.  Wiley does not deny that he told Lewan that he only

20 vaguely remembered a dispute with DeCapua but could not recall any details:

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 29
ANC 88555v13 3960028-6

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Q.    Do you remember him asking you about the DeCapua incident, though?

A.    Not really.  I don't –

Q.    Do you remember telling Mr. Lewan that you didn't remember the details of that incident?

A.    Probably.  If he asked me about it, it would probably be that -- I've had time to think about it, and to call me first thing in the morning like that, you know, after something that happened ten years ago or eight years ago, whenever it was he called me, it's hard to recall everything like that right away, for me anyway.

Q.    But it's possible that you told him at that time that you didn't recall the details?

A.    I'm sure I did.  I wouldn't have tried to – I'm not that, I don't wake up in the morning bright and shiny.

. . .

Q.    What time of the morning do you think Mr. Lewan called you?

A.    I don't think it was -- you know, it was like 9:00 . . .

Wiley Depo. at pp. 42-43.  Inasmuch as Wiley concedes there was a retro pay dispute, and that he did not provide any facts to contradict DeCapua's account of the incident, Lewan cannot be deemed to have violated any duty of care in publishing that story.

3.    None of the Statements About Wiley Are Defamatory Per Se, and Wiley Can Prove No Special Damages.

Even if Wiley could prove that the passages in the book that mention him contain false statements of fact, <u>and</u> that Lewan violated the applicable standard of care, Wiley still could not state a claim for defamation unless he can show that the statements at issue are defamatory per se, or that he has sustained special damages.  <u>Briggs</u>, 984 P.2d at 1120.  Wiley can do neither, and this is an absolute bar to his claim for defamation.  <u>None</u> of the statements about Wiley are defamatory per se under Alaska law, and Wiley admits

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 30
ANC 88555v13 3960028-6

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

that he cannot identify any special damages.  This is a further and independently sufficient basis for granting summary judgment against Wiley on his entire defamation claim.

a.    <u>None of the statements at issue are defamatory per se</u>.

To be actionable without proof of special damages, a statement must fall into one of a handful of narrow categories that are of such an inherently damaging nature that harm to reputation can be presumed.  The types of statements that are defamatory per se are those that charge the plaintiff with a serious crime, suggest that the plaintiff has a loathsome disease, accuse the plaintiff of misconduct in his or her profession, or charge the plaintiff with serious sexual misconduct.  <u>Alaska Statebank v. Fairco</u>, 674 P.2d 288, 295 (Alaska 1983); <u>French v. Jadon</u>, 911 P.2d 20, 32 (Alaska 1996); <u>Pope v. Chronicle Pub. Co.</u>, 95 F.3d 607, 613 (7th Cir. 1996) (describing the four categories of per se statements).  "Defamation per se has been narrowly construed, and . . . per se classifications and presumed damages are not favored."  <u>Keohane v. Wilkerson</u>, 859 P.2d 291, 301 (Colo.App. 1993).

Alaska courts have followed the trend towards limiting defamation per se, and have imposed an additional requirement that, to be considered defamatory per se, a statement must be unambiguous and susceptible of only a defamatory meaning:

> For a publication to be libelous per se the words used must be so unambiguous as to be reasonably susceptible of only one interpretation – that is, one which has a natural tendency to injure another's reputation.

<u>Pitka</u>, 376 P.2d at 194.  If the language used is capable of two interpretations, one of which is not defamatory, then the statement is not defamatory per se.  <u>Id</u>.  <u>See also</u> 50 Am Jur 2d Libel & Slander §138 (2nd Ed. 1995) ("in some jurisdictions a publication that falls into a category of defamation per se will not be held defamatory per se if it is reasonably capable of an innocent interpretation or if it is susceptible of two interpretations, one defamatory and one not").

> i.    <u>The Reference to Wiley as a "cocksucker" is not defamatory per se</u>.

Wiley contends that <u>The Last Run</u> can be read to suggest that he is a homosexual. This passage in question is an exchange in which DeCapua calls Wiley a "cocksucker" in relation to the retro pay dispute, and chides Doyle for getting along with Wiley by asking if he is giving Wiley "something special in his rack." <u>TLR</u> at pp. 46-47.  Regardless of whether such statements are capable of defamatory meaning (which defendants deny), they are certainly not defamatory per se, because they are obviously capable of being interpreted in a non-defamatory manner.

