Jon S. Dawson
Eric J. Jenkins
Davis Wright Tremaine LLP
701 W. 8th Avenue, Suite 800
Anchorage, Alaska 99501
(907) 257-5300

Attorneys for HarperCollins Publishers, L.L.C.
  and Todd Lewan

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| PHILLIP WILEY,<br><br>            Plaintiff,<br><br>vs.<br><br>HARPER COLLINS PUBLISHERS, INC.<br>and TODD LEWAN,<br><br>            Defendants. | Case No. 3:05 - cv - 00118 (TMB) |

NOTICE OF FILING EXCERPTS OF THE DEPOSITION
OF ROBERT DOYLE

Attached hereto are true and correct copies of excerpts from the deposition of Robert Doyle, taken on April 22, 2006.

Dated this __7th__ day of June, 2006

                                      DAVIS WRIGHT TREMAINE LLP
                                      Attorneys for Defendants

By:   s/ Jon S. Dawson
       Jon S. Dawson, ABA # 8406022
       Eric J. Jenkins, ABA# 0011078
       701 W. 8th Ave., Suite 800
       Anchorage, AK 99501
       Phone: (907) 257-5300
       Fax: (907) 257-5399
       jondawson@dwt.com
       ericjenkins@dwt.com

Certificate of Service:

I certify that on June 7, 2006, a true and correct copy of the foregoing Notice of Filing Deposition Excerpts was served electronically on:

Michael Hough
3733 Ben Walters Lane #2
Homer, Alaska 99603

__s/ Janet Eastman__
Janet Eastman

NOTICE OF FILING EXCERPTS OF THE DEPOSITION OF
ROBERT DOYLE - 2

ANC 89233v1 3960028-6

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ALASKA

 3              Case No. 3:05-CV-00118 (TMB)

 4


 5    * * * * * * * * * * * * * * * *
                                     *
 6   PHILLIP WILEY                   *
                  Plaintiff          *
 7       vs.                         *
                                     *
 8   HARPER COLLINS PUBLISHERS, INC.,*
     and TODD LEWAN                  *
 9                Defendants         *
     * * * * * * * * * * * * * * * *

10

11

12

13   VIDEOTAPE DEPOSITION of ROBERT DOYLE,

14   Deposition taken at The Holiday Inn,

15   2280 Brown Avenue, Manchester, New Hampshire,

16   on Saturday, April 22, 2006, commencing

17   at 9:33 a.m.

