

Jon S. Dawson
Eric J. Jenkins
Davis Wright Tremaine LLP
701 W. 8th Avenue, Suite 800
Anchorage, Alaska  99501
(907) 257-5300

Attorneys for HarperCollins Publishers, L.L.C.
  and Todd Lewan

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| PHILLIP WILEY,<br><br>            Plaintiff,<br><br>vs.<br><br>HARPER COLLINS PUBLISHERS, INC. and TODD LEWAN,<br><br>            Defendants. | Case No. 3:05 - cv - 00118 (TMB) |

NOTICE OF FILING EXCERPTS OF THE DEPOSITION
OF PHILIP WILEY

Attached hereto are true and correct copies of excerpts from the deposition of Plaintiff Philip Wiley, taken on April 11, 2006.

Dated this __7th__ day of June, 2006

                    DAVIS WRIGHT TREMAINE LLP
                    Attorneys for Defendants

By:   s/ Jon S. Dawson
       Jon S. Dawson, ABA # 8406022
       Eric J. Jenkins, ABA# 0011078
       701 W. 8th Ave., Suite 800
       Anchorage, AK  99501
       Phone: (907) 257-5300
       Fax: (907) 257-5399
       jondawson@dwt.com
       ericjenkins@dwt.com

Certificate of Service:

I certify that on June 7, 2006, a true and correct copy of the foregoing Notice of Filing Deposition Excerpts was served electronically on:

Michael Hough
3733 Ben Walters Lane #2
Homer, Alaska  99603

  s/ Janet Eastman
Janet Eastman

NOTICE OF FILING EXCERPTS OF THE DEPOSITION OF
PHILIP WILEY - 2
ANC 89231v1 3960028-6

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3
 4   PHILIP WILEY,                            )
                                              )
 5            Plaintiff,                      )
                                              )
 6        vs.                                 )
                                              )
 7   HARPER COLLINS PUBLISHER, INC.,          )
     and TODD LEWAN,                          )
 8                                            )
              Defendants.                     )
 9   _____)
     Case No. 3:05-CV-00118 (TMB)
10
11
12
             VIDEOTAPED DEPOSITION OF PHILIP WILEY
13
                   Pages 1 - 206, inclusive
14
           Tuesday, April 11, 2006, 10:36 a.m.
15
                      Anchorage, Alaska
16
17
18
19
20
              Taken on behalf of the Defendants
21                             at
                      Davis Wright Tremaine
22          701 West Eighth Avenue, Suite 800
                      Anchorage, Alaska
23
24
25
```

Page 10

1 glanced here, but then they got these great big huge
2 pallets that hold these barrels in the truck, and the
3 pallet came out and really whacked me right here. Just was
4 a lot of birds. And it crushed the disk, and it took me a
5 long time to recover from that.
6     Q. And did litigation ensue from that, a lawsuit?
7     A. Yeah. It was -- there was no big lawsuit because
8 they had done away with third-party suits, so it was just
9 whatever the industrial board would pay, which I think at
10 that time was 24,000 something.
11    Q. So what we could call up here workers' comp took
12 care of it?
13    A. Yeah, workman's comp.
14    Q. And you've since recovered from that injury?
15    A. No, never have.
16    Q. No?
17    A. Just trying to live with it, is about the size of
18 it.
19    Q. What residual injury do you have from that?
20    A. It's a lot of headaches, a lot of pain in my --
21 up here at the base of my skull. It made my left eye --
22 it's been blurred ever -- ever since that happened. My ear
23 drum on the left side got busted. I don't know. There's
24 just a lot of little things that -- but the main thing is
25 this pain up here, you know. You know, it's not much fun.

Page 11

1     Q. I imagine not.
2        Do you have to take medication for the pain?
3     A. Yeah, I do. I do take some.
4     Q. Do you know what kind of medication?
5     A. Yeah. I take -- I have a sleep paralysis, and
6 it's -- you wake up, you can't move, and so I take
7 Amitriptyline, which seems to help that pretty much. And
8 number two would be Clorazepate, which is a
9 tranquilizer-type muscle relaxer. And number three is I
10 take maybe a half -- a half a codeine number three if I got
11 a bunch of work to do labor-wise. Knock the pain down.
12 Other than that, that's it.
13    Q. Are you able -- notwithstanding the pain, are you
14 able to function as you'd like?
15    A. Yeah. Well, no, not as I would like. No.
16 That's hard to explain everything that's happened, but
17 it's -- yeah, I don't -- it's getting worse now because I'm
18 getting older, and the after-effects, which they don't tell
19 you about, are the arthritis and all that setting in.
20        I keep going back to the doctors trying to find
21 out every so often if there's anything they can do, and so
22 far nothing. I went to the Mayo Clinic last year. So they
23 said there was nothing they could do at this time.
24    Q. What sort of things are you not able to do that
25 you would like to be able to do?

Page 12

1     A. Well, pain cuts down on your stamina. After a
2 while you wear out a lot quicker. And when I get it
3 irritated I get swelling, and the swelling, there's a bone
4 spur supposedly in the center of my spine, and then that
5 swells up. That bothers me as far as, you know, my recall
6 seems to be not so good when that gets swollen up bad.
7     Q. Your memory?
8     A. Yeah.
9     Q. Yeah. So this seems to have some effect on your
10 memory?
11    A. Right. It does. That's about all I can say
12 about it. It's just got increasingly worse over the years,
13 but it's nothing that's...
14    Q. And how old are you, sir?
15    A. 68.
16    Q. I'm going to go back later on in the deposition
17 and take care of some housekeeping matters just to get some
18 personal background on you, but I think it's better, while
19 you're fresh, I think I'm going to just launch into
20 the issues in the case and we'll take care of the
21 housekeeping a little bit later.
22    A. Okay.
23    Q. Before we get into details and documents and the
24 like, I'd like to hear from you a little bit about how you
25 believe the book has wronged you, and before I start that

Page 13

1 process, I want to know if you've actually read the whole
2 book.
3     A. I haven't read the whole book.
4     Q. Is it fair to say that you've only read the parts
5 that have been provided to you by your counsel?
6     A. Yeah, that's pretty much. Pretty much that's --
7 yeah.
8     Q. And those parts would be the parts that your
9 attorney felt were injurious to you, that hurt you?
10    A. Yes. If I go back to Vikki, she did read part of
11 that book to me in the beginning before I ever had any
12 talks with Mr. Hough. I discussed -- asked her what she
13 thought -- what she thought, and I don't know. It was
14 just -- wasn't a very long conversation.
15    Q. Do you remember how long it took her to read the
16 part to you that she read to you?
17    A. Wasn't a whole long -- she just read the more
18 important ones that she thought were.
19    Q. Was it like five minutes?
20    A. May -- probably something like that, five, ten
21 minutes' worth. Not a whole lot.
22    Q. So it would be fair to say, wouldn't it,
23 Mr. Wiley, that you don't really know how -- let's say
24 Mr. DeCapua -- you don't really know how Mr. DeCapua is
25 portrayed throughout the whole book because you haven't

Page 14

1  read the book, correct?
2      A.  Well, the parts that I read about him -- yeah, I
3  didn't read the whole book, so I can't say that everything
4  in there is not truthful, but I'm sure part of it is, but
5  not with me. I don't -- you know. Okay. I guess that's
6  just a yes.
7      Q.  Okay. What about the book do you think was
8  hurtful to you?
9      A.  Well, all the stuff that pertains to me: my
10  name, my boat's name, the way other people interpreted
11  about what it is about me, my grandchildren, my daughter,
12  all my family you get ahold of. It's -- it brings doubt in
13  everybody's mind. It creates doubt, and once you've done
14  that, people don't know.
15          And it upsets me very much. I read all kinds --
16  you know, I read a lot of things in there that aren't true
17  that DeCapua said. Yeah, it's very upsetting to me, and it
18  makes -- it creates a lot of problems. I just don't really
19  go anywhere much at all anymore. It ain't something you
20  can go walk up to somebody and ask them about, because
21  they're not going to tell you anyway. So I just pretty
22  much just dropped out of the scene. I'm usually at home if
23  I'm not doing something.
24      Q.  Let me ask you a couple more questions about
25  that.

Page 15

1          Give me something from the book that you
2  considered to be false about you.
3      A.  Well, it insinuates -- and that's the way I
4  interpreted it -- that I'm a homosexual, which really
5  bothers me very bad. It also states that I've cheated
6  people. It states that -- it just makes me look like a
7  low-life, a real bad person, and that's something I've
8  never ever tried to be. I've always tried to be just the
9  opposite of that. So I -- yeah, I read it and I get very
10  angry.
11      Q.  How does the book insinuate that you're a
12  homosexual?
13      A.  Oh, God, I don't know. I'm not good at reading a
14  book and -- it -- well, the first -- one thing that comes
15  to mind, he calls me what you would refer to as a
16  cocksucker, and yeah, he is. And it's -- I don't know how
17  to explain it, but just knowing those people and then
18  hearing these things, it's what they -- that's what they
19  would think, these men.
20      Q.  So -- I'm sorry. I didn't mean to interrupt.
21      A.  Yeah.
22      Q.  So the use of the term "cocksucker" you believe
23  insinuates that you're a homosexual?
24      A.  Yeah. It has a -- well, the way it's put in the
25  book. I don't remember how it's phrased. But it was

Page 16

1  enough that I -- you know, that's -- and you can tell
2  people -- a lot of people don't say anything. A lot of
3  people don't say hi anymore. A lot of people -- it's kind
4  of a scary thing. It really is.
5      Q.  So you believe people think you're a homosexual
6  now?
7      A.  I don't believe that all people think that, but I
8  believe some people probably do.
9      Q.  But nobody has actually ever come up to you and
10  said, I think you're a homosexual?
