Page 78

1  those affected the seaworthiness of the vessel, correct?
2    A. Yeah, that's again what he states here. Yes.
3    Q. And some of those items 1 and 2 reflect a
4  violation of regulatory requirements, correct?
5    A. Let's see here. 1 and 2. The life ring is to be
6  labeled with the name of the vessel. I remember that.
7  Again, this is at the end of the season and I am doing
8  these things. The Coast Guard, you know, they come down
9  and inspect it. If you have them come down and inspect
10 your boat before the season, they put a stamp on your boat,
11 and then when they board you -- and they do every year,
12 they board you --
13   Q. Is it fair to say that your boat should comply
14 with the law during the entire season, not just the
15 beginning of the season?
16   A. No, no. They don't -- they don't want me to use
17 it in the off season. They want like a two or three-month
18 lay-up.
19   Q. I don't imagine the name of the vessel got
20 removed from the life ring during the off season.
21     So my question is, aren't you required to be in
22 compliance during the entire time of the season?
23   A. Yes.
24   Q. Okay. And with respect to items 3 through 8,
25 those are safety requirements, correct? Let me focus your

Page 79

1  attention on the bolded paragraph that begins with the
2  words "safety requirements."
3     Do you see that paragraph?
4    A. Yeah.
5    Q. Does it say, "These findings may constitute an
6  endangerment to personnel and/or affect the vessel's safe
7  and proper operating condition"?
8    A. Yeah, it does.
9    Q. So items 3 through 8 deal with safety
10 requirements, correct.
11   A. Yes.
12   Q. And it's true that these requirements need to be
13 met the entire -- during the entire season, correct?
14     MR. HOUGH: I object to the question. It talks
15 about the vessels next in buoy.
16     MR. DAWSON: I understand.
17     MR. HOUGH: So mischaracterizing the statement.
18     MR. DAWSON: Let me rephrase.
19 BY MR. DAWSON:
20   Q. All of these things -- strike that.
21     None of these things could be present during any
22 part of any season, correct?
23   A. They can. They can happen again in the middle of
24 the season and you got to fix them. If they're dangerous,
25 yes.

Page 80

1    Q. And you shouldn't be fishing if they exist,
2  correct?
3    A. No, you don't fish if it's dangerous. No. I
4  don't stick my neck out there. No way will I do it. I
5  mean, I'll fix it. I have enough tools on that boat to fix
6  anything that goes wrong any time.
7    Q. Well, these items had not been fixed at the time
8  of the survey, correct?
9    A. Well, this one I put in, this '96 one, I think --
10 is this '96 or 2001?
11   Q. This is 2001.
12   A. Well, '96 I put in a new John Deere and a new
13 reverse gear, which is a transmission, and he didn't like
14 the way I -- I had belt guards, but he didn't like the way
15 that I had the JABSCO emergency pump in there because there
16 was a belt, even though you couldn't get into it unless you
17 actually just stuck your hand into it some way or another.
18     And the argument was -- I talked it over with the
19 insurance company and I says, look, I don't want a guard
20 over that. If that belt busts, I want to be able to put --
21 that's my emergency pump. I wanted to be able to put that
22 belt on immediately. I don't want to have to sit there and
23 ask people for wrenches under water and everything else
24 trying to take this guard off to put a new belt on so I can
25 pump the water out.

Page 81

1     So they dismissed this one that they put down
2  here about the JABSCO pump, and it's still that way today.
3  It has saved my behind right there. And to do what he
4  wanted would have made the boat more unsafe, and the
5  insurance company agreed.
6    Q. Do you have any documentation from the insurance
7  company to that effect?
8    A. No. They just -- they just -- you just negotiate
9  with them each year.
10   Q. So as of the date of this survey, these are the
11 conditions that the surveyor found to exist?
12   A. That's what Steffan thought, yes.
13   Q. And isn't it true that in 2001 your insurer
14 threatened to cancel your insurance unless the starred
15 items on this page were fixed?
16   A. Yes. You got to fix what they -- which ones you
17 discuss. Not all of them. You discuss them and you
18 can't -- you can't have the boat insured unless they're
19 happy with what you've done.
20   Q. In fact, they felt that all of the starred items
21 needed to be completed in order to --
22   A. No. Steffan did. They didn't. They get this
23 and then I have to discuss it with them. Some of these
24 things -- let's see. Fix portable fire extinguisher --
25   Q. I'll have to --

Page 82

1    A.  If it fits -- the extinguishers are done yearly,
2  and he didn't come down and didn't see any tags, and you
3  don't have to have a tag every year. And I have the best
4  extinguishers on there you can possibly have. I've got --
5  I got halon. I got the one for foam that you can -- you
6  know, it will attack a fire anywhere in the bilge. I've
7  got ABC -- ABC.
8        And I finally took the CO2 ones off because they
9  were so much trouble that you had to send them to Seattle
10 to have them pressure-tested. And so I took them off. It
11 didn't make the boat any more hazardous because of that. I
12 just put other type of extinguishers in there.
13   Q.  In your opinion, correct?
14   A.  No. I've been to safety school and been showed
15 how to put out fires and what was all the latest and newest
16 stuff. Steffan has it.
17   Q.  Is there anything in here where the insurance
18 company said they agreed with your opinion in that respect?
19 Do you have any documentation --
20   A.  On this bilge pump, sure.
21   Q.  I'm talking about the fire extinguishers.
22       Do you have anything from the insurance company
23 that says they agreed with your view?
24   A.  I had them tagged.
25   Q.  So you solved -- you corrected the problem?

Page 83

1    A.  But then the Coast Guard came on later that year
2  and said you didn't have to do that. So that's -- you just
3  go over to the guy that works at the fire department and he
4  gives you some tags and you take them down and put them on
5  your extinguishers. They go by -- the Coast Guard goes
6  by -- there's a gauge on there, and when it says it's not
7  good, then that's when they give you a citation. And --
8    Q.  I'm going to have to ask you to hold up so I can
9  ask questions.
10   A.  I've got like five great big extinguishers on
11 there.
12       MR. DAWSON: Let's mark that as an exhibit.
13       (Exhibit 4 marked)
14       THE WITNESS: This is 2001. That's what it was.
15 I wasn't even using the boat. I worked on the boat for two
16 years.
17 BY MR. DAWSON:
18   Q.  Mr. Wiley, I will have to ask you to respond to
19 questions. If your attorney wants to bring out those
20 points, he can certainly do so.
21       I want you to look at Exhibit 4 for me, and I
22 will represent to you that this is correspondence between
23 your insurance broker and the insurance company that
24 insured you.
25   A.  Okay.

Page 84

1    Q.  Were you ever provided a copy of this from your
2  broker?
3    A.  I don't know.
4    Q.  Is Eric Erven your broker?
5    A.  He is now.
6    Q.  And this appears to be -- it was originally a --
7  some sort of a communication from Eric to Becky of your
8  insurance company, and then it appears that Becky in hand
9  returned it back with some notes on it.
10       Do you see those notes along the margin there?
11   A.  Becky.
12   Q.  Becky. And it looks like -- does it appear to
13 you that Becky was writing something from her to Eric, your
14 broker?
15       And you will see the notes on the side there, and
16 doesn't that say, "No trip without number 8 completed"?
17 And it says, "Written statement needed. All recs with star
18 will have to be completed or bye-bye." Signed Becky.
19       Do you see that?
20   A.  Uh-huh.
21   Q.  Does that refresh your recollection that the
22 insurance company required that all of the starred items be
23 fixed or your insurance be canceled?
24   A.  Yeah. That's very true. The boat...
25   Q.  Let's move on.

Page 85

1    A.  I didn't fish the boat that year. I'm sorry.
2  They just wanted a survey.
3        (Exhibit 5 marked)
4    Q.  Showing you what's been marked Exhibit 5,
5  Mr. Wiley, that appears to be correspondence from your
6  insurer to your insurance broker, dated May 18, 2001.
7        Did you ever receive a copy of that from your
8  insurance broker?
9    A.  No, I don't -- either one of these two I don't
10 recall ever receiving from him. I talked to him on the
11 phone about it.
12   Q.  Exhibit 5 says -- this is apparently Eric, your
13 broker, speaking. It says, "I informed the owner that the
14 vessel must not leave the Sitka harbor until the upgrades
15 have been completed."
16       Do you remember Eric informing you of that?
17   A.  Sure.
18       MR. HOUGH: Can I ask you on the prior exhibit,
19 do you have the original? And the reason I'm asking is if
20 the circle means that that -- then if the JABSCO is
21 deleted.
22       MR. DAWSON: I'm sorry.
23       MR. HOUGH: I'm wondering what the --
24       MR. DAWSON: Oh, there's a hole from the hole
25 punch.

Page 94

1  Q. You said somebody told them something about what?
2  A. About me.
3  Q. But not necessarily about the book?
4  A. No. I don't know. I wouldn't know. They would
5  not tell me anything.
6  Q. Okay. Other than they wanted to take a land job?
7  A. Yeah. They took a land job there in Homer.
8  Q. And they were worried about whether the fish
9  would come in?
10  A. Well, yeah. They started -- we started at the
11  beginning, which was like, I think, the end of June. They
12  usually don't start coming in very heavy until around the
13  7th or 10th, somewhere in there.
14      MR. HOUGH: When there's a convenient time, if we
15  could take a couple-minute break.
16      MR. DAWSON: Sure. Give me five minutes and I
17  will be done with this section here, if that's convenient.
18  And that will be a good stopping point.
19  BY MR. DAWSON:
20  Q. In July 2004 did you have what appears to be a
21  minor collision with a vessel named Ethernet?
22  A. Yeah, I did.
23  Q. And you ended up paying the damages to the owner
24  of that vessel?
25  A. I did. It's filed with the Coast Guard.