Even if a person could construe the term "cocksucker" literally to mean a homosexual, use of the term is more likely to be construed as synonymous with "jerk," or mere invective.  DeCapua Depo. at pp. 77, 207-08; Doyle Depo. at pp. 80-81.  Even Wiley admits that the passage at issue is open to this interpretation:

> Defendants negligently constructed false and defamatory dialog
> calling Plaintiff a cocksucker, <u>indicating or inferring that Plaintiff is</u>

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 32
ANC 88555v13 3960028-6

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

<u>either</u> homosexual or performs homosexual acts, <u>or is a despicable, contemptible person</u> . . .

Second Amended Complaint at para. 39 (emphasis added).  Use of the term "cocksucker" to refer to Wiley as a despicable, contemptible person is not defamatory because it is merely a statement of opinion.  <u>See</u> <u>Flowers</u>, 310 F.3d at 1127 ("[t]he law provides no redress for harsh name-calling"); <u>Knievel</u> 393 F.3d 1068 ("never too old to pimp" not actionable statement of fact); <u>Grillo v. John Alden Life Insurance Co.</u>, 939 F.Supp. 685, 688 (D.Minn. 1996) ("alleged description of [plaintiff] as a 'cocksucker' with a 'two inch dick,' although uncomplimentary, does not suggest verifiably false facts about plaintiff").  Since the passage at issue can be construed in a matter that is not defamatory, it will not support a claim of defamation per se under Alaska law.  <u>Pitka</u>, 376 P.2d at 194.

Furthermore, even if <u>The Last Run</u> clearly and directly accused Wiley of being a homosexual, such a statement would still not be defamatory per se:

> What has not changed in the case law is the conclusion that the category defamation per se should be reserved for statements linking an individual to the category of persons deserving of social approbation like a thief, murderer, prostitute, etc.  To suggest that homosexuals should be put into this classification is nothing short of outrageous.

<u>Albright v. Morton</u>, 321 F.Supp.2d 130, 136 (D.Mass. 2004).  <u>See</u> <u>also</u> <u>Miles v. National Enquirer, Inc.</u>, 38 F.Supp.2d 1226, 1229 (D.Colo. 1999) (accusing person of being gay not defamatory per se).  Having just made a strong statement of support for the rights of homosexual public employees in <u>Alaska Civil Liberties Union v. State</u>, 122 P.3d 781

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 33
ANC 88555v13 3960028-6

(Alaska 2005), the Alaska Supreme Court would undoubtedly agree that allegations of

homosexuality are not defamatory per se.

ii.    <u>Allegations that Wiley once improperly withheld retro pay are not defamatory per se</u>.

Wiley contends that DeCapua's statements that Wiley withheld retro pay and was

forced to make repairs to his vessel are defamatory per se because they tend to harm him

in the conduct of his profession.  Opposition to Motion to Dismiss (filed 8/19/2005) at p.

12.  These arguments fail because Wiley has retired, and because DeCapua's remarks

allege, at most, a single instance of misconduct.

False statements that harm the plaintiff in the conduct of his or her profession

may, under certain circumstances, be deemed defamatory per se.  That is not the case,

however, if the plaintiff is no longer engaged in the relevant occupation.  <u>Baum v.</u>

<u>Gillman</u>, 667 P.2d 41, 43 (Utah 1983) (no defamation per se where plaintiff no longer

engaged in relevant business); <u>Computerized Thermal v. Bloomberg, L.P.</u>, 312 F.3d

1292, 1298 (10th Cir. 2002) (citing <u>Baum</u>, 667 P.2d at 43) ("statements must damage

plaintiff in a current business endeavor or pursuit").  Wiley sold his IFQs in 2002, long

before publication of <u>The Last Run</u>, and is now retired from the fishing business.  Wiley

Depo. at 163, 167-69.  Wiley's current activities are limited to partnering with another

vessel captain 3 or 4 days a year to work a temporary black cod IFQ.  Wiley admits that

he "just go[es] along for the ride" on his partner's vessel, and that <u>The Last Run</u> has no

effect on this arrangement.  <u>Id</u>. at 162, 164.  Since Wiley no longer works as the captain

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

1  of a commercial fishing vessel, statements that he contends might harm him in the

2  conduct of that profession are not defamatory per se.[4]

3

4      Furthermore, even if Wiley were still actively working as a vessel captain,

5  DeCapua's suggestion that Wiley withheld retro pay would not be defamatory per se

6  because it alleges only a single instance of misconduct:

7
          A statement imputing a single mistake or act of misconduct . . . in
8        the conduct of a business or profession is actionable under the rule
          stated in this Section only if the act fairly implies an habitual course
9        of similar conduct, or the want of the qualities or skill that the public
          is reasonable entitled to expect of persons engaged in such a calling.
10

11  Restatement (Second) of Torts, § 573 cmt. d.  <u>The Last Run</u> mentions a single dispute

12  involving a $300 retro check.  <u>TLR</u> at 47.  Since DeCapua does not state that Wiley

13  withheld pay on other occasions, references to this incident are not defamatory per se.  <u>Id</u>.