18

19

20
     ATKINSON-BAKER, INC.
21   COURT REPORTERS
     1-800-288-3376
22   www.depo.com

23   FILE NO.:  A002FE7

24   Court Reporter:
     Pamela Carle, CCR, RPR
25   New Hampshire CCR No. 98
```

Page 1

**Atkinson-Baker, Inc. Court Reporters**                                    **1-800-288-3376**

**Page 34**

A. I saw the -- the Playboy edition, I read that. And Todd sent me a book at some point, I don't recall when, shortly after it was out. But I was in school at the time, busy working, and I read -- when I did read it, I believe it was shortly after my daughter was born. I always go to -- actually, our part, water part.

Q. So you believe you read the book shortly after it was sent to you by Todd?

A. I read the last portion of it. I always go to the -- I have, like in Spike Walker's, I went to the -- the water portion.

MR. HOUGH: Can I step out just for a second, back in the minute?

MR. DAWSON: Sure. Off the record.

THE VIDEOGRAPHER: Off the record at 10:20.

(Recess taken.)

THE VIDEOGRAPHER: The time is 10:28. We're back on the record.

BY MR. DAWSON:

Q. At what point did you read the entire book?

A. Oh, sometime in early November. Before Thanksgiving.

**Page 35**

Q. You said before that you had read what you called the last portion, the water portion, I think is the term you used?

A. Yes, the -- the being in the water portion.

Q. And you read that shortly after you had received the book from Todd?

A. Yes.

Q. Was the first time you read the portions dealing with Mr. Wiley, the first part of the book, was that in Thanksgiving -- around this Thanksgiving period, or was it before that?

A. Around that time frame.

Q. Is it possible that you read that before then?

A. I may have, but I skimmed through so much of it, because it just wasn't of much interest to me, other than the -- the water portion.

Q. Okay.

A. I know I had read a little bit of the beginning, and especially entranced about how they found out -- the state had found the identity of Mr. Hanlon, Dave, and that was so intriguing.

Q. And did you read that part shortly after you received the book from Mr. Lewan?

**Page 36**

A. I believe so. I'm not sure. I believe I got a book from Todd. I know I ended up going to the store for one or two more.

Q. When did you go to the store for one or two more?

A. Oh, after the holidays.

Q. Would that have been after Christmas of 2004?

A. I'd say, yes. But I remember thinking how, in skimming through, that I wasn't real pleased with the portions about myself.

Q. Who were you going to give the copies to?

A. Just to have them. I believe my mother was up, and I -- she read it.

Q. Did you end up giving those copies, either of them, to anybody?

A. I don't believe so, no. No.

Q. When Todd was conducting in-person interviews with you, did he record the interviews on some sort of recording device?

A. I believe so, yes, each time. Over the phone, I don't know. Yes, he had a tape almost every time. I don't recall in the car that he ever taped, but I know he took copious notes.

**Page 37**

Q. And he was taking notes even while he was recording?

A. I believe so. I don't recall. He did often ask, let me get this straight, and he'd ask as a -- did I get this right.

Q. And then -- and he would take some further note about that?

A. I -- I assume. I think so.

Q. Do you know if he was -- in the car was he driving or were you driving?

A. He was driving.

Q. Do you remember if he was trying to take notes in the car?

A. I don't think so.

Q. Aside from possibly your interviews in the car -- was there more than one -- more than one such interview where you were in a car?

A. I think two.

Q. Two.

A. One we went out through Cambridgeport area, then we went in to Twin Falls and took some pictures there. I recall two. Whether it was the same day, I don't think so.

Q. Do you know whether at breaks and the like during these car rides whether he would take

**Page 38**

1  notes?
2  A.  I think he had a little notepad much
3  like he has now. I'm not sure.
4      MR. DAWSON: And if I can borrow that.
5  Q.  For the record and the videotape, Todd
6  was using a notepad similar to the one I'm showing
7  you now?
8  A.  I don't recall for sure, but, yes, I
9  think so. Maybe a little smaller.
10 Q.  Maybe a little smaller? And he was
11 taking notes even on those occasions where he was
12 taping? Strike that. He was taking notes even on
13 occasions when he was recording your conversation?
14 A.  I believe so.
15 Q.  Do you know what kind of recording
16 device he was using?
17 A.  It was a small tape machine, small
18 tape-recorder.
19 Q.  And in answering Mr. Lewan's questions,
20 you tried to be as truthful as possible, did you
21 not?
22 A.  Yes. He was gracious enough to stop
23 when I'd get overwhelmed emotionally on several
24 occasions, and he'd also say, I know this is hard,
25 but I'd like to ask about these things.

**Page 39**

1      And I believe I answered as well as I
2  could. I don't think I ever said I can't do it
3  anymore other than once at the most, I just didn't
4  want to talk anymore.
5  Q.  Did you talk with Mr. Lewan after you
6  had read the book?
7  A.  Yes.
8  Q.  When was that?
9  A.  In particular? I believe the only time
10 was this last fall. I --
11 Q.  That was this -- that is the fall of
12 2005?
13 A.  Yes.
14 Q.  You didn't talk with him about the
15 book --
16 A.  Prior to it coming out?
17 Q.  No. Let me finish, I'm sorry.
18 A.  Okay. Go ahead.
19 Q.  Did you talk with him about the book
20 after it was published but prior to fall of 2005?
21 A.  Yes.
22 Q.  And when was that?
23 A.  I think the book came out in August
24 2004. I don't recall.
25 Q.  You just recall it was after the book

**Page 40**

1  came out?
2  A.  Right. In regards to -- we talked
3  to -- he said there was -- the publishers in
4  New York wanted me to get together at some point,
5  he wasn't sure when, maybe Boston, maybe New York,
6  for publicity. And I at one point did a radio
7  program with a firm in Seattle.
8  Q.  And by that time had you read the book?
9  A.  Not fully, no.
10 Q.  You were willing to give a radio
11 program about a book that you had not read?
12 A.  He was getting a -- giving an interview
13 about my experiences in the water. He was doing
14 the interview about the book.
15 Q.  What parts of the book had you read at
16 that time?
17 A.  Portions of the back part. Probably
18 the beginning of the -- of the book.
19 Q.  Had you read the portions dealing with
20 Mr. Wiley?
21 A.  I don't think so. If I did, I skimmed
22 through them. But I remember thinking -- well,
23 I'll let you bring that up when you do.
24 Q.  Since you brought it up, I have to ask.
25 So you remember thinking what?

**Page 41**

1  A.  In Spike Walker's book they said -- he
2  said Bob Doyle had spent time on this boat, whose
3  boat and captain will remain unnamed. For whatever
4  reasons, I don't know.
5  Q.  But you remember when you read --
6  A.  There was a little more expansive.
7  Q.  That is that Mr. Lewan's book was more
8  expansive?
9  A.  Yes.
10 Q.  Concerning?
11 A.  That employment with Mr. Wiley. And
12 time frames were wrong.
13 Q.  And that you did notice prior to the
14 radio program that you did in Seattle?
15 A.  I -- I'd have to say yes. I don't
16 recall.
17 Q.  But you believe that's the case?
18 Sitting here today, that's your best recollection?
19 A.  Yes, I'd have to say so. I remember
20 thinking that any input I would have would be
21 concerning the -- the water itself, the survival
22 aspect of it.
23 Q.  It's correct that you didn't complain
24 to Mr. Lewan about any inaccuracies in
25 The Last Run prior to your discussion with him in

```
 1    we got 300 pounds.  We were back in like the next
 2    day.
 3        Q.    My question is whether you have any
 4    reason to believe that this is different than what
 5    you told Mr. Lewan?
 6        A.    I would say no.
 7            MR. DAWSON:  Let's go off the record
 8    while I prepare another exhibit.
 9            THE VIDEOGRAPHER:  Going off the record
10    at 10:51.
11            (Off the record.)
12            THE VIDEOGRAPHER:  Back on the record
13    at 10:53.
14            MR. DAWSON:  Would you mark that,
15    please.
16            (Doyle Exhibit No. 31 was marked for
17            identification.)
18    BY MR. DAWSON:
19        Q.    Mr. Doyle, showing you what's been
20    marked for identification as deposition
21    Exhibit 31, I'll represent to you that this is
22    Mr. Lewan's transcript of one of the conversations
23    that he had with you, and I'd like you to look at
24    the section that I've marked that begins with,
25    "and how did it feel pulling up all of these
```
Page 46