11      A.  No, no, they haven't. But I wouldn't think that
12  they would either. I don't see how they would. People
13  just don't do that unless they --
14      Q.  In fact, nobody has gone up to any of your
15  friends and said, we now think Mr. Wiley is a homosexual;
16  that hasn't happened either, has it?
17      A.  Not that I know of because I -- but I don't talk
18  to any -- I don't really have any friends to speak of in
19  Sitka, so I wouldn't get any feedback like that.
20      Q.  None of your friends anywhere have said, I hear
21  that you're a homosexual?
22      A.  The friends that I grew up with down in
23  Long Beach, California, I told them, but they don't take a
24  second thought of it because they know me. They've known
25  me my whole life.

Page 17

1      Q.  So you don't know of anyone anywhere that has
2  said, I read that book and I now think that Phil Wiley is
3  gay; nobody has ever said that, as far as you know?
4      A.  As far as I know, I don't think so. I'm sure
5  somebody has, but they ain't going to tell me about it.
6      Q.  You said the other thing you don't like about the
7  book is that it suggests that you have cheated people.
8          Who does it suggest that you cheated?
9      A.  Well, one reference is DeCapua.
10      Q.  Anyone else?
11      A.  I'm not sure on what -- how many people or
12  what -- I'm -- I don't remember that much about it. It's
13  something I try to shove out of my mind. And I just --
14      Q.  So you don't think about this a whole lot?
15      A.  I think about it, but I try to keep from thinking
16  about it, and so you have a tendency to shove things away.
17  When things that upset you and you can't sleep and it makes
18  you have -- get angry inside, it's not a healthy thing. So
19  I try to discipline myself as much as I can not to think
20  about it.
21      Q.  And I'm sure your friends have assured you that
22  nobody that knows you would think less of you because of
23  anything that is printed in the book; isn't that correct?
24      A.  No. Nobody's ever said anything to the sort like
25  that.

Page 18

1  Q. Nobody's assured you that they think just as
2  highly of you as they always have?
3  A. No.
4  Q. Do you think your friends think less of you
5  because of what was written in this book?
6  A. Very well could be.
7  Q. That wasn't my question.
8     Have any of your friends said, you know, Phil,
9  now that I've read this book, I think less of you?
10 A. Nobody has said that, no.
11 Q. Have any fishing captains said they think less of
12 you because of this book?
13 A. No, none has said it.
14 Q. Have any crew said they think less of you because
15 of this book?
16 A. No. I haven't talked with anybody about it.
17 Q. So it's safe to say you haven't talked with
18 anybody about this book?
19 A. No.
20    MR. HOUGH: Object.
21 BY MR. DAWSON:
22 Q. You can still answer the question.
23    Is that correct, you haven't talked with anybody
24 other than your attorney about this book?
25 A. Not really. Just -- what I told you at the first

Page 19

1  with Vikki, and that was it. Otherwise, I haven't
2  discussed it with anyone. I told a few people that
3  somebody might be contacting them.
4  Q. You said the other thing that you don't like
5  about the book was that it made you look like a low-life.
6     What about the book made you look like a
7  low-life?
8  A. As far as I said a while ago. Low-life, I mean,
9  I cheated people. That's not a very good person. That's a
10 dishonest person if you cheat people.
11 Q. So the cheating would suggest you're a
12 low-life --
13 A. Yeah.
14 Q. -- if it said you cheated people?
15 A. Sure.
16 Q. Is there anything else about the book that you
17 believe made you feel as though it cast you as a low-life?
18 A. I'm drawing blanks. I don't know. There's
19 enough there that it's -- upsets me. I can tell you that.
20 Q. Anything about the book that you feel injured you
21 besides -- you believe that it insinuated that you're a
22 homosexual, you believe that it says that you cheat people,
23 you believe it made you look like a low-life.
24    Is there anything else that you believe the book
25 does?

Page 20

1  A. It's got my name in there. It advertises it.
2  Q. And your view is that books should not be allowed
3  to use somebody's name?
4  A. That's right.
5  Q. I'm just curious, why do you believe that?
6  A. Well, because, then it becomes -- it says it's a
7  true story. Then everything -- it gets to my family, they
8  pick it up and read the book. It could -- what about my
9  descendants? What about my grandchildren when they get old
10 enough and they should happen -- what if some other kid
11 finds it and starts teasing them? There's a hundred
12 million things that could happen that I don't know of, but
13 it's in the back of my head that that could happen.
14 Q. As far as the use of your name, though, you
15 wouldn't have any objection to a book that used your name
16 in connection with what you think are true statements; that
17 wouldn't bother you, correct?
18 A. It depends on what it was about, and if it was
19 true statements. I -- I can't -- I can't speculate on that
20 because I don't know. That's something that I don't know.
21 Q. So your objection is that it uses your name in
22 connection with statements that you say are false?
23 A. Right.
24 Q. Any other ways in which the book harms you, that
25 you're aware of?

Page 21

1  A. That's all that I can think of, the ones I've
2  told you there, manly and...
3  Q. I'm going to give you some excerpts from the book
4  that your counsel has pointed to on occasion.
5     (Exhibit 1 marked)
6  Q. I'm handing you what's been marked as Exhibit 1.
7  And I'd like you to turn to page 45 of that exhibit. It's
8  book page 45, so it would be the second page of the exhibit
9  there. And I'd like you to read, if you would to yourself,
10 the first five lines of the last paragraph of that page,
11 and once you've had an opportunity to read that, if you
12 would just let me know.
13 A. I've read more than just the first. You mean
14 just the first five lines?
15 Q. Uh-huh, of that paragraph. That's correct.
16    I'd like you to tell me, sir, what facts, if any,
17 does that passage say about you, in your mind?
18 A. That's got the boat name, so that's the same as
19 saying me. And it's saying that I was getting a little
20 cranky, and this was something that started January 1st and
21 ended, I think, on the 8th of January, and there was only a
22 few days spent out there on the ocean. So we waited --
23 it's a derby and it opens -- they open it January 1st, and
24 if you -- if you're not there to get a spot, you don't
25 catch anything.

Page 22

So I was waiting for wanting to go fishing and hoping it was on the first. And I think we did go. We didn't do very well. There was a lot of dog fish. And we ran gear, so we didn't catch much because we caught more dog fish. I was talking with the guys -- or I heard on the radio that guys were halibut fishing this year and weren't able to get into the halibut because there was so many dog fish eating their gear up.

Q. So it is true that you were waiting for the weather to clear?

A. Right.

Q. It is true that you hadn't been pulling in much?

A. Well, we hadn't fished, you know. I mean, it depends on what you consider a lot. You know, you -- we pulled in over 2,000 pounds. We went and ran the gear and we got a bunch of dog fish. And I don't remember the exact catch on that. I know they got paid, and from the pay it sounded like we did fairly well.

Q. 2,000 pounds certainly would not make you a high-liner, would it?

A. No, it wouldn't, but you have to realize that you got three days to fish, and we didn't get to fish three days. And you have to realize, too, there was so many boats around us that I couldn't lay the gear where the fish were. So, I mean, there's a lot of reasons why, you know,

Page 23

you don't do good.

Q. Sure.

A. And it happens to every fisherman.

Q. I understand completely.

But that means that this statement, the gist of this statement that you've read, is basically true?

A. Yeah. I assume he's -- saying I'm cranky, and I wasn't cranky. I was at home and I would just come down and see -- let them know when we was going to go, and that was about it. I didn't...

Q. Is it possible that the person who is being referred to as cranky here is Mr. DeCapua?

A. Could be.

Q. In general, though, from what you said, the statement I had you just read is generally true?

A. Yeah, I -- I'll read it again.

MR. HOUGH: I object to the question unless it's tied to a time frame, a date. When the statement is made it's before they even fished.

THE WITNESS: Yeah. I don't -- I guess he's talking about himself, is what he's talking about, evil mood and that.

BY MR. DAWSON:

Q. As far as the references to you or your boat, is there anything in that statement that you think is false?

Page 24

A. I don't -- I don't think there is, you know. I can't say a hundred percent that there isn't because I don't have that good of remembering to pull back to some after all these years.

Q. And certainly there are times when fishermen don't do very well; that happens to everybody, doesn't it?

A. Yeah.

Q. Including you, correct?

A. Right, it does. It also has a lot of baring on how good a sea boat you have. If you got a real good sea boat, it doesn't matter. You can usually do very well. The only problem with that is if you're rockfishing that rough water will knock them off the hook, and when a rockfish is up to the surface, he's dead. So you've wasted resource.

Q. Do you have what would be considered a good sea boat? Is the Min E a good sea boat?

A. It's a good sea boat, but it's not what you call a republic, which is an all-halibut schooner that they fish throughout the whole gulf and go anywhere in the Gulf of Alaska and have no problems. They can fish in any type of weather, where I can't. I mean, I just can't -- I can't afford to do stupid things.

Q. I understand. And it would be true that there were times when DeCapua fished with you when the boat

Page 25

didn't do so well; that would be true on occasion too?

A. Sure.

Q. I'm going to have you turn to the next page of these excerpts in Exhibit 1. I'd like to have you look at -- I'll go ahead and mark with my pen what I'd like to have you review. I'd like to have you review the section that begins with the words "for two days they untangled snarls" and then ends with the words "they barely pulled 300 pounds."

A. Well, you know --

Q. Let me know when you've finished reading it first. I want you to take a look at it first.

A. Okay. I've read to where you've written here.

Q. Now, it's true that in fact, although this passage says you pulled barely 300 pounds, in fact the case is that you pulled barely 100 pounds on that particular trip; isn't that true?

A. If -- I don't know if that was on the record that I gave you or not on how much I pulled. I don't remember. It could be that it was only a hundred pounds. It could be it was only 300.