Page 95

1  Q. And that collision was your fault, correct?
2  A. No. Well, it was my fault and it wasn't my
3  fault. The crew that was on there -- I can only get into
4  the Kenai River on high tide. I draw too much water under,
5  almost six feet. And I asked them to pull in the stabies
6  and pull the poles. And they knew the poles had to come up
7  because they've already had to do it quite a few times.
8      They didn't pull the poles, and I wasn't aware of
9  it. And I was very occupied getting the boat in there
10  without running aground. And I'd never been in there
11  before. And I didn't see that the poles weren't up. So as
12  I went along, the pole hit the stack of this boat, the
13  Internet, and knocked his stack over.
14  Q. What would it take to see if the poles were up or
15  not?
16  A. I would have had to get away from the wheel and
17  went and looked out the window or out the back door.
18  Q. And that's something you could have done before
19  you went in, isn't it?
20  A. We was already in when the pole -- I mean, I was
21  already in the shady waters so I was...
22  Q. Ordinarily a captain would look to see if the
23  poles were up or not, wouldn't he?
24  A. Yeah, you do, I guess, but it's just -- it's like
25  my fault. It's something that you're so used to over the

Page 96

1  years that somebody doesn't do something like that --
2  Q. Well, you trusted your crew?
3  A. Yeah, that's what I did. One of the guys said,
4  well, if I hadn't have been asleep, it wouldn't have
5  happened. So I don't know. It was an expensive --
6  expensive forgetness on my part.
7  Q. 1999 was there an incident where you ran aground
8  on Broad Island outside of Sitka?
9  A. Yes. I didn't actually run aground. But we ran
10  into the island. It's a steep island like this --
11  Q. Oh, okay.
12  A. -- and I ran into the island.
13  Q. That was because you fell asleep in the pilot
14  house?
15  A. I think it was because of the carbon monoxide.
16  It was early and we just had finished up a 30-day trip over
17  in Chatham, because Chatham has got to where it isn't very
18  good fishing. It's starting to come back now. So he shut
19  the door and turned the stove way up, and I -- I was
20  sitting there and all of a sudden I thought, boy, I better
21  get up, and that's the last thing I remember, and next
22  thing was bang, bang, bang. We hit the island and it woke
23  me up.
24      He opened the door and I got my head back, and
25  then fortunately the wind was on our stern and he managed

Page 97

1  to get -- because the stabilizers were out. He managed to
2  get one of the -- the pole that had came off, he got it
3  back onto the boat. And I backed -- she backed right out
4  perfectly. And I -- there was water coming in, but I just
5  turned on the emergency pump, and it was more than
6  sufficient to keep it pumped out. And I just -- from there
7  I just took my time and was no more sleep problems.
8  Q. Two follow-up questions, then we'll take a break.
9      You were certainly aware that the crewman had
10  shut the door, though, and the stove was turned up,
11  correct?
12  A. Yeah, but I didn't think a whole lot -- you know,
13  I just didn't think much about it. I don't know why. And
14  I got up to open it up, or I started to, but I never did.
15  Q. And you were not equipped with a watch alarm,
16  were you?
17  A. It wouldn't have made no difference. The watch
18  alarms are -- well, no, I don't have a watch alarm. I got
19  off-course alarm. I've got radar alarm. I've got --
20  Q. What's a watch alarm do?
21  A. It's a black box that sits up on the wall and
22  it's got a key in it and -- anyway, you got to push it
23  every ten minutes.
24  Q. So if you had a watch alarm, it might have
25  avoided this accident?

Page 98

1    A. It's possible, but not probable. I don't know,
2  you know. It's something I will never know. I'd never
3  ever had a sleep problem. I mean, I just -- for years and
4  years and years. And I still don't. And I contribute it
5  to carbon monoxide.
6    Q. But if you had a watch alarm, even if it were
7  carbon monoxide, it would have gone off and potentially
8  averted this?
9    A. It's potential, yes. But very few boats use
10 them. They're used mainly on big boats that are going
11 across the gulf. They got long-time wheel watchers for the
12 crew.
13       MR. DAWSON: And I will go ahead and take a break
14 so that you get a chance to take a break.
15       MR. HOUGH: Let's go off for ten minutes here.
16       THE VIDEOGRAPHER: Going off record. The time is
17 2:03.
18       (Recess)
19       THE VIDEOGRAPHER: Back on the record. The time
20 is 2:12.
21 BY MR. DAWSON:
22   Q. Mr. Wiley, before we went off record there, we
23 were talking about the incident in 1999 where you ran into
24 Broad Island.
25       Do you recall that the surveyor, as part of his

Page 99

1  1996 survey, actually recommended that you have a watch
2  alarm?
3    A. Yeah. I know that he had recommended it. Each
4  year he come on and even though things were the way they
5  were, he would recommend other things regardless. He felt
6  that he had to do it or he wasn't doing his job, is what he
7  told me.
8    Q. And the watch alarm was one of those things?
9    A. He thought that I should have one. They're
10 usually required of boats that travel long distances. They
11 don't -- and I didn't travel long distances. And I didn't
12 have crew. I never had my crew do wheel watches. I did
13 them all all through all the years. I didn't trust my crew
14 to do them. And if I got too sleepy, I would just anchor
15 up. But this was early evening when this happened.
16   Q. Okay. There was -- I understand there was a
17 minor incident in May of '99 when the Coast Guard responded
18 to an injury to a crewman who had taken a fish hook in his
19 hand? Was there an incident like that?
20   A. There was a guy --
21   Q. At this point, I just want to know if you
22 remember the incident. That's all.
23   A. You don't know what year?
24   Q. May of '99.
25   A. Okay. That must -- May of '99.

Page 100

1    Q. Would it help if I showed you the Coast Guard
2  write-up? Would that refresh your recollection?
3    A. I think it was a Native guy, is who he was, and
4  the crew member that was on there said he had been smoking
5  pot. And the guy -- anyway, he was going to start
6  something. I forget what it was. But anyway, he quit
7  after he found out that -- what he was doing, he was
8  pulling line through his shiv. I don't know if you know
9  anything about them. But you got to pull them straight and
10 down, and he started standing up and pulling it this way,
11 and he pulled it out of the shiv, is what he'd done.
12   Q. What is a captain supposed to do to make sure
13 that the crew are not under the influence when they come on
14 a vessel?
15   A. I don't know. That's something I don't know how
16 to do, because I don't use that stuff and never have.
17   Q. So you can't tell if somebody is under the
18 influence?
19   A. Of marijuana and that, I don't know how to tell.
20 Alcohol, I can smell it.
21   Q. You can't tell if somebody seems to be impaired,
22 based on their behavior?
23   A. I would if it was strong enough. I didn't know
24 that he was smoking pot. I mean, I didn't -- I've known
25 people that have smoked pot. It didn't seem to change them

Page 101

1  any. So I don't know. That's something I just don't know
2  how --
3    Q. At any rate, you were unaware that this
4  individual was on drugs at the time he was on your boat?
5    A. Yeah.
6    Q. Is it correct that you were cited in 1994 for a
7  variety of safety violations by the Coast Guard?
8    A. I think they were warnings that I needed to do
9  something. I think it was -- I think it was coming into
10 Juneau, is what it was.
11   Q. And that citation included the fact that your
12 survival craft wasn't serviced, your immersion suits
13 weren't properly marked and they hydrostatic release on
14 your EPIRB had expired.
15       Does that sound correct?
16   A. What date was that?
17   Q. 1994.
18   A. '94 and what -- what date? I mean, what month?
19   Q. Let's see if I can find that for you.
20   A. '94? Because I did my life raft once a year and
21 I was doing it -- let's see. I was having it sent up here
22 to Cook Inlet to be done because the guy was cheaper and
23 I'd bought it from him. In '95 I started coming up here,
24 and then I would have it serviced when I was up here
25 gillnetting.

Page 102

1    Q.  I guess my only question is, do you remember
2  being cited for those things at some point, regardless of
3  what year it was?
4    A.  I was never cited it to the fact I was fined. I
5  was just cited to warnings, is what I --
6    Q.  Which means those things were not complied with
7  at the time?
8    A.  At the time. I complied with them, though.
9    Q.  You mean some later time?
10   A.  If they said that, that's -- it may have expired
11 like a month or something like that while I was fishing.
12   Q.  So if the Coast Guard report says that your
13 survival craft wasn't service, your merchant suits were not
14 properly marked, and hydrostatic release was expired, you
15 wouldn't take issue with that?
16   A.  No. Annually you've got to do it. It's just it
17 could have expired like a month -- maybe it was just one
18 month past, but that's -- I don't know anymore about it.
19 If it was expired when they came on, that would be the way
20 it is.
21   Q.  That would be a violation, wouldn't it?
22   A.  I don't know. Did they cite me for it?
23   Q.  Whether you got a warning or they actually made
24 you pay money, it would still be a violation, wouldn't it?
25   A.  Well, it's supposed to be serviced, and I would

Page 103

1  not -- only thing is I can say it must have been right when
2  it had to be done in '94.
3    Q.  And I'll see if I can pull that documentation.
4    A.  I just don't know what month it was. That would
5  be much easier. If you're in state waters, you don't have
6  to have it. I don't know if it happened during --
7    Q.  Let's take a look at page 48 of Exhibit 1. Or
8  page 48 of the book, and Exhibit 1 are the excerpts.
9  Organize your exhibits a little bit here for you. Here is
10 Exhibit 1. And let's go to page 48. Take a look at the
11 footnote on that page.
12   A.  Okay.
13   Q.  My question is just whether that footnote
14 accurately reflects what you told Mr. Lewan?
15   A.  I -- yeah, I vaguely remembered something about
16 the dispute with DeCapua. And I told him -- I stressed to
17 him to call Northern Marine Insurance and talk to Mike
18 Miller to find -- if he didn't believe me.
19   Q.  My question is whether what's printed here
20 accurately reflects -- I mean, is there anything that's in
21 here that is inconsistent with what you told Mr. Lewan?
22        MR. HOUGH:  Object to the question. It's been
23 asked and answered. You told him to --
24        MR. DAWSON:  Let me rephrase.
25 ///

Page 104

1  BY MR. DAWSON:
2    Q.  Other than the fact that you asked him to call
3  your insurance company, is this statement accurate of what
4  you told Mr. Lewan?
5    A.  Well, I certainly would have told him it was
6  seaworthy. The skipper said the Min E was a fine boat with
7  a sturdy hull and required only routine maintenance, and
8  that at no time could he recall any insurance inspectors
9  finding otherwise.
10       No. It's correct, but it's not -- if you try to
11 tie in with something that's in here with this, it doesn't
12 jive. I don't know. That's my warning that I've got to
13 fix -- every time I got one of these I had to do everything
14 that was said to do or negotiate with the insurance company
15 in order to have my insurance each year. So --
16   Q.  Let me make sure I understand your question now.
17 Although you said in addition to what's in here, you said
18 you asked him to call your insurance company.
19       That aside, everything that's in that footnote is
20 accurate, as far as what you told Mr. Lewan?
21   A.  As far as I can see it's -- let it soak in a
22 little bit here. I don't recall. I probably said I don't
23 know about insurance inspectors. I probably said I didn't
24 recall any insurance companies having any fault with what
25 Mike might have said.