14

15      iii.    <u>The supposed implication that Wiley fished illegally is not</u>
                <u>defamatory per se</u>.

16

17      <u>The Last Run</u> states that the Min E sailed from Sitka harbor on January 15, 1998

18  to fish Chatham Strait, and returned with 1,000 pounds of black cod.  <u>TLR</u> at 48.  Wiley

19  contends he was fishing for rockfish in January 1998, and that Chatham Strait would

20  have been closed to black cod fishing during that month. Wiley concedes he is not aware

21  of anyone who believes he fished illegally, and he further admits there is nothing in <u>The</u>

22

23

24  _____

25  [4]  Any suggestion that these statements could harm Wiley if he decides to reenter the fishing business at
   some future date will not support a claim for relief. "Statements which may only be injurious to some
   future happening do not give rise to a cause of action for per se or per quod defamation." <u>Baum</u>, 667 P.2d
   at 43.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

1  _Last Run_ to suggest that the characters in the book believed Wiley was fishing illegally.

2  Wiley Depo. at pp. 125, 132.

3

4      Unlike murder or larceny, there is nothing inherently illegal or immoral about

5  fishing for black cod.  On the contrary, black cod are an important commercial fish, and

6  Wiley has certainly caught black cod.  Wiley Depo. at 168.  Wiley's complaint is that

7  The Last Run has Wiley fishing for black cod at a time when that species would not have

8  been in season.  However, the Alaska Department of Fish and Game sometimes permits

9

10  certain boats to catch black cod during the off-season to gauge fish stocks.  DeCapua

11  Depo. at p. 68.  Such a fishery was permitted during January of 2004.  Exh. 33 to Doyle

12  Depo.  Wiley admits, and DeCapua agrees, that even an experienced fisherman would

13  have to review regulations from eight years ago in order to say for certain that fishing

14

15  black cod was not permitted during January 1998.  Wiley Depo. at p. 128; DeCapua

16  Depo. at p. 67, 70, 197-98.

17      To be defamatory per se, a statement must "on its face and without extrinsic

18  proof, . . . [be] unmistakably recognized as injurious . . ."  Ramsey v. Fox News Network,

19  L.L.C., 351 F.Supp.2d 1145, 1150 (D.Colo. 2005).  The book does not say anything to

20  suggest that it was illegal for Wiley to fish for black cod in January 1998.  Before a

21  reader could determine if such fishing were permitted or not, he or she would not only

22  need to review the fishing regulations for that year, but would also need to know if Fish

23  and Game had authorized an off-season fishery.  Inasmuch as extrinsic evidence would

24

25

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 36

ANC 88555v13 3960028-6

be required to determine if it was in fact illegal to catch black cod during January 1998, the misidentification of the Min E's catch as black cod is not defamatory per se.

### b.    Wiley can identify no special damages he has suffered.

Since none of the statements about Wiley are actionable per se under Alaska law, Wiley must plead and prove special damages in order to bring a claim for defamation. Briggs, 984 P.2d at 1120.  Wiley admits, however, that he can identify no economic loss of any nature that he has suffered as a result of publication of the book.  Thus, even if Wiley could establish the other elements of a claim for defamation – that the book contains false statements of fact, that those statements are of a type that could injure his reputation, and that Lewan violated the applicable standard of care in publishing the false statements of fact – his claim for defamation would still fail.

Special damages "consist of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation, not the effects of the defamation."  Idema v. Wager, 120 F.Supp.2d 361, 368 (S.D.N.Y. 2000).  To meet his burden, Wiley must identify specific financial losses he has suffered and demonstrate that they occurred as a direct result of publication of The Last Run:

> Special damages must be pleaded to put the other party on notice of specific sums claimed . . . Special damages must be specifically claimed and described if recovery for them is to be allowed.

Alaska Statebank v. Fairco, 674 P.2d 288, 294 n.10 (Alaska 1983).  "Round figures or a general allegation of a dollar amount as to special damages do not suffice."  Idema, 120

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8ᵗʰ Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

F.Supp.2d at 368.  For instance, when "loss of business is claimed, the persons who ceased to be customers must be named and the losses itemized." Id.