```
 1    fish," and which ends with, "if Phil had ever
 2    gotten off his ass."  Just let me know when you've
 3    read that.
 4        A.    That's correct.
 5        Q.    And that is an accurate reflection of
 6    what you told Mr. Lewan, is it not?
 7        A.    That is my accurate recollection of
 8    what Mike DeCapua said to me that I had relayed to
 9    Todd Lewan.
10        Q.    I understand.
11        A.    Yes.
12        Q.    Just to make sure I understand your
13    answer, what you're saying is that part of what
14    you said there is you reciting to Mr. Lewan your
15    recollection of what Mr. DeCapua had told you?
16        A.    Yes.
17        Q.    But the section that I've indicated is
18    an accurate reflection of your words to Mr. Lewan,
19    correct?
20        A.    I would say yes.
21        Q.    And it's also true that you told
22    Mr. Lewan that -- this is DeCapua speaking -- that
23    you told Mr. Lewan that Mr. DeCapua said, we could
24    have caught this much fish, even more, if Phil had
25    worked his ass a little.  That prick, someone
```
Page 47

```
 1    ought to catch fish anytime he goes out; good
 2    rockfishermen do that.
 3        Q.    Did you tell Mr. Lewan that
 4    Mr. DeCapua said that?
 5        A.    I believe I did, yes.
 6        Q.    Do you believe you said that?
 7        A.    I believe I could have said that, yes.
 8    Putting myself in Mike DeCapua's head for the
 9    benefit of talking to Todd, yes.
10        Q.    Well, weren't you actually telling Todd
11    what Mr. DeCapua said to you?
12        A.    Could be.  Yes.  In the same vein.
13        Q.    And in your interviews with Mr. Lewan,
14    did you tell him that although you had a good time
15    on the Min E, you just didn't catch fish?
16        A.    That's correct.  Not enough to support
17    my family.
18        Q.    Do you remember telling Mr. Lewan that
19    Wiley, Mr. Wiley, would not go out in more than a
20    ten knot wind because he didn't want to and did
21    not have to?
22        A.    I would say that's correct, that I told
23    him that.  Whether that is correct or not, I don't
24    believe either way.
25        Q.    But you do believe you told Mr. Lewan
```
Page 48