Q. Certainly, if the fish tickets show a hundred pounds, then you wouldn't have any reason to quarrel with that?

A. No.

Page 26

1   Q. Is there anything about the statement that you
2  read there that you consider to be false?
3   A. Well, of course, I don't know -- we was running
4  snap-on gear, as far as I know. Now, we -- they may have
5  baited up some of this -- a few skates of what we call
6  conventional gear, but I don't recall doing it. I usually
7  have always used snap-on gear, especially with people like
8  this Bob Doyle who'd never gone fishing before. But if
9  they had some snarls, it was because the snarls were
10 something that they done themself when they baited the
11 gear.
12  Q. Anything other than that that you think is false
13 about this passage?
14  A. Well, I don't allow anybody to work on my engine
15 except me, or there's a mechanic in Sitka, Buckland, that I
16 do, but other than that, nobody is in my engine room.
17  Q. Anything else that you consider to be false about
18 this statement?
19  A. I don't see anything false other than that.
20  Q. There's a statement in the book at some point --
21 I don't have it at my fingertips -- that suggested you went
22 out a second time in January and may have come back with
23 only a thousand pounds.
24     Do you recall whether it was about a thousand
25 pounds, was it between a thousand and two thousand? Do you

Page 27

1  happen to remember how much rockfish you got on that day?
2     MR. HOUGH: Objection. The reference in the book
3  talks about black cod, and you're just trying to get him to
4  talk about rock cod.
5  BY MR. DAWSON:
6   Q. Let's set aside the species of what fish you
7  caught.
8      Is it fair to say that on a second trip in
9  January you brought back only about between a thousand and
10 two thousand pounds of rockfish?
11  A. I think that's what it was, somewhere in there.
12 I don't know. All I remember, they got -- I paid DeCapua
13 400 some odd dollars for that trip.
14  Q. If he received $400, what would that tell you
15 about how much you caught?
16  A. Well, it would tell me that -- that's usually
17 pretty average. Of course, the price is high, so for one
18 day's work, I would think that was pretty...
19  Q. I meant, would it tell you something about how
20 much poundage you caught?
21  A. Yeah, it does. Yeah, it would. I just don't
22 remember the price at the time.
23  Q. You would have to know the price to figure out
24 what the pounds were?
25  A. Right.

Page 28

1   Q. I got you.
2   A. This part there, just reading down to the last
3  paragraph, isn't too inviting.
4   Q. Your attorney will have a chance to ask you
5  questions later on. That will be fine.
6      MR. DAWSON: I'm going to go ahead, Mike, and
7  mark the area that I asked him about initially. I should
8  have made a little mark next to that. I just want to do
9  that so for the record when we look at this Exhibit 1 we
10 can see the areas that he's already talked about. Now I'm
11 going to ask him about a passage on page 149.
12     MR. HOUGH: 149.
13     MR. DAWSON: It's 149 in the excerpts. So I
14 think it's the very last page of the excerpts here.
15 BY MR. DAWSON:
16  Q. I'd like you to read just the passage that I've
17 marked there, and just let me know when you've read it.
18  A. Yeah, I've read it.
19  Q. Now, is it fair to say that the book The Last Run
20 paints DeCapua as somebody who talks a lot of trash, he's a
21 big talker; is it fair to say that the book paints him in
22 that light?
23  A. I don't know if the book does, but I know him
24 personally, and yeah, he is a real mouthy person.
25  Q. And sometimes he mouths off when he shouldn't,

Page 29

1  correct?
2   A. I -- yeah, I would assume that he probably does,
3  yeah.
4   Q. And sometimes he says things that people know he
5  doesn't really mean?
6   A. That I don't know.
7   Q. Okay. Is it fair -- when I use the expression
8  "he talks a lot of trash," do you know what I mean when I
9  say that expression?
10  A. Well, I don't -- I would say you're saying that
11 he tells a lot of lies, but I -- I would think that's what
12 you meant.
13  Q. Well, I guess when I use that term -- and I'm
14 glad I asked, because I wasn't suggesting that he
15 necessarily tells lies, but is it fair to say he
16 exaggerates?
17  A. Yeah, I would -- in some cases, yeah.
18  Q. Is it fair to say that the book portrays him as
19 somebody that sometimes exaggerates?
20  A. I don't know.
21  Q. This passage, if someone were to read this, do
22 you think they would think that Mr. DeCapua is just talking
23 the way Mr. DeCapua always talks, that he may be
24 exaggerating or he's just talking to talk?
25  A. No. Anybody that would be listening to that

Page 30

1  would be -- the way I'm reading it anyway and knowing Mike,
2  he's telling them that I'm lazy, and because I'm lazy,
3  we're not catching fish.
4      Q.  And that would just be --
5      A.  And that would be typical.  And I wouldn't say
6  that -- no, he wouldn't -- that wouldn't be considered a
7  baloney, especially to a new person.  If somebody -- if the
8  other person had fished with me for a long time he wouldn't
9  be able to do that.  But since Bob Doyle had never fished
10  before, he didn't know anything of the sort.
11      Q.  It would just be -- when somebody -- you know the
12  expression that somebody is lazy, that's their opinion,
13  isn't it?
14      A.  I was always taught to set an example, and I'm
15  not a lazy person, by any means.
16      Q.  I understand.  But when Mike DeCapua says that
17  you're lazy --
18          MR. HOUGH:  I object to the question as
19  mischaracterization of what he said.  He said "that lazy
20  prick."
21          MR. DAWSON:  And I'm focusing on the lazy part.
22          MR. HOUGH:  Okay.  Not the prick part.  Excuse
23  me.
24  BY MR. DAWSON:
25      Q.  When Mike DeCapua says you're lazy, if he said

Page 31

1  that as it states in the book, that would just be a matter
2  of Mike's opinion about you, wouldn't it?
3      A.  No.  If I had heard it, I'd have corrected it
4  right there on the deck, right then.  I didn't hear it.  I
5  mean, or whenever he told him or when he told him this.  If
6  I'd have been there, sure.
7      Q.  Is it fair to say what one person thinks is lazy
8  might not be what another person thinks is lazy; is that a
9  fair statement?
10      A.  Yeah, I guess it would be, but you have to
11  realize I got more than one job, and deckhands, they got to
12  bait gear.  I've got to find fish.  I got to be in the
13  wheelhouse, I got to talk on the radio, I got to find out
14  what other boats are doing.  You know, I do come outside
15  and work, but -- just as hard as they do, but I got a whole
16  lot of other opportunity.  So maybe they think I'm in there
17  sitting and not doing anything, and that could be construed
18  as maybe they think that's lazy, but --
19      Q.  And they might be wrong in their opinion; isn't
20  that correct?
21      A.  Very well.
22      Q.  But folks can have opinions about whether
23  somebody is lazy or not, can't they?
24      A.  Well, yeah, it's a free world, sure.
25      Q.  Now, we'll focus, as your attorney wanted to, on

Page 32

1  the word "prick."
2          As used there, that just means that -- that's a
3  word -- you could say "jerk" in its place, couldn't you?
4      A.  Not to me it doesn't say the same thing.
5      Q.  What do you think it says?
6      A.  It's kind of like he's a jackass or something
7  like that.  Kind of like what he's saying to me.
8      Q.  It's not complimentary?
9      A.  No, it isn't.
10      Q.  To summarize, you think the things that are false
11  about this passage are, one, you don't think you're lazy,
12  and you don't think you're a jackass; is that a fair
13  summary?
14      A.  That's fair, yeah.
15      Q.  Anything else about this statement, about the
16  passage that we've just read that you think is false?
17      A.  I don't know how you expect me to bust my ass.  I
18  don't -- I don't understand.  It's crazy.
19      Q.  Okay.  All right.  We're going to get into your
20  tax returns a little later on.
21          For the moment, I would just like to ask,
22  though -- I'd like to have you confirm for me that you have
23  lost money fishing every year since 2000?
24      A.  Yeah, I have, due to --
25      Q.  All right.

Page 33

1      A.  -- due to different reasons.
2      Q.  I understand.
3          And in fact, your cash receipts from fishing have
4  gone down every year since 2000?
5      A.  Yes, they have.  I started marketing fish, is
6  what I did.
7      Q.  And I will be asking you about your present
8  activities here in a little while.
9          Were you aware that Mr. Doyle is the one who told
10  us that Mike said if the Min E -- the Min E could have
11  produced if Phil Wiley had gotten off his ass; are you
12  aware that Mr. Doyle told us that?
13      A.  No.  That isn't the way I read it.
14      Q.  No.  I understand.  It isn't in there.  I just
15  wondered if you were aware that that's what we had been
16  told by Mr. Doyle?
17      A.  No, I wasn't.
18      Q.  I want to have you turn in the Exhibit 1 there,
19  the excerpts of the book, to page 63 of the excerpts --
20          MR. DAWSON:  Sorry, Mr. Videographer.  Let me get
21  this back on.
22  BY MR. DAWSON:
23      Q.  I just want you to read the two lines that I've
24  marked there on that page.
25      A.  Okay.

Page 34

1  Q. Do those two lines there say anything factually
2  about you at all?
3  A. I guess -- Bob Doyle said, like hell we will,
4  said DeCapua. I don't know. I don't know. You know,
5  that's crew people. What they talk about, I -- over the
6  years, you know, I've had a lot of crew people, and I
7  don't -- the crew people, the only thing you can tell about
8  a crew person is the next day when they come back if
9  they've been to the bar. I don't know.
10  Q. All right. Is it fair to say there's nothing
11  false about what's stated there?
12  A. No. I can't see where it's false. I don't quite
13  understand it.
14  Q. Let me take you to page 51 of the excerpts. And
15  there's two lines there that I've marked on page 51 of
16  Exhibit 1.
17    Does that say anything factually about you at
18  all?