Page 105

1    Q.  I'm sorry. I'm not sure I understand.
2        How is that different than what he says here,
3  just so I understand your answer? What is it that you're
4  disagreeing with here?
5    A.  It says insurance inspectors. I didn't -- I said
6  insurance companies, and insurance inspector would be
7  probably a surveyor.
8    Q.  And so you're --
9    A.  So I'm saying that I didn't say inspectors. I
10 said insurance companies.
11   Q.  Okay. So you think you said companies rather
12 than inspectors.
13       Anything else that seems different than what you
14 remember saying to Mr. Lewan?
15   A.  I didn't -- see, about the details, with the
16 agreement with DeCapua. I said I didn't remember, and I
17 probably didn't, not that early in the -- just wasn't woke
18 up enough. I hadn't thought about it. Something -- a lot
19 of years gone by.
20   Q.  Anything else?
21   A.  The retro, the retro deal is -- if you come to
22 work for a boat and then you jump on the boat and then the
23 next -- it was -- back in the early years it was all
24 derbies up till '95. So if you came back and you didn't do
25 as well as they liked, then they'd jump ship, and if they

Page 106

1  got a better job on a better boat that they thought they
2  would make more money. Sometimes that didn't work, but
3  that's what they would do. Well, it's the same thing as
4  quitting a job.
5      Q. So that's what you told Mr. Lewan?
6      A. Well --
7      Q. And that's what Mr. Lewan wrote here, correct?
8      A. Well, I told him that it wasn't uncommon to hold
9  back, because if a guy quits his job, you don't pay him.
10 That's even in the deep sea long-liners' union in Seattle.
11     Q. So you don't take issue with Mr. Lewan's summary
12 of what you told him here? I mean, there's nothing --
13     A. Just a few parts of it.
14     Q. And I understand companies rather than
15 inspectors, and you told him to call your insurance
16 company.
17         Aside from that, you don't take issue with this,
18 correct?
19     A. Correct.
20     Q. Now, if he had called your insurance company, he
21 would have gotten the same documents that we're talking
22 about here today, wouldn't he?
23     A. No. Because I don't think -- well, I guess he
24 would have got some of them, because I switched from Mike
25 Miller because of one reason. I told him that I was going

Page 107

1  to check on him for competition, or I was going to check
2  with another insurance company to see whether I could get a
3  better deal or not.
4         Well, what I didn't know what insurance people
5  do -- what they do is if you tell them that, they go and
6  present you to every insurance company there is so that the
7  insurance company you go to and ask -- see what they can
8  get it for you, they can't do anything then, because he's
9  already presented you and they're blocked out. And I
10 thought that was really a dirty thing to do, and so a
11 couple years later I switched to this -- Eric.
12     Q. You've had -- is it Gangle, Gerald Gangle?
13     A. Yes.
14     Q. You've had him work on the Min E for quite a
15 number of years, correct?
16     A. I've had him do -- yeah, he's an excellent
17 fiberglass person. He used to do -- he used to do, for the
18 company that built the boat, he used to do warranty work,
19 and he does build boats now too.
20     Q. That's somebody, by the way, we've spoken to in
21 this matter.
22     A. Have you?
23     Q. Yeah. Nobody has said to you that as a result of
24 reading The Last Run they think you've failed to maintain
25 your boat, correct; nobody's told you that?

Page 108

1      A. Nobody's actually said it. I've had people kind
2  of picky about certain things that ordinarily wouldn't be.
3      Q. Do you even know if they read the book before
4  they got picky?
5      A. I don't know. I don't know. I never -- it's
6  kind of like -- I don't know. That's -- just not sure.
7      Q. And nobody has told you that they won't work for
8  you because of the book; nobody has said that to you?
9      A. No, not directly.
10     Q. In fact, you haven't heard it from anybody else
11 that somebody told them that they won't work for you
12 because of the book?
13     A. No. And nobody's going to either. Because
14 that's just -- people don't do that.
15     Q. They certainly might say they won't work for
16 somebody because they don't like them; they might say that,
17 correct?
18     A. Yeah. Well, I've tried to ask people, well, why?
19 They'll never tell you. I've never ever -- tried for years
20 to find out. So if I'm doing something that's displeasing
21 them so I can improve myself and have an ordinary crew.
22     Q. You said you've tried that for years.
23        How long have you been trying that?
24     A. Ever since I've been doing this. I started
25 actually in 19 -- well, hiring crew was 1984, is when I

Page 109

1  started hiring crew.
2      Q. You haven't heard anyone tell you or tell
3  somebody else that as a result of reading the book they
4  think you cheat crewmen; you haven't heard anybody say that
5  to you?
6      A. I haven't -- I haven't -- I keep to myself pretty
7  much anymore. I don't -- I don't know.
8      Q. But the answer is no, you haven't heard anybody
9  say that?
10     A. No. I actually haven't.
11     Q. You added something there. The answer is no, you
12 haven't heard anybody say that?
13     A. Yeah. Just kind of mumbling to myself. I --
14 it's not much fun. That's all I can tell you. It's a gut
15 ache.
16     Q. I'm sorry. It's what?
17     A. It's -- makes your gut ache going around people
18 because --
19     Q. Isn't it perfectly possible --
20     A. No. You can -- no. People are different than
21 they used to be, and that's very easy for me to tell.
22 People don't say hi that used to say hi. There's a lot of
23 things like that.
24     Q. And these people that don't say hi, do you even
25 know if they read the book?

Page 110

1    A.   I don't know.
2    Q.   So you have no way of knowing whether people say
3    hi or don't say hi is because of the book?
4    A.   I just figure if they didn't read it, they got
5    secondhand information.
6    Q.   But you don't know that, do you?
7    A.   I don't know it, no.
8    Q.   It may just be that people aren't as friendly as
9    they used to be, right?
10   A.   I don't believe that. You might.
11   Q.   Isn't it just as possible that that's the answer?
12   A.   Anything is possible.
13   Q.   Sure. And I don't have any more information than
14   you do about this, right? You can't point me to anybody
15   that has said as a result of reading this book they've
16   changed their behavior towards you; you can't point to
17   anybody that's done that, can you?
18   A.   No. Because they would never tell me. Just
19   neighbors, everything. Nobody. It's pretty lonely.
20   Q.   But you don't know that the loneliness has
21   anything to do with the book, do you?
22   A.   Nobody directly has said so.
23   Q.   I'm sorry?
24   A.   Nobody directly has said so.
25   Q.   Has anybody indirectly said so?

Page 111

1    A.   No.
2    Q.   I want to direct your attention back to Exhibit
3    Number 1. We're going to look at pages 46 and 47 of
4    Exhibit Number 1. It's pages 46 and 47 of the book. And
5    we're going to start with -- we're starting with the text
6    that begins with, "Bob Doyle was not nearly as upset as the
7    others," going on to page 47 where it ends with, "He's a
8    cocksucker."
9         And I hope you understand, Mr. Wiley, I don't
10   enjoy using that term any more than you do, and I certainly
11   do not consider you to be such a man.
12   A.   I understand.
13   Q.   Just let me know when you've had a chance to --
14   A.   You want me to read from Bob Doyle or do you want
15   me to read from here and then over to that? The whole
16   paragraph or two paragraphs here?
17   Q.   Yeah.
18   A.   Okay.
19   Q.   You've had a chance look at that?
20   A.   Yep.
21   Q.   Regardless of what I might think, because what I
22   think is not relevant in this suit, it is perfectly
23   possible, is it not, that Mr. DeCapua might think you are,
24   to use his words, a cocksucker?
25   A.   Very possible.

Page 112

1    Q.   And isn't it true that, especially amongst crew,
2    amongst seamen, the word "cocksucker" is often employed to
3    mean that somebody is a bastard or a jackass, as you said
4    earlier today?
5    A.   No, and I don't -- you know, I'm pretty
6    clean-mouthed. I don't talk their language. But pretty
7    rare you ever hear that word.
8    Q.   I understand. But if you --
9    A.   I've heard it maybe somebody working on something
10   and they smashed their finger or something like that, but I
11   haven't heard it directly called at somebody.
12   Q.   You've never heard somebody referred to as a
13   cocksucker in your entire life?
14   A.   Well, yeah, I've been told people are certain
15   ways, yes.
16   Q.   Sure. And when you've heard that, you understood
17   that meant they were a bastard, didn't you, or a jerk or
18   a -- whatever, a jackass, to use your term earlier?
19   A.   No. I'm talking about if somebody told me they
20   were -- they used to call them queer, now they call them
21   gays.
22   Q.   That's not my question, sir.
23        When you have heard somebody in present-day times
24   refer to somebody else as a cocksucker, you understood that
25   they were calling that person a jerk or a jackass or a

Page 113

1    bastard, didn't you?
2    A.   No.
3    Q.   You didn't understand that?
4    A.   No, not really.
5    Q.   When they called -- you said you've heard the
6    term used.
7         When have you heard the term used?
8    A.   Well, I said I had heard it when -- I can
9    remember when I was younger somebody smashing their hand or
10   something and saying it.
11   Q.   When they did that, you think they were --
12   A.   No. They were just cussing at the -- whatever
13   the -- not a person, but they were cussing at something.
14   Q.   You don't think they were calling it gay, though,
15   do you?
16   A.   The hammer?
17   Q.   Yeah.
18   A.   No.
19   Q.   They weren't suggesting that the hammer was
20   homosexual, were they?
21   A.   No. I don't know. No. It was just a cuss word.
22   Q.   And so it's fair to say if that same cuss word
23   were directed at a human being as opposed to a hammer, that
24   doesn't necessarily mean that they think the person is gay,
25   correct?