Wiley admits that he can identify no economic loss that flows from publication of The Last Run, and really "do[es]n't know" if he has suffered any financial harm.  Wiley Depo. at p. 186.  The simple fact is that the book has never even come up in a conversation that Wiley has had with anyone other than his girlfriend or attorney. Id. at pp. 18-19.  Wiley concedes that the book has no impact upon his ability to partner with Mr. Esmeiler to work his sole remaining black cod permit.  Wiley Depo. at p. 164.  Wiley likewise admits that the book had no bearing on his decision to get out of the business of buying and selling salmon. Id. at p. 171.  Since Wiley cannot prove that he has suffered any special damages, much less identify "specific sums claimed," his defamation claim fails as a matter of law. Briggs, 984 P.2d at 1120; Fairco, 674 P.2d at 294 n.10.

B.    Wiley's Claim for False Light Invasion of Privacy Fails as a Matter of Law.

Wiley's claim for false light invasion of privacy is merely a restatement of his defamation claim and fails for all of the same reasons discussed above.  In addition, a false light plaintiff must prove that the Defendant published false statements with actual malice even if the plaintiff is not a public figure and the publication does not concern a matter of public importance.  There is no basis for concluding that Lewan acted with actual malice – reckless disregard for the truth or falsity of the published information – with respect to any statements about Wiley that appear in the book.

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 38
ANC 88555v13 3960028-6

To the extent that the false light tort is recognized in Alaska, the contours of that claim are established by the Restatement (Second) of Torts § 652E, which states:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if:
>
> (a)    the false light in which the other was placed would be highly offensive to a reasonable person; and
>
> (b)    the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Luedtke v. Nabors Alaska Drilling, Inc., 768 P.2d 1123, 1126 (Alaska 1989).  Actual malice on the part of the defendants is a required element of any false light claim. Restatement (Second) of Torts § 652E; Colbert v. World Pub. Co., 747 P.2d 286, 290-92 (Okl. 1987) (noting that the Restatement requirement of actual malice in false light cases prevents claims for negligently hurt feelings).

Apart from the additional requirements that the alleged false light be highly offensive, and that the plaintiff prove actual malice in all cases, a false light claim is "in substance equivalent to a libel claim."  Solano v. Playgirl, Inc., 292 F.3d 1078, 1083 n.2. (9th Cir. 2002).  As with a claim for defamation, "an action for false light invasion of privacy cannot survive when the publication or statement sued upon cannot be reasonably viewed as a factual claim . . ." Stien v. Marriott Ownership Resorts, Inc., 944 P.2d 374, 380 (Utah.App. 1997) (false light claim failed where video tape could not reasonably be construed as a factual commentary on plaintiff's sex life).  A plaintiff bringing a false

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

light claim must also plead and prove special damages for any claim that is based on

remarks that would not be defamatory per se.  <u>Fogel v. Forbes, Inc.</u>, 500 F.Supp. 1081,

1088 (E.D.Penn. 1980) (false light claim failed due to lack of special damages).

        1.     <u>Wiley's False Light Claim Fails Insofar as it is Based on any Statements that are True</u>.

As set forth above with respect to Wiley's defamation claim, Wiley admits that a

number of the statements about him in <u>The Last Run</u> convey no false facts, or he admits

facts that confirm the gist or sting of the allegedly defamatory remarks.  <u>See</u> Section

III(A)(1), supra.  That being the case, Wiley's false light claim fails insofar as it is based

on any of these statements because the light in which Wiley claims to have been

portrayed was not false.  <u>See Stien</u>, 944 P.2d at 380 (false light claim fails unless

statements at issue convey false facts).

        2.     <u>None of the Statements in the Book are Defamatory Per Se and Wiley Cannot Prove Special Damages</u>.

Special damages must be pleaded and proved in any false light claim that is based

on statements that are not defamatory per se.  <u>Fogel</u>, 500 F.Supp. at 1088.  None of the

statements regarding Wiley in <u>The Last Run</u> qualify as defamatory per se for the reasons

set forth above.  <u>See</u> Section III(A)(3), supra.  Since Wiley cannot identify any special

damages that he has suffered as a result of publication of <u>The Last Run</u>, his false light

claim fails as a matter of law.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

3.    <u>Wiley Cannot Demonstrate Actual Malice</u>.

The requirement that a false light plaintiff prove actual malice prevents the false light tort from degenerating into a cause of action for "negligently injure[d] . . . feelings." <u>Colbert</u>, 747 P.2d at 292; Restatement (Second) of Torts § 652E (false light plaintiff must prove actual malice in all cases). Measured against the standards established by the Alaska Supreme Court, there is no evidence, let alone clear and convincing evidence, from which a trier of fact could find actual malice in this case.