```
 1    that?
 2        A.    I believe I told him that.  I mean,
 3    it's hard for me to say that I didn't say it, since
 4    I already said it.
 5        Q.    I understand.
 6        A.    You know what I'm saying.
 7        Q.    Yes.
 8        A.    I mean, I wouldn't disagree with that,
 9    no.
10        Q.    Do you remember telling Mr. Hough's
11    investigator that Mr. Wiley could be gruff?
12        A.    Yes.
13        Q.    Do you remember telling the
14    investigator that Mr. Wiley could sometimes have
15    harsh words for folks?
16        A.    Yes.
17        Q.    And that is, in fact, true of
18    Mr. Wiley, isn't it?
19        A.    In regards of what I said to the
20    investigator, yes.
21        Q.    But it is true, in fact, that Mr. Wiley
22    could be gruff?
23        A.    To me.  Yes.
24        Q.    And that he did have occasional harsh
25    words for you?
```
Page 49

**Page 50**

 1  A.  Yes. For my safety.
 2  Q.  Isn't it true that you told Mr. Lewan
 3  that DeCapua wanted to get off the Min E because
 4  he didn't like the skipper very much?
 5  A.  He didn't like him to begin with.
 6  Q.  Okay. That is DeCapua didn't like the
 7  skipper to begin with?
 8  A.  Correct. I was on long before that.
 9  Q.  You were on the Min E before that?
10  A.  Correct. Yup. Long before Mike even
11  showed up.
12  Q.  Do you remember telling Mr. Lewan,
13  quote, can you see Phil's face when we tell him --
14  strike that.
15      At some point you told Mr. Lewan that
16  Mike DeCapua and you had made the decision to
17  leave the Min E, correct?
18  A.  Yes.
19  Q.  And do you remember telling Mr. Lewan
20  in connection with that that DeCapua said, quote,
21  can you see Phil's face when we tell him,
22  cocksucker will be all pissed, fuck him, fuck
23  that, owes me money, unquote.
24  A.  I can hear Mike saying that, yes.
25  Q.  Do you remember telling Mr. Lewan that

**Page 51**

 1  Mike said that?
 2  A.  I would have to say yes, at this point.
 3  Q.  Is it likely that you told that to
 4  Mr. Lewan?
 5  A.  Yes. In Mike's vernacular.
 6  Q.  Understood. That was, in fact, the way
 7  Mike spoke a great deal of the time?
 8  A.  Yes.
 9  Q.  Do you also -- do you remember telling
10  Mr. Lewan, quote, imagine the look on Phil's face
11  when he hears we're gone, cocksucker, shithead,
12  that's how he talked, you know, unquote. Do you
13  remember telling Mr. Lewan that?
14  A.  About DeCapua's conversation.
15  Q.  Yes. You told Mr. Lewan that that's
16  what DeCapua said?
17  A.  Yes. I would say yes.
18  Q.  Again, describing what you told
19  Mr. Lewan about what Mr. DeCapua said -- not what
20  you said personally, but you're relaying what
21  Mr. DeCapua said -- did you tell Mr. Lewan that
22  Mike said, Phil this and that, fucker, bastard
23  this, cocksucker that. He likes to complain a
24  lot, always complaining.
25      Do you remember telling Mr. Lewan that?

**Page 52**

 1  A.  That DeCapua had complained a lot?
 2  Q.  Yes.
 3  A.  Yes.
 4  Q.  And that he said Phil this and that,
 5  fucker, bastard this, cocksucker that?
 6  A.  Yes. I'd have to say yes.
 7  Q.  And you told Mr. Lewan, you'd say,
 8  Mike, shut up already. Do you remember telling
 9  Mr. Lewan that?
10  A.  Many times. Not that I told Lewan many
11  times, but Mike many times.
12  Q.  Yes. Now, did you leave a note for the
13  skipper when you left the Min E?
14  A.  I did.
15  Q.  And did you indicate to Mr. Lewan
16  that -- to use your words -- that pissed him off,
17  that is pissed Mr. Wiley off?
18  A.  It wasn't intended to piss him off, it
19  was intended to thank him for the opportunity, but
20  I had to provide for my family.
21  Q.  I understand.
22  A.  Yes.
23  Q.  And notwithstanding that, Mr. Lewan,
24  you understood, was -- excuse me, not Mr. Lewan --
25  Mr. Wiley was, though, pissed off?

**Page 53**

 1  A.  I never saw Mr. Wiley other than once
 2  after that as he was driving down the street, and
 3  we waved, so.
 4  Q.  Well, didn't you tell the investigator
 5  that when you saw Mr. Wiley after leaving the
 6  Min E, you smiled at him and he didn't even smile
 7  back at you?
 8  A.  One time, yup.
 9  Q.  And didn't you tell the investigator
10  that he was very upset that you had left the ship?
11  A.  I had heard that he was upset. He
12  never indicated to me that he was upset other
13  than -- I believe he had waved, I don't recall.
14  Q.  So you're not sure if he waved?
15  A.  That's correct.
16  Q.  But you did tell the investigator he
17  didn't even smile?
18  A.  He wasn't a smiling man.
19  Q.  And you did tell the investigator that
20  Mr. Wiley was very upset that you'd left the boat?
21  A.  Yes, I would assume he was.
22  Q.  And that's what you told Mr. Lewan.
23  You told Mr. Lewan that the skipper was pissed
24  off?
25  A.  Yes.

**Page 62**

1  vessel in the years prior to you coming on board
2  the boat?
3      MR. HOUGH: And the vessel is --
4      MR. DAWSON: The Min E. The Min E.
5   A.  Regarding the Min E?
6   Q.  Did he talk about any significant work
7  he had done on the Min E prior to the time you
8  came on board?
9   A.  Oh, he was really proud as we worked in
10  the engine room about the cleanliness in there.
11   Q.  Did he discuss with you any stability
12  work that he had done on the vessel?
13   A.  I can't recall that in specific.
14  General overall safety and cleanliness, and those
15  are the general things I can remember him being
16  specific about.
17   Q.  So you don't remember any conversations
18  about any more significant work that he did on the
19  vessel?
20   A.  I don't recall that.
21   Q.  Now, was your Coast Guard career
22  largely at sea or largely office space?
23   A.  I'd say 12 years at sea.
24   Q.  And how much time did you spend
25  commercial fishing?

**Page 63**

1   A.  A little over a year.
2   Q.  Would the fact that somebody had had to
3  make a repair to a boat, say, six or seven years
4  previous, would that fact make you less likely to
5  go fish with a particular captain?
6      Let me rephrase that. If you knew that
7  a captain had done work on his boat six or seven
8  years ago, would that have any impact on whether