19  A. It says that I would -- he would like to see my
20  face when he says they're splitting. I wasn't that hot on
21  going fishing anyway, so I would have doubted it would have
22  done anything to me.
23  Q. All right. There's nothing false about that
24  statement, is there, so far as you know?
25  A. No, not that I know.

Page 35

1  Q. I'd like you to turn to page 132 of those
2  excerpts again.
3  A. 132.
4  Q. 132. I'll help you here. Let me find the right
5  section. And I'd like you to read the lines that I've
6  indicated there.
7    Have you had a chance to read that?
8  A. Yeah, I read it. I don't quite --
9  Q. Is there anything about that statement that would
10  be false, as far as you know?
11  A. I don't know what "Phil crap" is.
12  Q. It says, does it not, that "when I was with that
13  Phil, I made money"?
14  A. Yes.
15  Q. In fact, this statement is complimentary of you,
16  isn't it?
17  A. Part of it is, yes.
18  Q. Is there any part of this that you think says
19  something that is factually false?
20  A. I -- no, I can't say that it's false, no.
21  Q. All right. Is it a fair statement to say that
22  you have always had trouble keeping a crew when you're
23  fishing for the black cod season?
24  A. Not really. It's getting a crew back in the
25  derby days that was the problem. Is getting a crew when

Page 36

1  we -- you know, you had maybe ten days and that was it.
2  And so everybody goes to the boat that usually does the
3  best, and they all tried to get on the best and then they
4  worked their way down the line. And so I was not
5  considered a high-liner so I usually ended up with the
6  lower end of the crew people.
7  Q. Now, you said, if I understood you correctly,
8  that in those days it was a derby fishery?
9  A. Oh, yeah. It was all the way up till '95.
10  Q. All right. Isn't it true that you continued to
11  have trouble getting crew even after '95?
12  A. Not really, not for black cod or halibut, no.
13  Q. Well, do you have some idea how many crew you
14  went through between '95 and today?
15    MR. HOUGH: For black cod?
16  BY MR. DAWSON:
17  Q. For black cod.
18  A. For black cod. Between '95, I don't know. I
19  know a couple of them have died.
20  Q. It's quite a few, isn't it?
21  A. What?
22  Q. The number of crew that you've gone through.
23  A. There's a lot of people that come back over the
24  years, but you would have to -- you just don't have a
25  consistent -- I don't care who you are, you just don't have

Page 37

1  the same people year after year after year.
2  Q. And I understand. It's fair to say it's very
3  difficult any time to get crew; that is a constant battle
4  for you?
5  A. Well, no. No, it isn't. That's not right
6  either, because I had a lot of days -- and my records will
7  speak for themselves all the days I put in fishing for
8  rockfish. I started fishing the fresh market for Sitka
9  Sound Seafoods and that means I had to -- I had to deliver
10  weekly, at least once a week and sometimes twice a week,
11  and they depended on me to bring in a certain amount of
12  fish.
13  Q. I understand. But isn't it fair to say that you
14  have always had trouble -- and not just with black cod, but
15  in general you've always had trouble getting crew?
16  A. Yeah. I -- to a certain point. I mean, it's --
17  yeah, I would say it's not always real difficult. Now it's
18  real hard. I can't get anybody to work now.
19  Q. You're not doing much fishing now, are you?
20  A. Well, if you don't have crew, you can't fish.
21  Q. We'll talk about that a little bit more later.
22  A. Okay.
23  Q. Were you aware that when Todd Lewan interviewed
24  Mr. DeCapua he said that you can't keep a crew; so you
25  would say that Mr. DeCapua was wrong in that respect?

Page 38

1  A. I had crew for certain fisheries that always
2  showed up. You know, it would go on three or four years at
3  a time. I've had guys come back that haven't worked for me
4  for eight years and come back. It's just -- I don't know.
5  It's a hard -- it's hard work, for number one.
6  Q. It's difficult to find a crew under any
7  circumstance?
8  A. I guess it is except unless they think they're
9  going to make a fortune.
10 Q. You had a dispute of some kind with Mr. DeCapua
11 concerning retro pay once upon a time, correct?
12 A. Yeah, it was a long time ago.
13 Q. Can you tell me -- can you summarize for me what
14 the nature was of that dispute?
15 A. Yeah.
16 Q. And after you do that, I'm going to go ahead --
17 we'll go another ten minutes and then I'll give you folks a
18 couple-minute break.
19 A. Okay. I had -- Chatham is a fishery. It used to
20 always come and start September 1st, Chatham Strait black
21 cod, and it was a fishery everybody wanted to do and there
22 wasn't very many boats. So I was one of the boats that had
23 done fairly well, so I always had a lot of people. So I
24 wanted to have -- the more fierce the battle got with these
25 boats competing in a small place, the more gear you run so

Page 39

1  that you could catch more fish.
2    So I bought more gear so that we would have 16
3  miles of gear, and I -- there was four people. I gave each
4  person -- I think it was three skates, three or four skates
5  of brand new gear that had to be stuck, and they all agreed
6  to do it just to do the fishery. And Mike wanted to do his
7  at home, and so we told Mike, well, don't undo these coils,
8  me and Jan will come over and help you. And Jan's name was
9  Jan Payne.
10   And the reason was if you -- you had these -- the
11 way they used to do them, they didn't come on spools. They
12 came in coils, and one guy had to stay on one side holding
13 the inside of it and another guy on the other side and one
14 guy pulls, and each time it comes around you let it go
15 around. Otherwise -- and if you don't uncoil it from the
16 center, counterclockwise, you run a coil forever.
17   And so me and Jan went over to help Mike undo it,
18 and Mike would not do it. He would not let us help him.
19 And he ranted and raved and he -- so Jan says, well, let's
20 just forget it, let him do it. He swore up and down he
21 could do it. Well, he brings the gear -- I think it's the
22 day before we're going to leave, and I look at the gear and
23 I don't -- something don't look right. It doesn't look
24 like there's as much line in there or something. So
25 anyway, I started counting the hooks. Yeah, there was

Page 40

1  300 hooks, which there should be, but then I started
2  measuring the distance apart between them, and they were
3  supposed to be 36 inches.
4    And so what he had done is he had got -- taken
5  the coil apart and it got all tangled and so he probably --
6  he had to start taking it from the outside, and so what he
7  had done is he took the part that he tangled and cut it
8  out, threw that line away, and in order to cover it up, he
9  shortened the spacing on the hooks in order to get the
10 hooks on there.
11   As I look back on it, I didn't charge him nearly
12 enough. I didn't charge him hardly anything, really. And
13 so that's what it was all about. I charged him -- I think
14 it was 200 and some odd dollars for I don't know how much
15 of my gear that got trashed. And that gear to this day is
16 still in my shed and it's all curly like this and you can
17 never get it uncurled. And every time I see that, I'm --
18 Mike comes to mind because he's the one that done it.
19 Q. Now, when you said you charged him 200 and some
20 dollars, that would have been taken out of his crew share?
21 A. Yeah. Just taken out, yeah.
22 Q. Was it out of his crew share or out of retro pay?
23 A. I don't know if it was out of retro or out of
24 crew share. It would have been -- Jan would remember. And
25 I don't remember.

Page 41

1  Q. What was Jan's last name again?
2  A. Payne, P-a-y-n-e. He called me about a year or
3  so ago, a couple years ago. He was in Klamath Falls.
4  Q. Now, as a general proposition, is it fair to say
5  that when you lose gear, you have the entire crew share in
6  the loss -- the expense of the lost gear?
7  A. Yeah. That's the way it's done on all boats. If
8  you lose gear, everybody has to share in the loss, taken
9  off the top.
10 Q. Understood. In this particular case, did the
11 entire crew share in the -- I guess it's not lost gear, but
12 the gear that was damaged, did the whole crew share or just
13 Mr. DeCapua?
14 A. Just Mr. DeCapua. That's why I said I didn't
15 charge him enough. I was -- I don't know. I just wanted
16 it -- you know, it's a hard thing to explain, those kind of
17 deals.
18 Q. Was he pretty unhappy about that, about the
19 charge?
20 A. Oh, yeah, he was fired up, but he wasn't -- you
21 know, he knew. It was just by coming at me like that, you
22 know, they're not going to admit -- he's not going to admit
23 that he was wrong. I mean, that's -- if he was to do that,
24 you know, he would think that I would probably charge him
25 more. So that's the way they deal. I don't know. I just

Page 42

1  done -- today I look back and I think I should have charged
2  him what everybody else would have charged him.
3      Q.  Now, do you remember that Mr. Lewan called and
4  talked to you about this incident?
5      A.  I don't -- you know, he called me.  He woke me
6  up.  It was early morning.  I got up and answered the
7  phone.  And there may have been some talk about retro.  I
8  don't know.  The main thing that got to me was about my
9  boat.  And I told him if he didn't believe me that he
10 should call Northern Marine and talk to Mike Miller.
11     Q.  Do you remember him asking you about the DeCapua
12 incident, though?
13     A.  Not really.  I don't --
14     Q.  Do you remember telling Mr. Lewan that you didn't
15 remember the details of that incident?
16     A.  Probably.  If he asked me about it, it would
17 probably be that -- I've had time to think about it, and to
18 call me first thing in the morning like that, you know,
19 after something that had happened ten years ago or eight
20 years ago, whenever it was he called me, it's hard to
21 recall everything like that right away, for me anyway.
22     Q.  But it's possible you told him at that time that
23 you didn't recall the details?
24     A.  I'm sure I did.  I wouldn't have tried to -- I'm
25 not that -- I don't wake up in the morning bright and

Page 43

1  shiny.
2      Q.  How was it that you remember those details today?
3      A.  Because I've thought about it and I had to write
4  about it and what I did.  You know, I had time and I
5  thought -- remembered what happened.