Page 122

1   MR. HOUGH: Yeah.
2   MR. DAWSON: Oh, it's -- he'll go the distance.
3   I've got a lot.
4   MR. HOUGH: So the distance is four hours?
5   MR. DAWSON: No. Federal rules it's seven.
6   BY MR. DAWSON:
7   Q. Anything else in that statement, in that passage,
8   other than, "Phil has got a crush on you," and "He's a
9   cocksucker," that you take issue with?
10   A. It's just a bunch of dirty stuff, and I don't
11   like it. I never did anything to anybody to deserve it,
12   and I don't -- I just -- I take issue with the whole thing.
13   I don't like it. It's wrong.
14   Q. You don't like having your name used in a book?
15   A. That's right.
16   Q. Let's talk about the statement at page 48 of
17   Exhibit 1 where -- let me highlight it for you, sir. I'm
18   looking at the sentence that reads, "They worked the lower
19   half of the Chatham Strait and returned to Sitka with one
20   thousand pounds of black cod."
21   A. That's an out-and-out lie right there.
22   Q. And the reason why it's a lie is because of the
23   mistaken reference to black cod, correct?
24   A. I don't know. It says Chatham. I don't fish
25   Chatham for rockfish.

Page 123

1   Q. So the reference to Chatham Strait is incorrect.
2   What should that have been?
3   A. It wasn't for -- I didn't -- I don't know what it
4   was supposed to be.
5   Q. Did you fish in the middle of January of 1998?
6   A. You know what -- no, I would never do anything
7   illegal.
8   Q. I asked whether you fished in the middle of
9   January of 1998?
10   A. Oh, yeah, I did. I didn't -- not in the middle.
11   In the first part. I think the 8th was the last delivery I
12   made.
13   Q. And you caught fish of some kind?
14   A. Caught rockfish.
15   Q. So your beef with this particular sentence is it
16   says black cod; is that correct?
17   A. Chatham Strait, I wasn't anywhere near Chatham
18   Strait.
19   MR. HOUGH: I object to the question. If you
20   want to tie it to a time. It's not January 15th. It's the
21   1st through 8th.
22   MR. DAWSON: It doesn't specify a time here.
23   THE WITNESS: It specifies I did something
24   illegal, is what it says.
25   ///

Page 124

1   BY MR. DAWSON:
2   Q. And the thing that makes it illegal is the fact
3   that it refers to black cod?
4   A. Yeah.
5   Q. All right.
6   A. Black cod and Chatham Strait both.
7   Q. All right. So you're saying that the reference
8   to black cod and Chatham Strait is what makes it illegal.
9   Is there anything in here that would suggest to
10   an average reader, not an experienced fisherman, is there
11   anything in here that would suggest to an average reader
12   that you were doing anything illegal?
13   A. That I don't know. I don't know.
14   Q. An average reader wouldn't know whether it's
15   illegal to fish for black cod in Chatham Strait in January
16   or not, would they?
17   A. If they live in Alaska, they probably would. Or
18   a fisherman.
19   Q. So a fisherman might, but an average nonfisherman
20   would not?
21   A. Yeah. I guess they wouldn't.
22   Q. And certainly there's nothing in this passage to
23   suggest that the crew thought they were doing anything
24   illegal, is there?
25   A. I don't know. Because I don't know what -- I

Page 125

1   don't know how this got in there or who said what or how
2   and why.
3   Q. My question is whether the passage, anything
4   about the passage -- it doesn't say "and the crew went out
5   and fished illegally for black cod"? It doesn't say that,
6   does it?
7   A. Un-unh.
8   Q. There's nothing in the passage that would lead
9   the reader to believe the crew thought they were doing
10   anything illegal, correct?
11   A. And the Min E sailed again on the 15th, and I
12   didn't.
13   Q. My question is, does this statement suggest that
14   the crew thought they were doing anything illegal?
15   A. I guess not. I don't -- it doesn't -- it doesn't
16   state that. It just states something that was done that
17   was illegal, and it doesn't say it was illegal. It just
18   states that.
19   Q. So it would be a mistake, correct?
20   A. I don't know if it's a mistake or deliberate.
21   Q. You're saying it's a mistake, that it's not
22   correct. It's not correct to say black cod; it should have
23   said rockfish?
24   A. I don't know if it -- no. Because they got
25   Chatham Strait in here.

Page 126

1    Q. Where would you have fished for rockfish?
2    A. Offshore. There isn't any yellow eye in Chatham
3  Strait. You would be very lucky to catch one or two if you
4  fished there a whole year.
5    Q. But it wouldn't be illegal to fish for red eye
6  there?
7    A. No, it wouldn't be illegal.
8    Q. So the thing that you say makes it illegal is the
9  reference to black cod?
10   A. Right.
11   Q. Now, it's true, isn't it, that the Fish and Game
12 folks have periodically allowed January and February
13 fisheries, off-season fisheries, in order to do surveys of
14 the stock?
15       MR. HOUGH: For what fishery? For what species?
16 If it's black cod.
17 BY MR. DAWSON:
18   Q. For black cod.
19   A. Off-season?
20   Q. Yes, off-season fisheries to do surveys of the
21 stocks.
22   A. There was one year that they -- I think it was
23 last year or the year before that they sent out some
24 notices that they were going to let some people, but other
25 than that, that's the only year that I've ever heard of

Page 127

1  that. They were going to let people catch their quota,
2  like in April, but I don't know if it actually happened or
3  not.
4    Q. In fact, there have been years when there were
5  surveys, fishing allowed to be done off season for that
6  purpose, weren't there?
7    A. Surveys?
8    Q. Well, it was done for the purpose of surveying
9  the stocks.
10   A. I don't know. You would have to ask Fish and
11 Game. I don't know.
12   Q. Well, I have the regs in front of me, sir, and
13 you're not in a position to deny that in fact that has been
14 allowed to occur over the years?
15   A. I don't know that it has. That's what I'm
16 telling you. They usually do it in August. They charter a
17 boat and they do the survey.
18       MR. HOUGH: You referred to a regulation. What
19 regulation are you talking about that allows somebody to
20 fish for black cod in January 15th in Chatham Strait?
21       MR. DAWSON: You and I can talk about that after
22 the deposition.
23       MR. HOUGH: Tell us the regulation that you're
24 referencing.
25       MR. DAWSON: You and I can talk about that after

Page 128

1  the deposition.
2  BY MR. DAWSON:
3    Q. Isn't it true, sir, that somebody would have to
4  go read the regs in order to figure out whether it was
5  illegal or not -- or whether that type of fishing was
6  permitted in January of a particular year; they would have
7  to go read the regs to figure that out, wouldn't they?
8    A. Sure they'd have to. To fish Chatham Strait for
9  black cod you got to have a permit, and not anybody can go
10 over there and do that.
11   Q. As far as the fishing done to survey the
12 stocks --
13   A. To survey the stocks.
14   Q. -- you'd have to go review the regs to figure out
15 when that was permitted, wouldn't you?
16   A. You'd have to go talk with the -- yeah, the head
17 biologist, Torry O'Connell.
18   Q. And you sitting here today don't know whether
19 that sort of fishing was permitted in any part of January
20 1998; you don't know that?
21   A. No, I don't know it.
22   Q. You think that it may have been permitted in the
23 last couple years, possibly?
24   A. There was something that was sent to me in the
25 last -- I think it was last year, that they were going to

Page 129

1  let a few boats go catch -- and like it was like March of
2  April, try to catch their quota. They were -- and I don't
3  know what I done with the letter.
4    Q. You're a fairly knowledgeable fisherman of the
5  regulations?
6    A. Yeah, but this was brand new.
7    Q. If anybody would know something like this, you
8  would be probably somebody who would?
9    A. Not really. The Fish and Game would be the ones
10 that would really know.
11   Q. But I meant amongst fishermen. You would
12 certainly consider yourself as knowledgeable as other
13 fishermen in this respect?
14   A. Not when I'm not in town and I just get a letter
15 and I'm not there when it happened. I don't know if it
16 happened or not. I wasn't in town.
17   Q. Let me rephrase my question.
18       Isn't it likely that a fisherman would have to go
19 look up the regs to figure out whether one of these special
20 fisheries was happening in January of 1998?
21       MR. HOUGH: I object to the question unless you
22 tell him which one of these special fisheries, what do you
23 mean by one of these special fisheries.
24       MR. DAWSON: Black cod. Black cod.
25       MR. HOUGH: For a survey?

33 (Pages 126 to 129)

Page 130

```
 1       MR. DAWSON:  Yes.
 2       THE WITNESS:  Just a survey or -- you would have
 3   to contact Fish and Game.  You'd have to work with them to
 4   do it.
 5   BY MR. DAWSON:
 6       Q.  And an ordinary fisherman would have to do that,
 7   wouldn't he; he wouldn't know unless he went and checked?
 8       A.  If they were going to do something like that?
 9       Q.  No.  I'm just asking for your experience.
10           Do you think an average fisherman would know
11   whether one of these special fisheries was going on in
12   January of 1998 without going and looking at the regs?  Do
13   you think that's the kind of thing an average fisherman
14   would know?
15       A.  I don't think so.  I would go to Fish and Game.
16   Any time I have questions in that regards, I call them and
17   ask them what's going on.  I don't know --
18       Q.  Right.  I'm talking about whether somebody today
19   would know whether that fishery was happening in January of
20   1998 or not unless they were to go and look at the old regs
21   or call Fish and Game.  They would have to do some
22   research, wouldn't they?
23       MR. HOUGH:  I object to the term "fishing."  If
24   you want to call it just a survey or if you want to call it
25   commercial fishing, but there's a difference, fish over
```

Page 131

```
 1   fishing.
 2       MR. DAWSON:  The question is fishing.
 3       MR. HOUGH:  I got a fishing pole that --
 4       MR. DAWSON:  It's fishing.  You can raise your
 5   objection in any way you want.
 6   BY MR. DAWSON:
 7       Q.  You can still answer the question.
 8       A.  They do have subsistence and you have to go get a
 9   subsistence permit.
10       Q.  We're talking about fishing for the purposes of
11   taking a survey of the stocks.
12           Isn't it true that an average fisherman would
13   have to go do some research to figure out whether that
14   fishery was happening in January of 1998 or not?
15       A.  I guess he would.  I don't know.  I really don't
16   completely understand what you want.
17       Q.  I just need an answer.  That's all I want.
18       A.  A survey -- he would have -- there wouldn't be
19   any regulations for it.  You would have to go and ask Fish
20   and Game, is what was my total answer, and that would be
21   what I would do, and I wouldn't advise anybody to do
22   anything different but that.
23       MR. HOUGH:  If I could just interject the
24   objection.  The focus is whether it's commercial fishing or
25   if it's just doing a survey.
```