To demonstrate actual malice, the plaintiff must "prove by clear and convincing evidence that the declarant acted with knowledge of the statement's falsity or in reckless disregard of the statement's truth or falsity." <u>Moffatt v. Brown</u>, 751 P.2d 939, 941 (Alaska 1988) (applying actual malice standard in defamation case). The actual malice test is a subjective one and requires proof that the defendant "himself entertained serious doubts as to the truth of the statements." <u>Id</u>. at p. 944.

> The defendant's testimony that he published the statement in good faith should be sufficient to counter a claim of actual malice when (1) the plaintiff has failed to present conflicting evidence, and (2) the circumstances do not indicate that the statement was fabricated by the defendant, the product of his imagination, based wholly on an unverified anonymous telephone call or so inherently improbable that only a reckless man would have put them in circulation.

<u>Id</u>. at p.946 (reversing denial of summary judgment due to failure to prove actual malice). In the context of a motion for summary judgment, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

finding either that the plaintiff has shown actual malice by clear and convincing evidence

or that the plaintiff has not." <u>Jenkins v. KYW, a Div. of Group W, Westinghouse</u>

<u>Broadcasting & Cable, Inc.</u>, 829 F.2d 403, 407 (3rd Cir. 1987).

There is absolutely no evidence, let alone clear and convincing evidence, that the

Defendants entertained serious doubts regarding the truth of any of the statements about

Wiley.  Lewan—who researched and wrote the book—affirmatively declares he had no

such doubts.  Lewan Decl. at para. 20.  The statements in <u>The Last Run</u> are all based on

Lewan's interviews with DeCapua and Doyle, and are taken essentially verbatim from

Lewan's interview notes.  <u>See</u> Lewan Decl. at paras. 6-19 and Exhs. A-H thereto.  Doyle

recalls that Lewan took "copious notes," and would "often ask, let me get this straight …

did I get this right."  Doyle Depo. at pp. 36-37.  Doyle and DeCapua both confirmed that

they did the best to tell the truth, and neither of them could say that Lewan's notes did not

accurately reflect in most all respects what they gold Lewan.  Doyle Depo. at 37-38, 62-

77; DeCapua Depo. at 32, 34-48 and Exh. 14 thereto.  In other words, Wiley was

portrayed just as he was described by those who worked with him.  Lewan Decl. at paras.

6-19.  Even if there were inaccuracies in what Doyle and DeCapua told Lewan, there is

no evidence to suggest that Defendants had any subjective doubts as to truth of what they

were told.  There being no evidence of actual malice, Wiley's false light claim fails as a

matter of law.

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 42

**Davis Wright Tremaine LLP**
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

C.    Punitive Damages Are Not Available on Any of Wiley's Claims Because He Cannot Demonstrate Actual Malice.

Even if Wiley could establish the required elements of a claim for defamation or false light, which he cannot, Wiley would not be entitled to recover punitive damages. Under Alaska law, "actual malice must exist before punitive damages may be awarded." Pitka, 376 P.2d at 195. For the reasons set forth above in the discussion of Wiley's false light claim, there is no evidence from which a trier of fact could conclude that Defendants entertained serious doubts about the truth of any of the statements in The Last Run.

IV.    CONCLUSION

In sum, Wiley's defamation claim fails for the reason that he cannot satisfy the requirements of such a claim, including the requirement that he demonstrate special damages. His claim for false light fails for these same reasons and for the further reason that Wiley cannot demonstrate actual malice. And because he cannot demonstrate actual malice, his claim for punitive damages fails even if his claims for defamation or false light should survive summary judgment.

For the foregoing reasons, the Defendants respectfully request that their motion for summary judgment be granted.

Dated this ___7th___ day of June, 2006

DAVIS WRIGHT TREMAINE LLP
Attorneys for Defendants

By:___s/ Jon S. Dawson_____
        Jon S. Dawson, ABA # 8406022
        Eric J. Jenkins, ABA# 0011078
        701 W. 8th Ave., Suite 800
        Anchorage, AK  99501
        Phone: (907) 257-5300
        Fax: (907) 257-5399
        jondawson@dwt.com
        ericjenkins@dwt.com

Certificate of Service:

I certify that on June 7th, 2006, a true and correct copy
of the foregoing Motion for Summary Judgment Against Plaintiff
Phillip Wiley was served electronically on:

Michael Hough
3733 Ben Walters Lane #2
Homer, Alaska  99603

    s/ Janet Eastman_____
Janet Eastman

MOTION FOR SUMMARY JUDGMENT AGAINST PHILLIP WILEY - 44
ANC 88555v13 3960028-6