9  you would go fish with that captain today?
10   A.  No. Unless it was someone that I had
11  known that he had purposely, you know -- no.
12   Q.  When you say purposely -- unless it was
13  somebody who had purposely sabotaged his boat?
14   A.  Correct, for ill gain or whatever. No.
15   Q.  Like insurance fraud?
16   A.  Yeah.
17   Q.  When you read The Last Run, you didn't
18  read it to suggest that the Min E is currently in
19  need of repairs, did you?
20   A.  No.
21   Q.  That is I'm correct, it doesn't suggest
22  that it is currently in need of repairs, that's
23  correct?
24   A.  As a crew member?
25   Q.  As a reader.

**Page 64**

1   A.  As a reader?
2   Q.  Yeah. When you read it, did you think
3  it suggested that the Min E is currently in need
4  of repairs?
5      MR. HOUGH: Currently as of?
6      MR. DAWSON: As of when he read it.
7   A.  I would say, no. Not in need of
8  repairs. It's a double-edged sword there.
9   Q.  When you were aboard the Min E, how was
10  the bait shed attached to the aft deck, do you
11  remember?
12   A.  The bait shed was -- wasn't any shed,
13  per se. I mean, there was -- on the transom we had
14  our staging area where we'd run the gear out.
15  There wasn't a shed, per se.
16   Q.  So there was no bait shed?
17   A.  On the Min E?
18   Q.  Uh-hum.
19   A.  There was none. We baited on deck.
20   Q.  Was there any kind of a shed on the aft
21  deck?
22   A.  No.
23   Q.  This would have been January of '98?
24   A.  The Min E, yes.
25   Q.  Correct.

**Page 65**

1   A.  Uh-hum. There was a holding rack for
2  the life raft above the working area and above the
3  hatch.
4   Q.  Do you ever remember if the life raft
5  had the name of the vessel on it -- excuse me --
6  yeah, you said life raft, correct?
7   A.  Yes.
8   Q.  Do you remember if the life raft had
9  the name of the vessel on it?
10   A.  I don't recall. I know I went topside
11  there and almost knocked the EPIRB off and Phil was
12  pretty adamant about that, not to run it -- knock
13  into it in port, which I knew quite well.
14   Q.  Because he didn't want to set it off?
15   A.  Obviously. It's a fine.
16   Q.  When you were aboard the Min E, did you
17  notice whether the port or starboard running
18  lights were in need of repair?
19   A.  Did not notice.
20   Q.  Did not notice? What about the anchor
21  light?
22   A.  Did not notice.
23   Q.  Do you know if the fire alarm sensor
24  above the galley range was working?
25   A.  I do not recall.

**Page 66**

 1  Q.  Do you recall if the Min E had a life
 2  ring?
 3  A.  Yes, I think one both port and
 4  starboard.
 5  Q.  Do you remember if they were labeled
 6  with the name of the vessel?
 7  A.  I believe so. At least the port side
 8  one, I just have that coming to mind.
 9  Q.  Now, the 2001 survey that was done on
10  the vessel indicated that one of the life rings
11  was not labeled with the name of the vessel, but
12  you believe that when you were on board in '98
13  that it was?
14  A.  I believe so. And, again, I'm just
15  seeing it in my mind's eye, so it could be
16  suggestive.
17  Q.  And of course we're now eight years
18  later, aren't we?
19  A.  Certainly.
20  Q.  So it's possible that you could be
21  mistaken in that regard?
22  A.  About anything.
23  Q.  Do you remember if there was a --
24  what's a Jabsco -- and it's spelled J-A-B-S-C-O --
25  what is a Jabsco auxiliary bilge pump for us

**Page 67**

 1  landlubbers?
 2  A.  I would imagine it would be a pump that
 3  you could put down into the bilges to pump them
 4  out.
 5  Q.  Did you notice whether it was missing a
 6  belt guard?
 7  A.  I don't recall.
 8  Q.  Did you see the bilge pumps?
 9  A.  I went down into the bilges with
10  Mr. Wiley.
11       MR. HOUGH: If I could just interject
12  an objection. There is several bilge pumps, and
13  Jabsco is distinct.
14       MR. DAWSON: That's a very fair
15  objection. And I apologize because I'm by no
16  means a seaman.
17  Q.  Would you know a Jabsco auxiliary bilge
18  pump if you saw one?
19  A.  Probably.
20  Q.  Do you happen to remember if there was
21  a belt guard missing from it?
22  A.  I don't recall.
23  Q.  Do you know if the Min E had an audible
24  fire alarm system?
25  A.  I don't recall.

**Page 68**

 1  Q.  Do you remember if the Min E's
 2  batteries were fixed -- excuse me, were fitted
 3  with boxes, covers or terminal protectors?
 4  A.  I believe they were.
 5  Q.  Do you remember whether they were
 6  secured against movement?
 7  A.  I think they were strapped down in
 8  the -- I believe they were, yes. And the only
 9  reason I say that is because I never recall,
10  fishing in heavy weather, some of it heavy, that
11  obviously they'd been running adrift rather
12  quickly.
13  Q.  They'd be moving?
14  A.  I would assume, yeah.
15  Q.  And you don't remember them moving?
16  A.  Not that we ever had to take care of,
17  no, or having them askance.
18  Q.  Do you remember a number of -- in the
19  engine room, do you remember a number of
20  non-insulated DC electrical wiring and some
21  unprotected circuits?
22  A.  In the Min E, I don't recall.
23  Q.  Would you have noticed if it was there
24  one way or the other? Were you looking at that
25  sort of stuff when you were aboard the Min E?

**Page 69**

 1  A.  No. I was down there in the engine
 2  room with Phil and we were changing the filters and
 3  it was very clean.
 4  Q.  But you might not necessarily have
 5  noticed the condition of the wiring?
 6  A.  I would say, unless it was obviously
 7  frayed, no.
 8  Q.  Since you had no contact with Mr. Wiley
 9  after you left the Min E and before your contact
10  in 2005 that you previously described, I assume
11  you don't know anything about a threat by
12  Mr. Wiley's insurer in 2001 to cancel his
13  insurance?
14  A.  I don't.
15  Q.  Okay.
16  A.  No.
17  Q.  And you probably don't know who
18  Mr. Wiley uses for a vessel surveyor these days?
19  A.  Negative. I do not.
20  Q.  Do you know who Mr. Wiley was using for
21  a vessel surveyor, a marine surveyor, at the time
22  you were on the boat?
23  A.  I do not. I'm assuming it would be
24  somebody local.
25  Q.  But sitting here today, you don't have