6      Q.  What time of the morning do you think Mr. Lewan
7  called you?
8      A.  I don't think it was -- you know, it was like
9  9:00, probably, but if I'm up late, sometimes I work real
10 late.  So I go to bed -- I get up later.  I mean, I wasn't
11 dead asleep.  I was probably getting ready to get up or
12 something like that.  But I -- anyway, I do remember I
13 wasn't very bright at the time when he called.
14     Q.  Do you recall any other fishermen with whom
15 you've had any kind of a dispute over pay?
16     A.  Not really, no.  I know I've paid a lot of guys
17 that sure didn't have it coming.  I don't recall it.
18     Q.  In your responses to some discovery requests that
19 we gave you, you mentioned a couple hippie types that maybe
20 had a beef about pay; does that ring a bell?
21     A.  Yeah.
22     Q.  What was that about?
23     A.  It was the middle -- gosh, it was in the summer,
24 and I don't -- I think I read an ad on -- they have what
25 they call Problem Corner in Sitka on the radio, and I think

Page 44

1  I ran an ad on there, and these two guys show up and they
2  want to go fishing, and they never fished before.  And one
3  guy was a hippie and the other guy was a weirdo of the
4  Sitka people.  I didn't know much about him.  But anyway, I
5  took them out and tried to show them how to do it.
6          And so we start -- I started hauling gear and
7  I -- when I haul gear I have one guy storing hooks and the
8  other guy bleeding fish.  Well, one -- the one guy, he was
9  storing hooks and the other guy was bleeding fish, but he
10 was throwing the fish back into the same tote that I was
11 throwing the fish in we came in with.  And so just
12 things -- one thing led to the other.  They didn't even
13 know they was going in.  I just figured there was no way
14 that I could possibly -- these guys just weren't going to
15 work.  So I went in.  And it was only a few hours.  We was
16 only a few hours out.
17         Took them in and told them, and then they started
18 saying, oh, we'll work for a whole lot less.  And I says,
19 no, it won't work.  And I didn't -- that was it.  And they
20 in return went to small claims and filed a small claims,
21 and I went down there and they says, well, you'd be better
22 off just to pay the 15 dollars that they want apiece.  So I
23 gave them 15 dollars apiece, and that way we didn't have to
24 go to small claims.  That was it.  That was that incident.
25     Q.  Okay.

Page 45

1      A.  It was really comical, actually.
2      Q.  When Mr. Lewan interviewed Mr. DeCapua about the
3  issue involving the retro pay, Mr. DeCapua had quite a
4  different story, and if -- Mr. DeCapua's recollections of
5  the events were very clear, and he gave essentially the
6  same recollection of events to your investigator.
7          Is it possible that with the passage of time your
8  recollection may be off?
9      A.  Unless there was another dispute involved that
10 he's talking about that I'm not thinking of.  I only recall
11 this one because it was just a lot of heck raised.  Other
12 than that, I -- I wouldn't know.
13     Q.  Now, are you -- are you aware that after this
14 dispute Mr. DeCapua went and apparently tried to contact an
15 insurance company of yours?
16     A.  Yeah.
17     Q.  How did you become aware of that?
18     A.  Yeah.  The insurance guy told me when I called
19 him.  I think I called to take out more crew insurance.
20 And he said, oh, this guy called and he was really -- said
21 he was really pissed.  And he was laughing about it.  And
22 that's -- that was all that was really ever said about it.
23     Q.  And this is when you're talking with your
24 insurance broker?
25     A.  Yes.

Page 46

1    Q.  And I think you said this, but I missed it.
2        And why were you calling your insurance broker?
3    A.  The only reason I can think of -- and I'm not
4    sure exactly when it was, but it was either to renew or it
5    was to take out more crew insurance.
6    Q.  And it would have been close in time to when this
7    dispute was with Mr. DeCapua?
8    A.  It must have been because it was on his mind that
9    he mentioned it.
10   Q.  All right.  Did he say anything more about the
11   call other than Mr. DeCapua was really pissed off?
12   A.  That was it.
13   Q.  Now, as part of calling to get new insurance or
14   take out more crew insurance, would you have had to get a
15   survey or an inspection on the vessel?
16   A.  No, no.  You just -- that's the way it's done
17   because you never know for sure if you're going to have
18   three people, four people back in the derby days.  And most
19   guys do it by the month because -- well, that's kind of the
20   way they ask you to do it, the insurance broker.  That's
21   the way they kind of set it up.  So you just call them and
22   tell them, I'm only going to have two crew members or I'm
23   going to have three or one.
24   Q.  Isn't it true, though, that on a fairly regular
25   basis, in connection with getting insurance, you would have

Page 47

1    to get vessel surveys?
2    A.  Yeah, you do once a year, or once every two or
3    three years.  I forget what it is.
4    Q.  All right.  And so it's possible -- if you were
5    calling the broker to renew your insurance, it's possible
6    you were also getting a vessel survey?
7    A.  No.  They always -- when you go to renew it and
8    then they -- if the guy wants a survey, then they will tell
9    me, and then I will have it done, and that was done
10   regularly throughout my career.
11   Q.  And it's possible that one was done in connection
12   with this renewal?
13   A.  Not in connection with anything that Mike had to
14   say, no.
15   Q.  That wasn't actually my question, though.
16       I just wanted to know whether it's possible that
17   a vessel survey, an inspection, was done in connection with
18   this renewal when you were calling your broker?
19   A.  It's possible.  I just don't remember the month.
20   Q.  I understand.
21   A.  Most of the time the surveys were done in the
22   winter and the off months, like, say, October on to
23   probably January or something in there, January or
24   February.
25   Q.  Just let me catch up one moment in my outline

Page 48

1    here.
2        In some discovery responses that you provided in
3    this case you mentioned that there was some work done on
4    the vessel around the same time period as the dispute you
5    had with DeCapua.  One of the things you mention was a
6    stability test.
7        Can you tell me what a stability test -- what
8    sort of stability test was done?
9    A.  Stability test has to be done by a naval
10   architect, and I hired the naval architect that took care
11   of the State of Alaska's ferries.  On the side he went and
12   did stability tests on boats.  And the whole thing came
13   about -- the stability test came about I wanted more
14   balance on the Min E and I wanted to have Gangle -- it's a
15   fiberglass -- to take like about a three-inch-round shaft
16   and glass it to the bottom of my keel.  And Gangle told me
17   he could not do anything like that unless my insurance
18   okayed it.  So the only way I could have it okayed,
19   according to the insurance guy, I had to have a stability
20   test and a naval architect recommend it.
21       So this naval architect, he comes out and he has
22   me take drums, 50-gallon drums, set them on this side --
23   they're full of water -- and here and there, and he takes
24   all kinds of measurements.  And does -- he spent a half a
25   day doing a lot of different things.  And then he --

Page 49

1    throughout it he kept saying "cheap ballast, cheap
2    ballast."  And I guess he was talking about the concrete.
3    And that always stuck in my head.
4        But anyway, he did not allow Gangle to add this
5    to the bottom of my keel like I wanted to because he felt
6    that it might cause performance problems.  So he
7    recommended more flotation on the deck so there wasn't as
8    much -- so the decks couldn't hold as much water.  And the
9    only thing he would allow me to do on the bottom of the
10   keel was to put some angle iron, like that, that stuck out
11   about this far that would supposedly help it from rolling
12   so much, and which it didn't do anything.  It was just a
13   waste of money.
14       But this "cheap ballast" stuck in my mind, and
15   then it dawned on me that the keel was hollow inside, and
16   on all fiberglass boats it is.  So if I dug out the cement
17   out of the keel, that I could stick lead down in there and
18   it wouldn't hurt anything.  So that's what I done.  In 1990
19   I bought a bunch of lead that came out of a boat.  And they
20   were in ingots, and I sawed them and put them down, 5,000
21   pounds down inside the keel.
22   Q.  How -- do you remember today roughly how much it
23   cost to go through the stability testing and whatever work
24   was done after that?
25   A.  I did all the other work.  The stability test ran

Page 50

1  me, like, 12 hundred bucks.
2      Q. Were there any other sort of significant repairs
3  that were done around the time of your dispute with Wiley?
4      A. You mean with DeCapua?
5      Q. DeCapua, I'm sorry. I'm sorry. Thank you.
6      A. No. 1990 I was in the yard there for -- in Allen
7  Marineway's yard for about two months doing this.
8      Q. Whose yard was that?
9      A. It was called Allen Marineway. He -- he's still
10 got the yard there, but they build boats there now. It was
11 the boat yard, the only boat yard, at that time.
12     Q. They had to haul this out for two months just for
13 the stability test?
14     A. No. For me to put the lead in the keel. I
15 thought that's what you was talking about.
16     Q. I'm sorry.
17     A. No. He did the stability test in the water.
18     Q. And the work in the yard, how much -- with all
19 the work that was done in the yard, what do you suppose
20 that cost you?
21     A. The guy put those things on the -- I think he put
22 those on there at the same time, that fiberglass work. I
23 don't recall. Maybe he did that in '89. I don't know.
24 Anyway, that's a project in the winter when I do those
25 things. But it was within a year or two of each other.

Page 51

1      Q. Are we talking about a $20,000 change to your
2  boat or a $5,000 change to your boat?
3      A. The lead cost me, if I remember right, it was
4  50 cents a pound, so whatever that would add up to for the
5  lead, and shipped. I think it was -- be around -- I think
6  it was probably 2,500 to 3,000 pounds, and the yard bill
7  would have probably been 900 or so.
8      Q. Did you have some work done to fix a problem with
9  bulwarks pulling inward because of a downward force of the
10 mast?
11     A. Yeah. That -- yeah, I did, and I -- that was
12 pointed out to me in early years, and I tried to -- I had
13 these braces that -- well, there was braces on there, and
14 the main thing that was causing -- it didn't do it till I
15 made these bigger stabilizers, and the bigger stabilizers
16 pulled a lot harder and they caused it to press down.