Page 132

```
 1       MR. DAWSON:  And I object to counsel testifying.
 2   The question was asked and answered.
 3       MR. HOUGH:  Just what the term is.
 4   BY MR. DAWSON:
 5       Q.  It's correct that nobody has suggested that they
 6   believe you fish illegally because of what was written in
 7   The Last Run.  And I --
 8       MR. DAWSON:  Mr. Hough, the shrugging of the
 9   shoulders is a communication with your client.
10       MR. HOUGH:  I'm sorry.  What?
11       MR. DAWSON:  The shrugging of the shoulders is a
12   communication with your client.  I'm going to ask you not
13   to gesture in response to my question.
14       MR. HOUGH:  I'm not shrugging my shoulders.
15   BY MR. DAWSON:
16       Q.  Go ahead and answer the question.
17       A.  Well, as far as I know, I've answered it the best
18   I can.
19       Q.  No.  The question is, as far as you know, nobody
20   believes that you have fished illegally based on what's
21   written in The Last Run?
22       A.  I don't know.  I haven't talked to people, and I
23   don't know if they do or not.
24       Q.  All right.  As far as you know, it's just as
25   likely that somebody thinks the reference to black cod is
```

Page 133

```
 1   just a mistake?
 2       A.  I doubt it.  If they're in the business, they're
 3   going to think twice.
 4       Q.  But you don't actually know that, do you?
 5       A.  I don't know.  It could come up because I'm on
 6   what is called a point system permit there, and it could
 7   cost me my permanent permit, which would be a big blow to
 8   me.
 9       Q.  Certainly nobody would -- nobody thinks that you
10   would be foolish enough to go load up with 2,000 pounds of
11   fish that you can't sell, right?
12       A.  You can sell them.  Take them to Seattle.  It's
13   been done.
14       Q.  All right.  So is there anything in there that
15   suggests you off-loaded them in Seattle?
16       A.  No.  I didn't -- I don't know, you know.
17       Q.  That's correct.  You don't know.
18           You also don't know if there's imprisonment
19   provided for violation of these regs, do you?
20       A.  I think there is.
21       Q.  Do you know?
22       A.  But the biggest blow would be, to me, I know what
23   would happen.  I would lose my permit.
24       Q.  Sir, do you know if imprisonment is provided for
25   for a violation of the regulations?
```

Page 134

1  A. I don't know.
2      MR. HOUGH: And I just interject an objection to
3  when you talk about regulations, are you back to the one
4  about the survey or are you talking about commercial
5  fishing for black cod?
6      MR. DAWSON: Let me clarify.
7  BY MR. DAWSON:
8  Q. Do you know if -- if you fished illegally for
9  black cod in state waters, do you know if the penalty would
10 be imprisonment?
11 A. Very well could be. I wouldn't be surprised if
12 it wasn't.
13 Q. The question is, do you know?
14 A. I don't know.
15 Q. All right. Do you know if you fished illegally
16 in federal waters for black cod, would the penalty be
17 imprisonment?
18 A. I don't know.
19 Q. Okay. Mr. Wiley, isn't it true that in fact you
20 have been cited for fishing illegally on at least two
21 occasions?
22 A. No. Only one that I -- and that's it. And it
23 wasn't to my knowledge that I was doing anything illegal at
24 the time.
25     (Exhibit 7 marked)

Page 135

1  Q. Exhibit 7. Do you recognize Exhibit 7,
2  Mr. Wiley?
3  A. Yeah, I know what this was about.
4  Q. And it's a citation for fishing in the federal
5  commission -- or the federal --
6  A. I was fishing --
7  Q. Sir, you have to let me finish my question.
8      It's a federal citation for fishing without a
9  federal permit, correct?
10 A. That's correct. This was the first year they
11 ever come out with them. They -- I went out by myself,
12 made a set. I had received it in the mail, I had it in the
13 envelope, it hadn't gotten mailed. I didn't know it was
14 even a problem because in the past you didn't have to have
15 one. I didn't -- I was starving. I didn't have no money,
16 no nothing, and I went out there and made a set for 600
17 pounds and brought them in and sold them.
18 Q. Sir --
19 A. I had a helicopter fly over me and I -- anyway, I
20 fought with them about it, that I really wasn't doing
21 anything illegal, as far as I was concerned. And anyway,
22 they fined me like six, seven hundred bucks.
23 Q. So you were fined for fishing illegally?
24 A. But I didn't know. It was the first year they
25 came out with that. I don't care. It was unfair. It

Page 136

1  wasn't right.
2  Q. Sir --
3  A. I wasn't -- no, I didn't know that I was fishing
4  illegally.
5  Q. That's not a defense to fishing illegally,
6  though, is it?
7  A. Well, you can make of it what you want.
8  Q. Well, it isn't, is it, sir?
9      MR. HOUGH: I object to the use of the term
10 "illegal" and this is a civil fine. It's a civil penalty.
11 BY MR. DAWSON:
12 Q. It's not a defense to fishing without a permit,
13 is it?
14 A. To fish without a permit?
15 Q. Yes. The fact that you didn't know it was a
16 violation doesn't mean it wasn't a violation, does it?
17 It's still a violation, correct?
18 A. It's a violation, yes, and I was fined for it and
19 I paid for it, but I still don't think it was right. I
20 think it was wrong. I don't think it's right that they
21 give people thousands and thousands of pounds of fish that
22 were cited fishing illegally and deliberately more than
23 once. I don't think -- the government rewards people, and
24 in my case they didn't. So I don't know. I think it was a
25 dirty rotten thing, and I --

Page 137

1  Q. The fact is --
2  A. -- I didn't know. If I thought I would, I would
3  have not done it. It's a tough thing, but I don't know.
4  Q. Sir, I'm going to have to caution you again on
5  simply responding to my questions.
6  A. Okay. All right.
7      (Exhibit 8 marked)
8  Q. Mr. Wiley, do you recognize Exhibit 8?
9  A. It looks like my handwriting.
10 Q. And this letter, although it's undated, based on
11 the fact that the letter says, in the middle there it says,
12 "I'm 57 years old," leads me to believe that this letter
13 was written sometime around 1996; is that correct?
14 A. I don't know when it was written. I will read it
15 and see if it brings back memories. It was probably
16 written regards to the...
17     I remember this incident. They --
18 Q. There's no question pending, sir.
19     This is a letter that you wrote?
20 A. Yeah. Torry O'Connell, went in and talked with
21 her. They changed --
22 Q. Sir. Sir, please answer my questions.
23     This is a letter that you wrote, correct?
24 A. Yes.
25 Q. And you wrote it about 1996?

Page 138

1  A. Yeah, because it was right after IFQs went into
2  effect.
3  Q. And in fact, in that letter you admit to
4  illegally taking certain rockfish?
5  A. They had had meetings that, if you didn't take
6  them, they were dead, so why -- you had to bring them in.
7  So I did what they wanted. I kept them, brought them in,
8  not because I -- you know, we didn't even want to deal with
9  them, but it was against the law to throw them back. I
10 don't know. It was something that they just changed, and
11 then they switched it back the following year, so it's not
12 even in effect anymore.
13 Q. Isn't it a fact, sir, that the time you wrote
14 this letter it was illegal to do what you did?
15 A. Not to my knowledge it wasn't, at the time.
16 Q. Doesn't the letter acknowledge that -- although
17 you may not have been aware of it at the time, doesn't the
18 letter acknowledge that you understand that you did
19 something wrong?
20 A. I don't think I done anything wrong, and they
21 agreed later on that I didn't, but then I can't prove that,
22 and they've changed all the rules since then.
23 Q. At the time this letter was written, though, it
24 was not legal to retain the rockfish that you retained,
25 correct?

Page 139

1  A. Not at the time I was doing it. I thought that
2  you were able to. I thought I was doing the correct, right
3  thing, and they didn't fine me for it. They didn't do
4  anything about it. They just --
5  Q. I understand.
6     But in fact, you weren't doing the right thing?
7  A. Not in -- not unintentionally, I mean, and not
8  intentionally I wasn't doing the wrong thing. I thought I
9  was doing the right thing.
10 Q. I understand.
11    Are there any other violations, fishing
12 violations, illegal fishing that you have --
13 A. No.
14 Q. -- that's happened with you?
15 A. Not that I know of. I didn't even know this here
16 was a --
17 Q. You make an interesting comment in this
18 Exhibit 8. You make the comment that everyone makes
19 mistakes once in awhile.
20    And you were obviously hoping that somebody would
21 forgive you for that mistake, weren't you?
22 A. Well, I wasn't, not for this one here. This one,
23 they changed the rules.
24 Q. And although you hope people will forgive you for
25 mistakes, you are not willing to forgive Mr. Lewan for the

Page 140

1  mistake of saying black cod as opposed to rockfish in the
2  book, correct?
3  A. That's not a one-on-one situation. That's
4  something he's advertised.
5  Q. You're not willing to forgive him for that?
6     MR. HOUGH: I object to the course as it's
7  argumentative.
8     MR. DAWSON: I can still get an answer.
9  BY MR. DAWSON:
10 Q. You're not willing to forgive him for that, are
11 you?
12    MR. HOUGH: Assumes a fact not in evidence there
13 was a mistake when he wrote it.
14    THE WITNESS: I don't know how to answer. I'm
15 sorry.
16 BY MR. DAWSON:
17 Q. You don't know what the word "mistake" means?
18 A. I know what the word "mistake" means, but I
19 didn't publish the book and I don't know that it's -- he
20 wrote the book, but then the person that published it is
21 the one that --
22 Q. You're not willing to forgive Mr. Lewan for the
23 fact he used the word "black cod" instead of "rockfish,"
24 correct?
25 A. Right. Whether it's something else that just

Page 141

1  recalls to my mind that Mr. Lewan, when he called me, I
2  told him or he told me --
3  Q. I'm going to have to ask you to answer my
4  question.
5  A. Can I say --
6  Q. I need an answer to my question. Your counsel is
7  allowed to ask you all the questions he wants.
8     And my question is, you're not willing to forgive
9  Mr. Lewan for using the word "black cod" instead of
10 "rockfish," correct?
11 A. No. I'm not going to forgive him for that
12 because it's not --
13 Q. All right.
14 A. I mean, if I'm going to forgive him for that,
15 then I might as well say okay.
16 Q. There's been some indication in the various
17 pleadings back and forth in this matter that you take issue
18 with the fact that a statement was made at page 46 of
19 Exhibit 1, of the book -- if you look at page 46 with me,
20 sir. It's the section that begins with, "DeCapua told him
21 that one of the deckhands on Min E." It begins with that
22 and ends with, "So the deckhands split."
23    Let me know when you've had a chance to look at
24 that.
25 A. It's untrue.