```
 1    A.   I would have to say if it's on the
 2  tape, yes.
 3    Q.   My question is rather whether you
 4  remember telling the investigator that?
 5    A.   I don't recall.
 6    Q.   But it's possible you told the
 7  investigator that?
 8    A.   Uh-hum.
 9    Q.   Yes?
10    A.   It is possible I said that to the
11  investigator.
12    Q.   Now, when you used the word cocksucker
13  in that context, it wasn't because you think
14  Mr. Lewan is gay, correct?
15    A.   I do not think Mr. Lewan is gay.
16    Q.   When you used that term, it's just the
17  equivalent of saying somebody's a jerk or an
18  asshole, is that fair?
19    A.   I'd say, yes.
20    Q.   And, in fact, that term is commonly
21  used among fisherman to express just that
22  sentiment; that somebody is a jerk or an asshole
23  or something of that nature?
24    A.   That -- that's a leading question. I
25  wouldn't -- wouldn't know. Which fisherman?
```
Page 78

```
 1    Q.   Well, my question was -- well, you were
 2  a fisherman for a year, yes?
 3    A.   Uh-hum.
 4    Q.   Is it fair to say that the fishermen
 5  around whom you spent time used that term?
 6    A.   Son of a bitch a lot, cocksucker,
 7  whichever.
 8    Q.   But they certainly used cocksucker from
 9  time to time?
10    A.   They could, yeah.
11    Q.   And they did?
12    A.   They obviously did there; Mike.
13    Q.   I'm sorry?
14    A.   Mike.
15    Q.   Mike did?
16    A.   Said that, yeah.
17    Q.   Did you hear it from other fishermen as
18  well?
19    A.   Couldn't guess.
20    Q.   You don't remember hearing any other
21  fisherman say the word cocksucker?
22    A.   Have you? Any lawyers?
23    Q.   The nice thing about depositions is I
24  get to ask the questions.
25    A.   I would be -- I would have to say it's
```
Page 79

```
 1  possible because they know that word. You know,
 2  it's hard to say.
 3    Q.   All right. You did hear Mr. DeCapua
 4  use that term?
 5    A.   I did, yes.
 6    Q.   And you certainly did not think -- when
 7  Mr. DeCapua used that term, you certainly did not
 8  think he meant homosexual by it?
 9    A.   Correct. Yes, correct.
10    Q.   And on occasion -- on the occasions
11  when -- on the occasions when Mr. Wiley used the
12  term cocksucker in reference to Mr. Wiley, he
13  certainly did not mean Mr. Wiley was gay?
14    A.   DeCapua for Wiley? You said Wiley for
15  Wiley.
16    Q.   Sorry.
17    A.   That's all right. I just --
18    Q.   I appreciate that. Let me rephrase so
19  I ask it correctly. You're right. I should make
20  sure my question is properly framed.
21         On those occasions when Mr. DeCapua
22  used the term cocksucker in reference to
23  Mr. Wiley, he did not mean that Mr. Wiley was gay?
24    A.   As far as -- I would say that's
25  correct. It would be like any form of, you know,
```
Page 80