17 Evidently it was doing it when there was smaller
18 stabilizers, but it wasn't very noticeable. Somebody
19 happened to notice that it was working in and out, and they
20 pointed that out to me. And it wasn't really hurting
21 anything except that I knew the fiberglass shouldn't flex.
22 It can cause delamination.
23     Q. And delamination would result in what?
24     A. Well, if you delaminate, you lose all your
25 strength. That never did happen. Around the cabin -- in

Page 52

1  the aft part of the cabin -- and it was like that even when
2  I bought the boat -- there was cracked and you could see
3  where the guy even filled in with putty around the edge
4  here. And he says, I don't -- he says, it's just always
5  done that -- or been that way. And the surveyor was there
6  and everything and he had been a boat builder, and he
7  didn't think anything about it. So I never thought
8  anything about it.
9      Q. You did fix it, though?
10     A. Yeah. I fixed it in '99, or '98. I don't know
11 which.
12     Q. And what did that cost you?
13     A. That ran me -- I think it was -- it was supposed
14 to be 35 hundred dollars. That's what it was. Pretty sure
15 that's what it was. And then I did some glass work too.
16 Anyway, it was around that. There's just a lot of
17 different maintenance.
18         But the guy charged me way too much. There
19 really wasn't that much to do. But it wasn't Gangle that
20 done it. It was a guy that worked for him that he thought
21 would be good, but Gerald wasn't very happy with what he
22 charged me either, because it wasn't that big of deal. It
23 had to be done. What he did is he made triangles that we
24 put down in the fish hull up against the bulwarks, and he
25 put in three of those on each side, glassed them in, and

Page 53

1  that was it.
2      Q. Okay. When Todd Lewan spoke with Mr. DeCapua, he
3  said there was a problem with rails coming loose from the
4  deck.
5          Is that the same problem that we're talking about
6  with the bulwarks being pulled in; can that result in rails
7  coming loose from the deck?
8      A. Well, there's nothing on the deck to come loose.
9  It could be your cap rail, which they put iron bark on for
10 trim. It doesn't have no -- it doesn't have any structural
11 thing for a boat. And up in my bow part there is a place
12 where the screws start -- because it's -- well, the wood is
13 soft, but it's yellow cedar, and yellow cedar, when it's
14 wet, is soft.
15         And I kept thinking somebody was prying them up
16 in the winter when I wasn't there. I still to this day
17 don't know whether they were or not. But I finally took
18 the screws out and then I bolted it down. But I notice
19 there's another part up there in the bow where the same
20 thing is happening again now. So I have to do that.
21     Q. And the screws come loose and it does result in
22 the rails being loose?
23     A. Yeah. I mean, it doesn't make anything loose.
24 It's just that iron bark that they put on there for trim.
25 You see guys sanding it and putting a nice finish on it.

Page 54

1    Q.  So that's on the surface, the top?
2    A.  All it's for is looks. It's like a paint job on
3  a car. Just to make them look pretty.
4    Q.  Was there anything relating to the bulwarks being
5  pulled in that had to do with the rails?
6    A.  No. Nothing has ever been changed on the rails.
7  It's just those gussets that we put underneath that
8  stopped -- it doesn't do it anymore. It just stopped it
9  completely. The other option was I had this guy from
10 Precision Boat Works come down, and he says, well -- he was
11 the one that pointed out the whole reason it was happening
12 was because the bulkhead was not -- on most boats the
13 bulkhead is placed underneath the mast. In my case, the
14 bulkhead is two feet forward and there's no bulkhead. So
15 he said, well, you should just take a piece of pipe or a
16 brace and put it down, all the way down into the bilge and
17 up to the deck to where the mast is coming down and that
18 would do it.
19     Well, this is after we've already put the gussets
20 in. So I bought some aluminum from him and I put it in,
21 and it was kind of in everybody's way down there. And
22 finally I had to take it out for a reason. I forget what
23 reason. And anyway, we went fishing without it. And it
24 didn't need it. It wasn't doing it.
25   Q.  Because of the gussets?

Page 55

1    A.  Yeah, because of the gussets. They took care of
2  it.
3        MR. DAWSON: I see it's noon. Although we didn't
4  start quite as early as we might have wanted to, I still
5  want to give you a break for lunch. In the interest of
6  trying to make up for a little lost time, would 45 minutes
7  be enough?
8        MR. HOUGH: Sure. That's fine.
9        MR. DAWSON: There's -- off record, please.
10       THE VIDEOGRAPHER: Going off record. The time is
11 12:01.
12       (Lunch recess)
13       THE VIDEOGRAPHER: Back on the record. The time
14 is 12:51.
15 BY MR. DAWSON:
16   Q.  Mr. Wiley, before we get going, I have just a
17 couple housekeeping matters related to Exhibit 1. If you
18 would, I want to just take you through each of the pages
19 where we discuss something, and I want, for the record, to
20 just identify the beginning and ending words on the
21 sections that I marked. I just don't want to have a
22 problem with the transcript showing what we discussed.
23      When we were talking about the language on
24 page 45, am I correct that we were discussing the language
25 that began with, "It was a slow time of the year for

Page 56

1  fishing," and which ended with the sentence, "And he was in
2  an increasingly evil mood."
3       Is that correct?
4    A.  Yeah, that's correct.
5    Q.  And when we were talking about information on 46,
6  which is the next page, we were talking with the section
7  that begins with the words, "For two days they untangled
8  snarls," and which ended with the words, "Pulled
9  300 pounds."
10   A.  Correct.
11   Q.  The next page where there was some information
12 that we discussed is page 51 of Exhibit 1, and it was just
13 the very short sentence that begins with, "A smile
14 flickered across DeCapua's lips," and ends with, "Tell him
15 that we're splitting."
16   A.  That's correct.
17   Q.  Then the next page we discussed something on was
18 63, and we just talked about the sentence that begins with,
19 "I guess we'll stick with Phil", and ends with, "Like hell
20 we will, said DeCapua."
21   A.  Correct.
22   Q.  And the next page we had anything to discuss on
23 was page 132. We discussed the section that began with,
24 "This is make-work," and ended with, "And he don't make
25 money."

Page 57

1    A.  That's correct.
2    Q.  And then the last page that we discussed so far
3  was the section -- it's on page 149, and begins with the
4  language, "This, DeCapua told Bob Doyle", and ends with a
5  phrase that I don't even like saying out loud, "That lazy
6  prick."
7       Correct?
8    A.  Yes.
9    Q.  All right. By the way, if I didn't say so, that
10 last page that we were talking about was page 149, correct?
11   A.  That's correct.
12   Q.  You mentioned that one of the things that can
13 happen when the force of the mast pushes down and causes
14 the deck to flex is that you can get delamination; did I
15 understand that correctly?
16   A.  It can happen. I mean, flexing fiberglass,
17 supposedly, not supposed to be good for it. All fiberglass
18 boats do it. It's basically your supports ones because
19 they're much thinner. In my case, my hull is very thick.
20 It's an-inch-and-a-half thick from the water line down, and
21 I think up top there it's around three-quarters of an inch
22 thick.
23   Q.  So the delamination would affect the integrity of
24 the hull?
25   A.  Yeah, it would. But there is no delamination.

Page 58

1  Q. And that's in part because you fixed the problem
2  with the mast, correct?
3  A. Well, yeah, that would be, except it flexed for a
4  long time before I ever, you know, did the final fix. I
5  tried different things, but they didn't work. The final
6  one did.
7  Q. And why was stability an issue that you decided
8  to have a stability test?
9  A. I just -- when you go out there you just want to
10 make certain that you don't -- I used to fish year-round,
11 rockfish and it was before it was a derby, and you just
12 want a lot of balance. You go up some of those waves and
13 look straight up and down and you don't want to go around,
14 tip over. So that's the idea, to have enough balance that
15 you don't have to worry about that.
16 Q. Was there ever a concern about the stability of
17 your vessel?
18 A. Not really. Everybody felt it was -- it was me
19 mainly. It wasn't anybody else.
20 Q. What was the concern?
21 A. Oh, I just felt that -- that it just didn't --
22 maybe it might tip over or maybe there wasn't enough
23 balance in it. Fiberglass boats are different because -- I
24 guess I read one time a Canadian guy says all they do is --
25 fiberglass boats, most of the weight's in the bottom, and

Page 59

1  all they do is fly around. So I don't know. They're just
2  a completely different ride.
3  Q. All right. And you replaced the concrete ballast
4  with lead ballast as one of the remedies to the stability
5  issue?
6  A. Yeah. I added -- there was concrete down in
7  that, five-inch wide, inside the keel. I took that part
8  out, but the rest of the concrete is still in there.
9  Q. Help out this landlubber.
10    My understanding is that bulwarks are the side of
11 the vessel above the deck; is that --
12 A. Yeah, that would be bulwarks.
13 Q. Is that right?
14 A. Yeah.
15 Q. Is that the same as rails, or is that different
16 than rails, or can it be rails?
17 A. I don't think it would be rails. It would be
18 bulwarks, as far as I know. Rails would be something above
19 the bulwarks that you can hang on to probably.
20 Q. So the bulwarks would probably be something solid
21 coming up on the side of the boat --
22 A. Right.
23 Q. -- above the deck?
24 A. Right.
25 Q. Okay. And that's what was getting pulled in by

Page 60

1  the downward force of the mast?
2  A. Yeah. Because -- downward force and then it
3  pulls on the cables and that pulls them in.
4  Q. Got you. Thank you.
5  A. Kind of a hard thing to picture in your head.
6  Q. And my understanding is that's because the
7  stabilizers are extended and because they go up and that
8  pushes the mast down; is that right?