Page 142

1   Q. My question wasn't that. Again, I'd like you to
2  answer my questions.
3   A. Okay.
4   Q. My question is whether, if an opener happens on a
5  holiday, it's not at all unusual to fish on a holiday,
6  right?
7   A. If you want to catch any fish, yes.
8   Q. Sometimes you've had to fish on holidays,
9  correct?
10  A. I sure have.
11  Q. And sometimes you've required crew to fish on a
12 holiday as a result?
13  A. They didn't have to. I didn't twist their arms.
14  Q. If they wanted to fish with you, they would have
15 to fish on a holiday?
16  A. That's true.
17  Q. Mr. Wiley, so far as you're aware, you still have
18 a good reputation, isn't that true, so far as you're aware?
19  A. No, I don't.
20  Q. Well, what makes you think you don't?
21  A. You'd have to be me in order to understand. I
22 can't explain to you why people -- it's something I can't
23 prove. It's -- I won't even attempt that, to try to answer
24 it.
25  Q. And that's because you can't answer it?

Page 143

1   A. No. I can't answer it to your satisfaction.
2  That's why.
3   Q. I am looking for whatever your answer is.
4   A. Well, it's your neighbors, your people that you
5  know, people that you -- everybody changes. Things change.
6  Things happen. I haven't written them down because I don't
7  like being upset all the time.
8   Q. You don't know whose read the book and who
9  hasn't?
10  A. I don't know. I don't keep track of it. I
11 haven't asked. I don't know, and I don't want to know.
12  Q. Right. So you --
13  A. It's out. What can I do about it? I can't stop
14 it. It's out of my control.
15  Q. So as you said, you can't prove that your
16 reputation has been injured, can you?
17  A. Maybe. I don't know. But maybe I can.
18  Q. What do you have that suggests your reputation
19 has been injured?
20  A. I can't really get anybody to work for me. I've
21 spent two years marketing fish. I can't guarantee any
22 customers that I had any kind of product. I can't deliver
23 product because I can't get people to work. So I told them
24 I was sorry, but I was -- wasn't able to supply them. I
25 would try and help them to get the fish somewhere else, but

Page 144

1  other than that, I was going to have to bow out.
2   Q. But you don't know if the reason why you don't
3  get people to work for you has anything to do with the
4  book, do you?
5   A. Well, I don't know. You know, that's -- I don't
6  know how to answer that.
7   Q. Well, the question is, you don't know, do you?
8   A. When you say "know" or "believe," there's a
9  difference. I believe that they don't, but I don't know
10 it.
11  Q. Well, your belief is actually kind of irrelevant.
12    What I want to know is whether you have any
13 basis --
14  A. The difference believing --
15  Q. -- for believing --
16  A. The difference between believing and knowing,
17 your daughter, you believe it's your daughter, but your
18 wife knows it's your daughter. That is the difference
19 between knowing and believing. And I believe, but I don't
20 know.
21  Q. What's the basis of your belief?
22  A. Just from the way people have changed toward me.
23  Q. What's the basis for believing that there are
24 changes because of the book?
25  A. It's dozens of things have happened. I -- I'm

Page 145

1  sorry.
2   Q. Mr. Wiley, you're suing my client for nine
3  million dollars. We're entitled to know what you base your
4  belief on, what is it that you base your belief on that
5  people have changed toward you on the basis of the book?
6   A. On the basis of the book I believe they've
7  changed their opinion, and I think that they think that I'm
8  pretty much what's in this book.
9   Q. I know you think that.
10    Why do you think that?
11  A. Because of the way they -- either they don't
12 speak anymore or they don't -- they just -- there's nobody
13 says any direct thing to me, so I can't prove it.
14  Q. But these people that don't speak to you anymore,
15 you don't even know if they've read the book, correct?
16  A. Well, I'm sure they must have, but I don't know.
17 I believe that they have, but I don't know.
18  Q. You don't know, do you?
19  A. I don't know.
20  Q. Who are the people that won't speak with you
21 anymore?
22  A. Bring up their first and last names is tough.
23 Well, my neighbors, but I don't even -- I don't know their
24 first and last names. I'm sorry. They're my neighbors,
25 where I live. People on the docks. I usually say hi to

Page 162

1    Q.  So the person that you fished with is also the
2  owner of the Rusty?
3    A.  Yeah.  You mean fished with?
4    Q.  I thought you actually fished as someone's crew
5  for some period of time.
6    A.  No.  Never crew.
7    Q.  You didn't fish on the Rusty?
8    A.  I just -- I have to be on that boat because I'm
9  the permit holder and so --
10   Q.  Were you the skipper?
11   A.  I just go along for the ride.  So I have -- by
12 law I have to be on that boat or they can't fish.  Unless
13 you transfer the permit into their name and that's the only
14 way it can be done.
15   Q.  So you were along for the ride on the Rusty and
16 they fished your permit, basically?
17   A.  That's the way it is.  When you pay somebody 45
18 percent they're contracting to do -- that's the way most of
19 these IFQs and all that, that's the way it's done.  People
20 farm it out rather than...
21   Q.  And then you said that this same individual --
22 what is this individual's name that owns the Rusty?
23   A.  That's what I was trying to bring up.  David
24 Esmeiler (ph).
25   Q.  And you said David Esmeiler was also fishing your

Page 163

1  boat?
2    A.  No.
3    Q.  No?  Okay.  What are you doing with your boat at
4  the time moment?
5    A.  Nothing.  Just there and just in case, and that's
6  it.  I don't have no plans to do anything more.
7    Q.  So you're basically getting out of the business
8  of fishing on your own -- I mean, fishing your own boat?
9    A.  Yeah, I'm getting close to 70.  If I live much
10 longer I would like to be able to spend some time with some
11 people I like.
12   Q.  And that's just because you're getting a little
13 older?
14   A.  Yeah, and that and it would take quite a bit of
15 time.  I mean, I could make this pay, but I'd have to -- it
16 would just take a lot of work to get the right people and
17 get it going, and I don't -- like I say, I don't know how
18 much longer I'll live.  So it's time to -- there's a time
19 to quit, I guess.
20   Q.  Time to finally retire?
21   A.  Yeah, I think I've got the message.  Too many bad
22 things.
23   Q.  And so you think this year you'll be letting
24 Mr. Esmeiler fish your permit again?
25   A.  I'm pretty sure, yeah.  He's a nice guy.  Yeah.

Page 164

1  He's...
2    Q.  And what do you get for that?  Do you get a share
3  of the catch?
4    A.  Yeah.  I pay him 45 percent and I get 55 percent.
5  There's places you can get it done for less, but the price
6  of fuel has gone up, the price of bait has gone up, so I --
7  I think it's a fair exchange.  If I tried to do it myself,
8  it'd probably cost me almost 40 percent.  But they operate
9  on volume rather than small amounts.  They come out good,
10 the guys that are doing this.  That way they're not having
11 to go out and invest a bunch of money in IFQs and they
12 still make a pretty good living.
13   Q.  And nothing about The Last Run is preventing you
14 from working for Mr. Esmeiler, is it, or working with him;
15 nothing in The Last Run is preventing that, is it?
16   A.  He's not that type of person, and he never -- I
17 don't think he ever read the book.  I don't know.  Maybe.
18   Q.  You have some -- I could tell from your tax
19 returns you have some fairly sizeable investments.  I saw
20 almost two million dollars worth of stock trades over the
21 course of a couple years.
22   A.  That was just buy and sell.  There weren't a lot
23 of money in there.  I just traded a whole lot and it was
24 during that -- when everything went downhill and it was in
25 the -- I was into those telecom stocks, and I didn't have

Page 165

1  enough sense to realize what was happening.  So I traded a
2  lot, but I still didn't -- I ended up with a profit.
3    Q.  Do you still own stocks?
4    A.  A few.
5    Q.  What would you say your -- in terms of your
6  portfolio, what's the current value?  In very round
7  numbers.  I'm just trying to get an idea of what you had.
8    A.  Do I have to give out all my personal
9  information?
10   Q.  I'll tell you why I'm asking.  My next question
11 was going to be -- and nothing about The Last Run is
12 affecting your ability to invest, is it?
13   A.  No.  It don't hurt me -- that wouldn't -- that
14 would be a discrimination or something.
15   Q.  But it doesn't affect that at all, does it?
16   A.  I wouldn't think so, no.  I don't even know
17 anybody that even knows.
18   Q.  So The Last Run is not going to affect your
19 dealings with Mr. Esmeiler.  It doesn't affect your
20 investment activities.  It looks like you're pretty much
21 retiring, and deservedly so, and it doesn't look like you
22 actually made any business profits since 2000.
23       All that is by way of saying, is it fair to say
24 that you really haven't sustained any financial loss as a
25 result of The Last Run?