```
 1  son of a bitch, prick, whichever.
 2    Q.   I understand.
 3    A.   Not specifically labeling him.
 4    Q.   Not labeling him as somebody who
 5  performs fellatio, either?
 6    A.   Correct.
 7    Q.   Do you remember describing for
 8  Mr. Lewan a conversation that you had between -- a
 9  conversation you had with Mr. DeCapua following
10  your -- I believe your first trip in January of
11  1998 where Mr. DeCapua said, what did you do, give
12  him something special in his bunk? Don't be an
13  ass-kisser. Do you remember describing --
14    A.   I don't recall that.
15    Q.   You don't recall describing that
16  conversation to Mr. Lewan?
17    A.   I don't recall.
18    Q.   Is it possible that you did describe
19  that -- did describe such a conversation to
20  Mr. Lewan?
21    A.   It's possible. I'd have to see the
22  tape.
23    Q.   You indicated that not everything
24  that -- not every interview you had with Mr. Lewan
25  is on tape, did you not?
```
Page 81

21 (Pages 78 to 81)

**Page 90**

1  A. I believe in Florida.
2  Q. Do you have an address or phone number?
3  A. I do not. I do not correspond or
4  anything.
5  Q. Do you know where in Florida?
6  A. I think Orlando. Most of her family
7  lived down there.
8  Q. When you were fishing aboard the
9  La Conte -- not the Min E, but the La Conte --
10 that was in January of 1998, also?
11 A. That was -- yes. I'd say around the
12 20th or so.
13 Q. And what were you catching when you
14 were fishing with the La Conte?
15 A. We went for rockfish, primarily.
16 Q. Did you catch cod as well?
17 A. I don't recall, no. I don't think we
18 did. Not that we kept, no. Lingcod, yes. Are we
19 talking specific cod?
20 Q. Well, thank you for the clarification.
21 A. Lingcod, yes. That was a by-catch,
22 marketable, as is Pacific cod, but not that we
23 kept, no.
24 Q. So you did keep some lingcod?
25 A. Yes.

**Page 91**

1  Q. But not Pacific cod?
2  A. Correct. To the best of my knowledge.
3  Because they wouldn't have -- they weren't as
4  prickly as anything else. I would remember that
5  specifically.
6  Q. So you could tell the difference --
7  A. Oh, yes.
8  Q. -- between lingcod --
9  A. Oh, yes.
10 Q. You have to let me finish.
11 A. I'm sorry.
12 Q. -- between a lingcod and a Pacific cod?
13 A. That's correct.
14 Q. I think you're probably one of the few
15 around the table besides Mike that could. And
16 what kind of gear were you fishing with the
17 La Conte?
18 A. Stuck gear.
19 Q. And that was longline?
20 A. Longlining gear.
21 Q. What's stuck gear?
22 A. You have ganions coming off with a set
23 of hooks, or the hook at the end. Ganion coming
24 off the main line, ground line, at whatever
25 intervals for whatever you're fishing for.

**Page 92**

1  Q. In your interviews with Todd, would you
2  have told him that you were catching rockfish and
3  lingcod?
4  A. Yes.
5  Q. And rockfish includes what species?
6  A. Oh, variations of rockfish. Yelloweye
7  primarily, was the species we were after.
8  Q. And yelloweye is sometimes known as red
9  snapper?
10 A. Correct.
11 Q. And what were you catching aboard the
12 Min E?
13 A. The same.
14 Q. The same.
15 A. That was the fishing opening for
16 rockfish.
17 Q. And, again, you might also have been
18 catching lingcod in the course of that?
19 A. Yes, right.
20     MR. DAWSON: Mark that as an exhibit.
21     (Doyle Exhibit No. 32 was marked for
22     identification.)
23 Q. Mr. Doyle, do you remember telling Todd
24 that the Min E was a black cod boat?
25 A. It was. Phil had quotas for black cod,

**Page 93**

1  yes.
2  Q. And I'll represent to you that these
3  are notes that Mr. Lewan took of one of his
4  interviews of you.
5  A. Okay.
6  Q. Page 2 of those notes, you'll see a
7  place where -- excuse me. You'll see a place
8  where it states -- you tell me if you think I'm
9  reading incorrectly, January 15, returned from
10 second trip, 1,000 pounds, B, slash, C, do you see
11 that?
12 A. It says B, slash, C, yes.
13 Q. Is it possible that you told Mr. Lewan
14 that when you returned from the second trip on
15 January 15 you caught a thousand pounds of black
16 cod?
17 A. No. It would have been lingcod.
18 Q. Do you think it's possible you may have
19 mistakenly said black cod?
20 A. As far as catching a thousand pounds?
21 We never caught -- I might have said it. I don't
22 believe I did.
23 Q. But you at least believe it's possible?
24 A. I believe he wrote it. I don't believe
25 I said it.

24 (Pages 90 to 93)

**Page 94**

1  Q. Well, when you were talking with
2  Mr. Lewan, you knew that he wouldn't know --
3  A. The difference between the two.
4  Q. Sure.
5  A. I would say so, since he wasn't a
6  fisherman.
7  Q. And it's fair to say that he took
8  copious notes?
9  A. Yes.
10 Q. Sitting here today, you don't actually
11 remember that specific conversation?
12 A. Correct. Yup. Because that would be
13 erroneous to tell him that we caught a thousand
14 pounds of black cod.
15 Q. But sitting here today you can't say
16 one way or another as to whether you made an error
17 or not?
18 A. I could not.
19 Q. I don't know if you are familiar with
20 this or not, so I'm just going to ask.
21 A. Okay.
22 Q. Are you aware that there is
23 occasionally an off-season fishery for black cod
24 that is permitted by the Alaska Department of Fish
25 and Game?

**Page 95**

1  MR. HOUGH: Objection, because it's not
2  an off-season fishery. It is an off-season
3  survey, it's not a fishery.
4  A. That I'm not aware of.
5  MR. DAWSON: Let's go off the record
6  momentarily.
7  THE VIDEOGRAPHER: Off the record at
8  1:12.
9  (Discussion off the record.)
10 MR. DAWSON: Can you mark that as an
11 exhibit?
12 (Doyle Exhibit No. 33 was marked for
13 identification.)
14 THE VIDEOGRAPHER: Back on the record
15 at 1:13.
16 BY MR. DAWSON:
17 Q. Mr. Doyle, handing you what's been
18 marked as Exhibit 33, which I will represent to
19 you is being a commercial fisheries news release
20 by ADF&G. Can you read the sentence that begins
21 with the Alaska department?
22 A. Yes. Sitka. The Alaska Department of
23 Fish and Game announced today that they're
24 requesting names of NSEI sablefish permit holders
25 that are interested in fishing for their 2004 equal

**Page 96**

1  quota share outside of the regular fishing season.
2  Q. And read the next sentence.
3  A. At the 2003 Board of Fisheries meeting,
4  the board adopted a regulation that would allow
5  sablefish to be taken outside of the established
6  season, parenthesis, August 15th through November
7  15th, end paren, in order to provide information on
8  stock condition and other research.
9  Q. Thank you.
10 A. Is that it?
11 Q. Thank you. When you say off fishery --
12 off-season fishery, I was referring to fishing
13 outside of the established season as described in
14 this news release.