9  A. Well, they're on the end of poles that are --
10 Q. Right.
11 A. -- way out like this. So they pull real hard
12 when the boat goes to roll this way. So let's see, that
13 pull -- anyway, if you sit -- I will make a drawing, and
14 sit there long enough, it dawns on me what it is, but
15 that's what happened.
16 Q. At any rate, those stabilizers, though, are the
17 reason why the mast gets pushed down?
18 A. Right.
19 Q. Okay, okay. And I will leave it to the marine
20 engineers to understand how that works.
21 A. You don't have to have stabilizers. You would
22 just roll like crazy, that's all.
23 Q. And I assume most people prefer not to roll?
24 A. Yes, pretty much. Can you please put the
25 stabilizers out?

Page 61

1  Q. Mr. DeCapua had told Mr. Lewan that you once said
2  to him you cost him $25,000 because of his call to the
3  insurance company.
4    Did you tell Mr. DeCapua that?
5  A. No.
6  Q. Any idea why Mr. DeCapua would think that you
7  said something like that?
8  A. I have no idea why he would do that.
9  Q. Okay. All right. Now, the book makes mention of
10 certain repairs that were done to the Min E.
11   And isn't it correct that in the same place where
12 it says that repairs were made, it's clear that those
13 repairs were made at least eight years ago?
14 A. Every year there's repairs done. It would be
15 more than eight years that the stability test would be
16 like, what, 16 years ago, something like that. 16 or 17
17 years ago.
18 Q. I guess my point is the book -- is it fair to say
19 that the book does not say that your boat is presently in
20 need of repairs? It doesn't say that, does it?
21 A. Not that I'm aware of. It -- it -- you would
22 think that it wasn't a very good boat, I mean, by the way
23 it is. Otherwise it doesn't --
24 Q. Doesn't it just say that you --
25 A. To me this whole thing is like something that

Page 62

1   happened in one year, but it's spread out over 15 or so
2   years. That's what makes it so strange. Supposedly it's
3   something that happened in a real short time period, and it
4   didn't.
5       Q. Isn't it fair to say that the repairs that are
6   mentioned in the book are repairs that, according to the
7   book, took place way back prior to 1998?
8       A. Oh, yeah. Yeah. Most of them. Not all of them.
9   I mean, I -- I consistently -- I mean, I've rebuilt motors
10  and put new motors in, gear boxes. Just everything has
11  been replaced on that boat over that period of time.
12      Q. I want to focus, though, on what the book
13  actually says. Is there anywhere in the book where it
14  suggests that you've had repairs done after 1998?
15      A. I don't know if there is or not.
16      Q. You'll agree with me, though, that the repairs
17  the book says you had done would have taken place,
18  according to the book, prior to 1998, according to the
19  book?
20      A. The -- I think -- I'm not sure just exactly which
21  ones we're referring to.
22      Q. Maybe I can help you out there. One second.
23         MR. HOUGH: Page 47 where it talks about the
24  previous year?
25         MR. DAWSON: Yeah. Let me just highlight a

Page 63

1   section here.
2   BY MR. DAWSON:
3       Q. What I'd like to do, Mr. Wiley, is mark a section
4   and give it to you to review. The section is on page 47 of
5   The Last Run from Exhibit A (sic), begins with the words,
6   "So Mike DeCapua marched back to the Basement," and ends
7   with the words, "The boat would no longer be insured."
8          Actually, you know, that's not the section I want
9   to ask you about. One second.
10         MR. HOUGH: The previous year.
11         MR. DAWSON: I'm sorry. Where is that, Mike?
12  I'm not seeing it.
13         MR. HOUGH: Look here some more.
14         MR. DAWSON: There we go. There we go. The
15  previous year, yes. Okay. Okay.
16  BY MR. DAWSON:
17      Q. Yeah. I'd like you to look at two sections on
18  page 47. One begins with, "Wiley, he explained," and ends
19  with the words, "Pulled Wiley aside." And then the next
20  section begins with "So Mike DeCapua marched back," and
21  ends with the words, "No longer be insured."
22         Just look at those two sections and after you've
23  had a chance to review those, just let me know.
24      A. Okay.
25      Q. And my question, then, is, again, doesn't the

Page 64

1   book make it clear that the repairs in question were
2   actually done the prior year to that conversation?
3       A. Well, I don't think he's -- if he's referring to
4   '98 -- repairs took -- there wasn't really any repairs to
5   be done. The thing was flexing and there wasn't anything
6   unsafe about it. Was -- I -- you know, you just don't --
7   unless something -- a boat isn't seaworthy, you do what you
8   can do, and it was expensive to do what I done. But
9   actually, when I did the stability test, it was before Mike
10  ever came to work for me, or just about the time he did in
11  '89.
12      Q. Let me rephrase my question. I may not be doing
13  a good job of it.
14         If you were reading this passage, if you were
15  reading this passage, wouldn't the passage suggest to you
16  that the repairs took place prior to 1998? Now, I
17  understand you're saying they took place even before then,
18  but if you were reading this, it would suggest they were
19  before 1998?
20      A. Yeah, it would suggest that. Yes, if there was.
21  As far as I can see it's suggesting that.
22      Q. Let me ask you some questions about vessel
23  surveys that you've had done over the years.
24      A. Sure.
25      Q. Is it fair to say that vessel surveys that you've

Page 65

1   had done -- let me back up.
2          It's fair to say that boats have problems that
3   need to be repaired on a regular basis, isn't it?
4       A. Yeah, it's a continuous job.
5       Q. And it's fair to say that vessel surveys on the
6   Min E have disclosed a variety of problems over the years?
7       A. Knowing -- not really. There has never been
8   anything -- there's been a few things that Steffan didn't
9   like. He usually always shows up when I'm working on the
10  boat and doing a project and I got tools everywhere and
11  everything, and then I will call him and ask him about him,
12  and he says, I got to put all this stuff down. So I don't
13  know.
14         He's not -- anyway, the insurance company has
15  never -- has never really -- the only thing they've ever
16  said, well, we would like you to put -- there was something
17  with the belts not being enough protection there, so they
18  would like me to do that, and they would like me to do --
19  strap the batteries down better than what I had, and just a
20  few minor things like that. There's never been anything
21  that was a big deal.
22      Q. Let me go over a few of those.
23         What was the name of the surveyor? Steffan?
24      A. Steffan.
25      Q. Is it Jim Steffan?

Page 66

1   A.  I think it is Jim Steffan.  He did it, and let's
2   see, who else was a surveyor?  They had a lot of other
3   ones, but I can't recall.  I had one from Juneau, too, one
4   year.
5        (Exhibit 2 marked)
6   Q.  Mr. Wiley, I've handed you what's been marked as
7   Exhibit 2.  I believe this actually consists of a couple
8   surveys, but let's make sure of that.  If you look at the
9   bottom, there's some stamped numbers, and I'd like you to
10  confirm for me that the first two pages -- actually, one
11  second.  It looks like more than that.  I believe
12  pages 1 through 7 -- actually, forget about the Bates
13  numbers, but if you look, it says, page 1 of -- the very
14  first page it says page 1 of 7.
15  A.  Right.
16  Q.  Would you confirm for me that those seven pages,
17  the first seven pages of Exhibit 2, are a survey that you
18  had done on the Min E dated May 10, 2001?
19  A.  It says 1 of 7 and 6 of 7.
20  Q.  It looks like page 6 may be out of order there.
21  A.  Okay.  I got -- there's some more that doesn't --
22  Q.  There are, but I'm just wanting to go through the
23  first seven pages there.
24  A.  Okay.
25  Q.  Is that a survey you had done --

Page 67

1   A.  Yeah, it would be.
2   Q.  All right.  Dated May 10, 2001?
3   A.  Right.
4   Q.  And let's see.  If you start, then, with the very
5   next page of Exhibit 2, and you will notice at the bottom
6   it says page 1 of 6, confirm for me that the next six pages
7   there are a survey that you had done dated October 14,
8   1996.
9   A.  Okay.
10  Q.  Is that correct?
11  A.  Yeah, as far as I can see it would be right.
12       (Exhibit 3 marked)
13  Q.  And showing you Exhibit Number 3, would you
14  confirm for me that that is a survey that you had done on
15  the Min E dated October 8, 1992.
16  A.  Okay.
17  Q.  And that is correct?
18  A.  Yeah, I think so.
19  Q.  I want you to look at page -- that was Exhibit 3;
20  is that correct?
21  A.  Yes.
22  Q.  I want you to look at page 6 of Exhibit 3.
23  Excuse me.  Page 5 of Exhibit 3.  It makes a comment that
24  you -- you see there at the top it makes the comment that
25  the plywood bait shed is in fair to poor condition.

Page 68

1        What was it about the bait shed that was in fair
2   to poor condition?
3   A.  One double-wide galvanized bait shed.  I don't
4   see no 3.
5   Q.  Right here.  It says, plywood bait shed in fair
6   to poor condition.
7        Can you tell me what was in fair to poor
8   condition about the bait shed?
9   A.  Well, it was an aluminum-framed bait shed that
10  was put up, and at that time when I first had it put on I
11  didn't have the money to have it laid with aluminum, so I
12  put on plywood, and then we nailed like a -- to keep it
13  from leaking we put like a tarp over it.  But it really
14  was -- yeah, it was a piece of junk after a couple of
15  years, and I did saw it off and do away with it and put a
16  new one on.  It wasn't something that was dangerous.  It
17  wasn't that bad.  But it was something that didn't look
18  very nice.  I can say that.
19  Q.  If you look at the next page of that Exhibit 3,
20  page 6 of 6 of Exhibit 3.
21  A.  Okay.
22  Q.  You will see a number of starred recommendations,
23  the recommendations that have two asterisks in front of
24  them?