Page 166

1   A. Well, that remains to be seen. I had a customer
2   call me two weeks ago, and she wants 51,000 pounds a year,
3   and I had to turn her down, tell her I couldn't do anything
4   about it.
5   Q. Why did you turn her down?
6   A. Because I can't -- I don't have -- I can't
7   guarantee her any kind of product. I can't get anybody to
8   work.
9   Q. Didn't you just say you were trying to retire?
10  A. Well, yeah, I just made up my mind that it was
11  the best thing for me to do, whether I want to or not. I
12  have an ambitious mind. I can't help that. I like to do
13  things, but it's just not a practical thing for me to be
14  doing anymore.
15  Q. And it's not practical because?
16  A. I mean, it's very enticing if I had it set up
17  better. I can't speculate on that. I don't know what
18  would come. I just -- everything has just gone -- because
19  there's just too many problems for me to carry on.
20  Q. What kind of problems prevent you from carrying
21  on?
22  A. Well, I've tried to tell you, I can't get crew
23  anymore. Now, I don't know why, but I can't. So that's
24  all I can tell you.
25  Q. Isn't it true that you've had trouble getting

Page 167

1   crew for years?
2   A. You always have trouble getting crew. Just
3   whether or not you can train them. I don't want -- I don't
4   want to be training people. I had the woman that is the
5   best filleter in Sitka that was going to work last year,
6   and I got back and she said she changed her mind. She
7   didn't want to do it. I offered her 38 cents a pound. She
8   still wouldn't go.
9   Q. Is one of the reasons, too, why you've had
10  trouble getting crew is because you don't fish that much
11  anymore?
12  A. Well, I don't have any IFQs, if that's what
13  you're saying. All I've got is Chatham. I sold my IFQs
14  and put them into my house.
15  Q. When did you do that?
16  A. I don't know which year it was.
17  Q. Around 2002?
18  A. Whenever my heavy interest deductions. Probably
19  somewhere in there. I don't -- it probably was then
20  because it was that -- my mother left me some money and I
21  took some of that money along with mine. And I did with
22  her money what I thought would make her the happiest, so I
23  paid the house off.
24  Q. All right. So you paid the house off with the
25  proceeds of your IFQs, and so the only permit you have now

Page 168

1   is the Chatham Strait permit?
2   A. Yeah. And it really isn't a permanent one, and I
3   don't know how many years it's going to take before I'll
4   find out whether I get one or not.
5   Q. What does that let you fish?
6   A. It lets me fish Chatham Strait.
7   Q. What species?
8   A. Black cod. It's -- we all got together, all the
9   people that have permits, about eight years ago and decided
10  to divide the quota up equally amongst us, so whatever the
11  quota is, it's divided between -- I think there's
12  105 permits this year and then you go catch it.
13  Q. So it's fair to say that you made the decision
14  for a variety of factors, including age, including the fact
15  that you sold your IFQs to get out of the -- basically to
16  get out of the fishing business?
17  A. I had to sell them and get out. I own -- they
18  didn't give me enough to start with, and I borrowed a lot
19  of money to buy more of them so I would have enough to
20  fish. The price of halibut dropped to a dollar ten a pound
21  and they dropped the quota in Chatham Strait 60 percent.
22  That took away a whole lot of money, and there was no way
23  in the world I could stay and make the payments to the
24  bank, so I sold everything. I didn't have no choice.
25  Q. So you're basically out of the business?

Page 169

1   A. Basically except I got that Chatham permit that
2   supplements me and it only takes three or four days with a
3   good boat to go over there and get it.
4   Q. And you're fishing that with Mr. Esmeiler?
5   A. That's what I plan to this year, yes. Things
6   change, but sometimes -- well, it's a continuing changing
7   thing, fishing is.
8   Q. Now, was there a period of time when you were
9   buying and selling salmon?
10  A. No. Just that one year I took the 11,000 pounds,
11  I think I bought, from the -- that was including my 40
12  percent and I shipped them down, and I started at flea
13  markets, and I finally learned that that wasn't going to
14  sustain me, so then I started beating on restaurant doors,
15  and I did drum up accounts, and it started going. And I
16  got up to -- I think I had selling -- I had about
17  200 pounds a week going out, but I was delivering. I
18  wasn't making much, but I figured after I got everything
19  and could do a volume, well, then it would work.
20  Q. But you got out of that business as well,
21  correct?
22  A. Yeah. I just didn't have enough to carry on with
23  the money without taking too big a chance and losing my
24  security.
25  Q. Sure. When did you get out of that business?

Page 170

1    A. Well, after that deal with -- I finished it up
2  this year. I gave most of the balance to one customer. It
3  was about 700 pounds. And then there was some stuff
4  that -- but it was mainly the shrimp. I took them and
5  dumped them because I couldn't sell them and they weren't
6  done right anyway. They were supposed to glaze them
7  individually, and he glazed them all stuck together and
8  then they were real small ones, and there's not much of a
9  market for stuff like that.
10   Q. So you're not buying or selling salmon or shrimp
11 any longer?
12   A. No. I put together a trailer down -- to get
13 around the health department I bought one of those wells --
14 well, it's like a concession trailer. But I put it
15 together myself so that I would be approved by health
16 departments and be able to give people samples and to try
17 different things and be like -- also be like a traveling
18 process or butcher shop or whatever. But I never got that
19 far because they don't have product now. But the trailer I
20 still have. I don't know. I thought of if I could do
21 shrimp I might take it to Sitka and do shrimp in shifts if
22 I could. But otherwise, I don't have no plans one way or
23 the other. I want to spend a lot of time with my
24 grandkids. They're interested in horses, and I like
25 horses.

Page 171

1    Q. Your decision to get out of the business of
2  buying and selling product, that had nothing to do with The
3  Last Run, did it?
4    A. I don't think so. I don't know whether it ended
5  up into it. I don't know if that could have caused Jason
6  to turn out to be the turd that he is. Other than that, I
7  don't -- I don't know. I have no proof.
8    Q. You made that decision without regard to the
9  book; you decided that you wanted to get out of that
10 business, correct?
11   A. Well, I got out of it because of circumstances
12 with the people that I was doing business with, and like I
13 say, I don't know. That book came along at the time that
14 he could have got ahold of this kind of information before
15 it was even done. I don't know. And that could have been
16 part of it. I'm not sure. That's a speculation.
17   Q. So you don't have any idea one way or the other
18 as to whether somehow his dealings with you are affected by
19 that book?
20   A. No.
21   Q. You don't even know if he read the book?
22   A. I have no idea. The guy is so stoned, I don't
23 think he'll -- he'd even know.
24   Q. All right. Is it true that in -- I'm not trying
25 to sandbag you here. I have documents that say these

Page 172

1  things.
2    Q. Is it true that in October of 2000 you told your
3  insurance broker that you're semi-retired and you lease out
4  your IFQs to other fishermen?
5    A. When was that?
6    Q. October of 2000.
7    A. Of 2000? That I leased them out? You can't
8  lease them, unless you got freezer shares. You have to go
9  on the boat. So I did hire some boats to do part of my --
10 you know, there was a time I couldn't get crew so I would
11 hire.
12   Q. Is it fair to say you were semi-retired even as
13 long ago as 2000?
14   A. I don't think I had plans to retire. No, I
15 wouldn't have because I was doing all this, putting money
16 into this trying to develop -- I just felt like people
17 could get something really good to eat like it's supposed
18 to be, that it would be a good thing, and it would be, but
19 hardly anybody is doing it. And that's what I tried to do,
20 but I just don't have the -- I just don't -- it would take
21 too long. If I was younger, I would pursue it, and I can
22 see where it's the way to go.
23   Q. If your insurance broker were to say that you
24 told him you were semi-retired, is it possible you said
25 that and you just don't remember that?

Page 173

1    A. Yeah, I would have I told him I was semi-retired
2  because I was redoing the boat, and he gave me a lesser --
3  he gave me like a yacht policy when I was doing that, and
4  it was quite a bit cheaper. And it was kind of undecided
5  about just exactly what direction I was going.
6    Q. Is it true, then, the policy, the insurance
7  policy you got in October 2001, it said you could only
8  operate for one month of the year and then with only one
9  paid crew member; does that seem correct?
10   A. Yeah, that was correct, but I had to do
11 something -- if I wanted to do something, then I had to
12 call him with something else. That was -- yeah, that was
13 pretty much what it was. In 2001 I was working on the
14 boat.
15   Q. In 2002, is it correct that the insurance policy
16 that you had -- that you got in January 2002 prohibited any
17 paid crew?
18   A. Yeah, because I was still working on the boat.
19   Q. And in fact, you didn't use your boat
20 commercially in 2002; is that correct?
21   A. That's correct, I'm pretty sure.
22   Q. In September of 2002 did you charter your boat to
23 another individual, a Michael West, for the shrimp season?
24   A. Oh, yeah. That was when -- the boat wasn't quite
25 finished, but he wanted to take and do the shrimp for 40

Page 186

1  is 4:50.
2      MR. DAWSON: Thank you.
3  BY MR. DAWSON:
4      Q. Mr. Wiley, sitting here today, can you point to
5  even a single item of economic loss that you think you've
6  suffered as a result of The Last Run?
7      MR. HOUGH: Other than these ones he's already
8  mentioned?
9      MR. DAWSON: I actually don't believe he's
10 mentioned any. That's why I'm asking the question.
11     THE WITNESS: Loss, you mean a financial loss?
12 BY MR. DAWSON:
13     Q. Yes.
14     A. Never thought about that. Let me think about
15 that. Well, I don't know. That's a tough one to answer.
16 I don't know. Very well could be, but I can't -- at this
17 time I haven't drawn it up.
18     Q. Okay. Your attorney has indicated that you've
19 experienced some emotional distress as a result of the
20 publication of the book.
21     Can you -- have you felt a need to seek any kind
22 of psychiatric help in that regard?
23     A. I went to talk to a psychologist there in
24 Dr. Hunter's office.
25     Q. And who is Dr. --

Page 187

1      A. I just felt things were just so -- so I just went
2  and talked with him and it helped some.
3      Q. When was this?
4      A. About a week ago.
5      Q. And what was the name of the --
6      A. Or two weeks ago, I guess, or something.
7      Q. Thank you. And what was the name of the
8  psychologist?
9      A. Dr. Morgan, I believe it is.
10     Q. So this was just a couple weeks ago?
11     A. Yeah. It was pretty recent.
12     Q. How did you get the name of Dr. Morgan?
13     A. He's in the office there with Dr. Hunter, my
14 family doctor.
15     Q. Did someone suggest that you should go see
16 Dr. Morgan?
17     A. I really just felt the need to talk to somebody,
18 and I called them and asked them if they had somebody. I
19 don't know. I read the book and I was having a lot of
20 turmoil. I didn't read the whole book, but read enough to
21 make me very angry.
22     Q. So nobody suggested that you go see a
23 psychologist or a psychiatrist?
24     A. Well, I called there -- his office and told them,
25 and they told me, well, we have a guy you can see.