15 Were you familiar with the fact that
16 there was fishing outside of the regular season as
17 indicated in this news release?
18 A. In 2004? 2003?
19 Q. Yeah, for whatever the news release --
20 A. No.
21 Q. All right. Do you know if the board
22 had authority to have such a fishery in prior
23 years as well?
24 A. I -- I am not aware of that.
25 Q. Okay.

**Page 97**

1  A. To the best of my knowledge, it was
2  October, I think, was the normal fishery.
3  Q. You're talking about the fishery for
4  black cod?
5  A. Correct.
6  Q. As the usual season?
7  A. That is -- that I felt was the usual
8  season.
9  Q. I understand. And you wouldn't know
10 whether fishing was permitted outside of the
11 regular season in 1998 without looking back at
12 regulations, correct?
13 A. That is correct.
14 Q. Do you know of anyone who thinks that
15 Mr. Wiley fishes illegally after having read
16 The Last Run?
17 A. I do not.
18 Q. Have you heard anybody say that they
19 know of anyone who thinks Mr. Wiley fishes
20 illegally as a result of having read The Last Run?
21 A. I do not. Personally, no. I do not.
22 Q. When you say personally, it suggests
23 maybe you've heard something.
24 A. No, no.
25 Q. All right.

# COMMERCIAL FISHERIES
# NEWS RELEASE
## ALASKA DEPARTMENT OF FISH & GAME

STATE OF ALASKA
Department of Fish and Game
Kevin Duffy Commissioner

Doug Mecum
Director

FOR IMMEDIATE RELEASE

Sitka Area Office
304 Lake Street, Room 103
Sitka, Alaska 99835

Contact: Tory O'Connell

Phone: (907) 747-6688 · Fax: (907) 747-6239

December 23, 2003

### NSEI (Chatham Strait) Sablefish Permit Holders requested to participate in Off-season Fishery beginning January 26

Sitka... The Alaska Department of Fish and Game announced today that they are requesting names of NSEI sablefish permit holders that are interested in fishing for their 2004 equal quota share outside of the regular fishing season. At the 2003 Board of Fisheries meeting the Board adopted a regulation that would allow sablefish to be taken outside of the established season (August 15 through November 15) in order to provide information on stock condition and other research (5AAC 28.110 (c)). The department is interested in having a number of vessels fish during the following periods:

- January 26-February 2 (period 1)
- April 11-April 18 (period 2)

The 2004 NSEI sablefish quota and equal quota share (EQS) will be announced prior to January 15th. Each permit holder interested in fishing during the January period will be advised of his/her specific EQS adjusted by the legal overage or underage incurred during the 2003 fishery. Catch in this off-season fishery will be limited to the adjusted equal quota share, not to exceed 5% of this amount. In order to qualify for this request to participate the following conditions must be met:

- 2004 NSEI sablefish CFEC permit card and vessel license must be purchased.
- The <u>skipper</u> must have participated in the NSEI sablefish fishery in the 2003 season and at least 2 previous years.
- The vessel and crew must be insured by the permit holder or the skipper.
- The vessel crew must have at least 2 years of experience longline sablefish.
- Permit holder must be onboard during fishing unless they have an emergency transfer. Valid CFEC emergency transfers of permits will be allowed if experience conditions are met.
- The vessel must meet safety standards outlined by the USCG and be available for vessel inspection. ADF&G reserves the right to reject a vessel if space and/or safety seem compromised.
- The vessel must be able to accommodate one AD&FG biologist and allow this biologist to sample the catch. This means that a portion of the catch will be dressed and a covered area must be available for the biologist for sampling.
- All fuel, gear, and bait will be provided by the permit holder. Bait must be high quality squid.

- Food for the vessel crew will be paid for by the contractor, ADF&G will pay for food for the biologist (no cost to the vessel for carrying a biologist).
- The skipper must provide detailed information on fishing effort, bycatch accounting, and number of hooks per skate set for each set made during the off-season fishery effort.
- The gear must have consistent hook spacing and hook size in each set (no mixed gear).

The primary purpose of this off-season fishery is to collect information regarding stock condition. Therefore the crew may need to facilitate sampling or gear count backs and make changes to their usual operations if requested by the biologist. If fish quality, catch rates, or weather are unacceptable, ADF&G and the permit holder may agree to cancel the off-season permit and the permit holder will be allowed to take the remaining portion of their EQS during the regular fishery period or submit their name for the April fishing period drawing. Fishermen are reminded that this off-season fishery has all the same regulations as the normal fishery except fishery dates. The fish will be landed on the permit holder's card. The permit holder is responsible for arranging for delivery of fish and may sell to any licensed processor in the Southeast District.

Permit holders interested in fishing in January should submit the form on the following page no later than 4:30 pm on January 9th, 2004 to the Sitka Fish and Game office. Drawings, if necessary, for the January period will be on Monday, January 12th. The response by permit holders and the number of department staff available for field work will determine the number of vessels drawn for the January off-season fishing period. Permits will then be issued to the vessels that are approved to fish during the first period and arrangements made for taking a biologist on the trip. No vessel may fish without a Commissioner's permit specific to this off-season fishery and an ADF&G biologist on board.

A second drawing will be conducted in February for the April fishing period.

*News releases can be found on our web site at* http://documents.cf1.adfg.state.ak.us/TopicContents.po.
*Phone numbers for the Southeast Area Offices are: Juneau 465-4250, Sitka 747-6688, Ketchikan 225-5195, Petersburg 772-3801, Wrangell 874-3822, Haines 766-2830, and Yakutat 784-3255.*
*For enforcement related questions or comments, contact Fish and Wildlife Protection at the following numbers: Ketchikan 225-5111, Petersburg 772-3983, Wrangell 874-3215, Sitka 747-3254, Juneau 465-4000, Haines 766-2533, Yakutat 784-3220.*



## REQUEST TO FISH OFF-SEASON IN THE NSEI SABLEFISH FISHERY 2004

Period 1: January 26-February 11, 2004

Permit holder:_____

Permit number:_____

Address:_____

Contact Phone number:_____

Vessel:_____

Vessel location:_____

Length:_____ Crew size:_____

Bunk Space:_____

Covered Deck area:_____

**Due no later than 4:30 p.m., January 9, 2004 at the Sitka for those permit holders interested in fishing during January fishing period.**