25  A.  Uh-huh.  The ones with two in front of them?

Page 69

1   Q.  The asterisks?
2   A.  Yeah.
3   Q.  Is it correct that things that have --
4   recommendations that have asterisks in front of them were
5   items that were found by the surveyor as affecting the
6   seaworthiness of the vessel?
7   A.  No.  I don't think he would have -- these are
8   things that he wanted me to do, but he wouldn't have --
9   let's see, the electrical leads.  I changed the electrical
10  stuff in the engine room, and when I did I coil them up and
11  put them in a different section rather than throw them
12  away, because it was another system, even though it wasn't
13  hooked up.  He didn't like that, but it wasn't -- they're
14  still there, and it doesn't bother anything.  Let's see.
15  Secure battery --
16       THE VIDEOGRAPHER:  Can we go off record?
17       MR. DAWSON:  Please.
18       THE VIDEOGRAPHER:  Going off the record.  The
19  time is 1:17.
20       (Off record)
21       THE VIDEOGRAPHER:  Back on the record.  The time
22  is 1:20.
23  BY MR. DAWSON:
24  Q.  Let's go back to Exhibit 3 again, Mr. Wiley.  At
25  the bottom of page 6 of 6 of Exhibit 3 you will notice a

Page 70

1  box that has a line around it and the text is capitalized
2  and in bold; do you see that?
3      A.   Oh, okay.
4      Q.   And you see it says, "With the exception of
5  starred findings, this vessel is found to be in good
6  physical risk for the purpose of use, sale, insurance, and
7  finance and well suited for the intended use.
8  Recommendations not so noted do not significantly detract
9  from the seaworthiness or safety of the vessel at the
10 present time."
11          Do you see that?
12     A.   Uh-huh.
13     Q.   So is it correct, then, to say that
14 recommendations that do not have stars do not detract from
15 the seaworthiness; is that a correct statement?
16     A.   Yeah, that would be what I would say, yeah,
17 that's what Steffan is stating.
18     Q.   And in the opinion of the surveyor, then,
19 recommendations with stars in front of them do detract from
20 the seaworthiness of the vessel?
21     A.   He -- what this is, he comes on when everything
22 is being done. It's not done -- he doesn't come on when I
23 say, okay, the boat's ready to go, we're going to fish the
24 year. He comes on at the end of the year when I'm
25 repairing everything, and all through these things, and

Page 71

1  then he makes all these statements. Even though you're
2  standing there and you're telling him, I'm working on the
3  boat, I'm doing this and doing that, I'm not going fishing,
4  he will state, I have to tell them.
5          And that's what he does. He's just a hard-headed
6  person. So then I have to talk with the insurance company
7  and explain everything to them and take pictures, and then
8  they give me the final okay.
9      Q.   And my question is whether it's correct to say
10 that starred items, in the opinion of the vessel
11 surveyor --
12     A.   I don't think --
13     Q.   -- in the opinion of the vessel surveyor do
14 affect the seaworthiness of the vessel?
15     A.   In his opinion, I don't think so, but I don't
16 know. Maybe that's what he's -- I guess that's what it
17 says.
18     Q.   Isn't that in fact what it says?
19     A.   Yeah, I guess that's pretty much what it says
20 here. I'm fishing...
21     Q.   So those would be things that you would have to
22 fix?
23     A.   Yeah. It's recommended.
24     Q.   Now, isn't it true in 1996 you were told by the
25 vessel surveyor that the bait shed was poorly attached?

Page 72

1      A.   In what year?
2      Q.   1996.
3      A.   He didn't like -- it was fairly new and he -- I
4  don't remember exactly what the problem was. It wasn't
5  poorly attached. It was something to do with the stays,
6  and the stays comes back to the -- to the -- all it does is
7  you got your pole sticking out, and all it does is keep the
8  pole from going forward. He didn't like it because it was
9  loose. And it would work itself, because of the wood there
10 and that, and people would tighten the stay up real tight,
11 and that would cause the amount to sink in further into the
12 wood, so then it wouldn't be quite as tight as it should
13 be.
14          And then he would see that the bolts were -- had
15 more space. You know what I mean? Because they sunk in
16 further, even though there was no more thread left, the
17 bolts were loose. So those things were taken care of, you
18 know -- if you don't take care of them, your pole will come
19 off, if -- you know, if -- the only time it would happen
20 would be if you had your pole out without the stabilizer in
21 the water or if you put the boat in reverse without the
22 stay being hooked, then the pole would come off.
23     Q.   And that would be a bad thing?
24     A.   Well, it wouldn't be a seaworthy thing, but it
25 would be a thing that you wouldn't want to happen because

Page 73

1  it costs a lot of money to replace it, and a lot of time.
2      Q.   Let's look at Exhibit 2. And I'd like you to
3  look at page --
4      A.   But this is at the end of a year, a fishing year,
5  and every time at the end of a fishing year there was
6  things that had to be done. And because he comes on my
7  boat and makes these recommendations doesn't mean that I
8  didn't take care of them. It means he came on when things
9  needed to be repaired, or certain things had to be done,
10 and I took care of them and did them or I couldn't go
11 fishing.
12     Q.   All right. Let's look at page --
13     A.   Or it was either that or I had to convince the
14 insurance company that there wasn't a problem.
15     Q.   Let's look at page 6 of 6 of the 1996 survey,
16 which is the second survey that is part of Exhibit 2.
17     A.   Page what now?
18     Q.   It's the sixth page of the -- at the bottom of
19 it, it says --
20          MR. HOUGH: Last page.
21          MR. DAWSON: There you go. Last page of
22 Exhibit 2.
23 BY MR. DAWSON:
24     Q.   Last page of Exhibit 2, and you'll notice right
25 there at the bottom it specifically says, "At the time of

Page 74

1  inspection, the bait shed was poorly attached to the
2  bulwark caps on the aft deck."
3      Correct?
4      A. Which paragraph is that? Or which one?
5      Q. It's recommendation number 10. It says, "At the
6  time of the inspection, the bait shed was poorly attached
7  to the bulwark caps on the aft deck."
8      It says that, does it not?
9      A. Yeah.
10     Q. And it says at the beginning, before, "Prior to
11 offshore fishing operations, all of the shed mounting pads
12 are to be securely attached to the bulwark."
13     Correct?
14     A. Right.
15     Q. And you'll notice there are stars in front of
16 that recommendation, correct?
17     A. Right.
18     Q. And that, in the opinion of that vessel surveyor,
19 therefore, that was something that affects the
20 seaworthiness of the vessel, correct? Again, in the
21 opinion of that surveyor.
22     A. I don't know if it would affect the seaworthiness
23 of it. You would just lose the bait shed, is what would
24 happen.
25     Q. I'm asking whether the report says that in the

Page 75

1  opinion of the surveyor --
2      A. Yeah, in the opinion of the surveyor.
3      Q. It does?
4      A. Yeah.
5      Q. In fact, if you look on that same page, I see
6  four other items that are starred as affecting the
7  seaworthiness of the vessel, items 5, 6, 7, and 8; is that
8  correct?
9      A. That's correct.
10     Q. And with respect to each of those
11 recommendations, because they have stars, that means that
12 in the opinion of the surveyor they would affect the
13 seaworthiness of the vessel?
14     A. Uh-huh.
15     Q. Correct?
16     A. Yeah, that -- according to his opinion, yes.
17     Q. The only reason I had you to say it again is
18 because you said uh-huh.
19     A. I see. Yes.
20     Q. I wasn't trying to give you a hard time.
21     A. It's just this guy is -- he's never gone fishing.
22 He doesn't know anything except how to fix wood plank
23 boats, and he goes on people's boats and he sees little
24 things he don't like and he makes a big deal out of things
25 that aren't a big deal. Sometimes he's correct and I'm

Page 76

1  working on it or it's in the plan to fix it. But it
2  isn't -- the day that he comes, it isn't done.
3      Q. This gentleman is a professional surveyor,
4  correct?
5      A. I don't know how he got to be one, but yeah,
6  he's -- he is really a shipwright and he makes most of his
7  money on repairing wood boots, is where he makes most of
8  his money.
9      Q. And he is somebody that is hired by insurance
10 companies in order to --
11     A. Well, he's got -- you don't have to have anything
12 special about you, except some background, to be a
13 surveyor. There's no -- there's no certain -- at least
14 there didn't used to be. As far as I know, there's no
15 certain...
16     Q. And this gentleman has that background?
17     A. He has a background of fixing boats, but he
18 doesn't have the background fishing, being on the ocean. I
19 would question that, and then he's been there -- as long as
20 I've been there, he's been there.
21     Q. Okay.
22     A. But he's never -- he never goes fishing. But it
23 doesn't -- a lot of these things were just things that I
24 was doing. Steffan comes on your boat and you're repairing
25 it and it's like you got your car in the -- having it tuned

Page 77

1  up and everything done, and the guy comes in and says,
2  well, this gots to be done to your car and that's got to be
3  done to your car, and you're doing it, but you can't do
4  that right that minute. So he puts these things in. It
5  would be much better if he would come down like the Coast
6  Guard does and give you a stamp of approval that everything
7  is seaworthy.
8      Q. These surveys reflect the condition of your
9  vessel at the time it was surveyed?
10     A. Yeah.
11     Q. Let's look at the -- I want to ask you a few
12 questions about the 2001 survey. This is Exhibit 2 again.
13 And I want you to look at page 6 of that 2001 survey. And
14 at the bottom of it you'll see a Bates stamp number that
15 says W50125, just to make sure we're looking at the same
16 page.
17     A. Page 6 of 7?
18     Q. Yes. And at the bottom does it have the number
19 W50125, the very bottom?
20     A. Yep. 50125.
21     Q. That's correct. Thank you. In looking at this
22 survey, I see a number of starred items, and this is from
23 the 2001 survey.
24     And my question again is, with respect to the
25 starred items, it would be the opinion of the surveyor that