Page 188

1      Q. And you went there for what purpose?
2      A. I don't know. I needed somebody to talk to. I
3  didn't have anybody to talk to. That's the main thing.
4      Q. To talk about your feelings about the book?
5      A. That and just what was going on inside because of
6  the book.
7      Q. Were you also becoming anxious about the fact
8  that your deposition was going to be coming up?
9      A. I'm sure it had an effect on me, but I don't
10 think that was reason that I went. In fact, I know it
11 wasn't.
12     Q. Does the lawsuit make you -- also make you
13 anxious, the fact that you're having to be involved in a
14 lawsuit?
15     A. Yeah, it doesn't agree with me, that's for sure.
16 But it's not -- what do you do? You got to do something
17 when you feel you've been wronged, so that's what I'm
18 doing.
19     Q. Does your -- whatever distress you feel as a
20 result of the book, does it prevent you from going about
21 your usual routine?
22     A. No. I have a -- I keep busy doing things. I
23 have been building a stairway down to my -- to the ocean in
24 my backyard. It's about 200 feet, so I can take a lot of
25 energy there carrying and measuring.

Page 189

1      Q. And you're still able to get along fine with your
2  family?
3      A. Well, yeah, but my daughter-in-law -- my daughter
4  and my son-in-law, they don't -- I don't know -- something
5  is not right, and I'm not sure what it is.
6      Q. How long has that situation been going on?
7      A. About a year or two. I don't know. It's been
8  more than that. I don't know what it is, and I can't find
9  out. First of all I was told I was too conservative and
10 then -- by her mother and --
11     Q. I get told that by my daughter, too, for what
12 it's worth.
13     A. Is that right? So I don't know what it is. It
14 something. And I know they're not telling me what it is,
15 but I don't know for sure.
16     Q. Does that -- I'm sorry. I didn't mean to
17 interrupt.
18     A. I don't know what to do. It's a family thing and
19 it will come out eventually and we'll get it straightened
20 out, but right now things aren't too cool.
21     Q. Does that cause you some anxiety?
22     A. It makes me feel sad.
23     Q. Is that another reason why you sought to talk
24 with a psychologist?
25     A. Yeah. It all adds up, sure. That would be one

Page 194

1  true you have a cod boat and it's true that you're a
2  fisherman, but are there any true facts about you that you
3  think should not have been published?
4       MR. HOUGH: Other than what he's already said,
5  which was the use of his name?
6       THE WITNESS: My name and that, but that's the
7  worst because it identifies me.
8  BY MR. DAWSON:
9    Q. So just the fact of your name and the name of
10 your boat?
11   A. Right.
12   Q. Anything else here today, any true facts that you
13 think you shouldn't have -- that should not have been
14 published?
15   A. I don't know that there is any true ones in here,
16 but I'd have to go -- I'd have to read it and then tell
17 you.
18   Q. Do you want to take a moment to look at those
19 excerpts? I certainly don't mind if you want to take a
20 moment. I'm not in a rush.
21   A. I don't think -- any true ones that should be
22 published. I haven't done anything that I'm ashamed up, so
23 I don't see why there would be.
24   Q. I understand.
25      MR. HOUGH: It's 20 pages long. If you want to

Page 195

1  go off record or something or if you actually want me to
2  help him, I will be able to help him.
3       MR. DAWSON: I'm asking for what he believes.
4       MR. HOUGH: I understand. So he will have to go
5  off the record and read it then.
6  BY MR. DAWSON:
7    Q. Would you like to go off record and take a look
8  at it? I have no problem with that if you would like to
9  take a few moments?
10   A. Yes, if you'd like me to, sure.
11      THE VIDEOGRAPHER: Going off record. The time is
12 5:03.
13      (Off record)
14      THE VIDEOGRAPHER: Back on the record. The time
15 is 5:04.
16 BY MR. DAWSON:
17   Q. Mr. Wiley, while we were off record you informed
18 me that you are not able to read?
19   A. I can read, but I have a problem with it. What
20 happens is my mind -- well, I can be reading something and
21 my mind drifts away and I will not even remember anything
22 that I read, and I -- even when I was in school they would
23 put me up in front of the class to read to the class
24 because I guess I could read the book nicely, but I would
25 read that, stand there a whole hour and read, and at the

Page 196

1  end of the hour I didn't know a thing that I read.
2    Q. So sitting here today, you don't recall any true
3  facts, other than your name and the name of the boat, that
4  you think should not have been published; just sitting here
5  today that's all you can think of, correct?
6    A. Yes.
7    Q. And your attorney is free to ask you any
8  questions he likes about any other parts of the book. I
9  understand that there may be things here that you haven't
10 looked at that you want to be able to look at, and he'll
11 help you with that.
12      Have you -- this may seem like a silly question,
13 sir, but you've never used your name to advertise a
14 product, have you?
15   A. No.
16   Q. And you're not a celebrity, are you?
17   A. No.
18   Q. And your name doesn't have any commercial value,
19 does it?
20   A. No.
21   Q. And so far as you know, we didn't use your name
22 in promoting this book, that is, my clients didn't use your
23 name in promoting the book, did they, so far as you're
24 aware?
25   A. Not as I'm aware, yeah, right. Correct.

Page 197

1    Q. Mr. Wiley, can you give me your principle
2  addresses. I know you have more than one.
3       But where do you principally live?
4    A. My principle address is in Sitka. It's p.o. box,
5  because if I don't use that I get problems. They don't
6  deliver to the house anyway.
7    Q. Give me your physical address for my information.
8  I won't be contacting you.
9    A. It's 121 Knutson -- that's K-n-u-t-s-o-n --
10 Drive.
11   Q. And you are not currently married, correct?
12   A. That's correct.
13   Q. I understand you were at one time?
14   A. Yes.
15   Q. What was your ex-wife's name?
16   A. Her maiden name or her current name?
17   Q. What is her current name?
18   A. Teri Littleton.
19   Q. Where does she live?
20   A. She lives in Fresno, California.
21   Q. Do you happen to know her phone number?
22   A. I got it if you want me to get it.
23   Q. That's okay.
24      MR. DAWSON: Mike, is that one of the names you
25 gave us already?

Page 198

1    MR. HOUGH: Yes.
2    MR. DAWSON: Don't worry about it, Mr. Wiley.
3  Thank you.
4  BY MR. DAWSON:
5    Q.  Do you have kids?
6    A.  Yes.
7    Q.  What are their names?
8    A.  Martha Blessington. And that's all the kids I
9  have.
10   Q.  How old is Martha?
11   A.  She's -- I think Marty's about 44 or 45.
12   Q.  How long ago did you and Teri divorce?
13   A.  It's been a long time. There was reconcil- --
14 where we went back together but we never got married. We
15 was divorced back in 1962, I guess it was, or '63. I'm not
16 sure which year.
17   Q.  So early '60s?
18   A.  Yeah. And then we -- off and on until she got
19 married to this last guy, and then that didn't work out,
20 but then -- somehow or another he got title to her house
21 and now she can't get her house back. And so I don't know,
22 but they don't live together or anything.
23   Q.  She lives in Fresno then?
24   A.  Right.
25   Q.  And your daughter lives where?

Page 199

1    A.  She lives in Manhattan Beach, California.
2    Q.  And you said you had high school education.
3         Did you graduate from high school?
4    A.  Yes.
5    Q.  Where did you graduate?
6    A.  Jordon High School in Long Beach.
7    Q.  Long Beach?
8    A.  Yeah.
9    Q.  Any college?
10   A.  One semester at Long Beach.
11   Q.  Do you remember what you studied?
12   A.  It was just --
13   Q.  Basic freshmen stuff?
14   A.  Yeah. It wasn't -- I was going through some
15 pretty mixed-up times at that time.
16   Q.  Was that the '60s too?
17   A.  No. It was the '50s. My father had a business,
18 and of course I was going to marry this other gal, and then
19 we broke up, and I was upset about that. So the schooling
20 wasn't going too good, and we had a very good, thriving
21 business, my father did, and I was trained to take over
22 that. So I wasn't really worrying much things.
23   Q.  What kind of trade was that, sir?
24   A.  It was like Home Depot, small. It was one of the
25 bigger businesses in Long Beach, California.

Page 200

1    Q.  When did you begin fishing?
2    A.  1977.
3    Q.  And what licenses do you hold in connection with
4  fishing?
5    A.  Here in Sitka -- yeah, Sitka, I mean. I got the
6  Chatham permit and I got a Cook Inlet drift permit. Of
7  course, the Chatham is a temporary permit. I don't know
8  whether I will get a permanent one or not.
9    Q.  What about like licenses to operate a vessel?
10   A.  You don't have to have that. That's only if
11 you're going to take like sport people and stuff. You have
12 to get that. Boat's documented. I got 400 pounds of
13 halibut which I figured I will leave to my grandson. Other
14 than that, that's all I've got in that department.
15   Q.  I have a few questions that I missed earlier
16 today. I'm going to go back and get those and I think
17 we're very close to being completed.
18       There is a -- amongst the statements that we've
19 been told are objectionable to you are some statements
20 about how DeCapua doesn't like to lick ass.
21       Have you heard the expression to lick someone's
22 ass?
23   A.  I've heard kiss their butt, but that's about it.
24   Q.  Okay, a similar expression.
25       And in general terms, what do you think that

Page 201

1  means? If somebody says, he's an ass kisser, what does
2  that mean to you?
3    A.  That means that he's -- he's -- yeah, the boss's
4  pet or something, or something like that. I guess that's
5  what it means.
6    Q.  It doesn't mean that he's gay, though, does it?
7    A.  No.
8    Q.  And you don't think that a person reading
9  something about an ass kisser would think that the person
10 is gay, correct?
11   A.  Correct. I wouldn't, but I never -- you know, it
12 wasn't until I was almost 60 years old that I found out
13 exactly what homosexuals do, and I was very shocked. I
14 thought they did a completely different menu, and I
15 don't -- I really don't understand it.
16   Q.  And that's just -- that's not something that
17 obviously you care for?
18   A.  No, no.
19   Q.  I haven't asked the obvious question, but I have
20 to ask.
21       You're not gay, are you, sir?
22   A.  No. I'm guilty of a lot of things, probably, but
23 not that.
24   Q.  Is it fair to say, though, that although you may
25 have been older when you sort of found out about