Jon S. Dawson
Davis Wright Tremaine LLP
701 W. 8th Avenue, Suite 800
Anchorage, Alaska 99503
(907) 257-5300

Attorneys for HarperCollins Publishers, L.L.C.
and Todd Lewan

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| PHILLIP WILEY,<br><br>               Plaintiff,<br><br>vs.<br><br>HARPER COLLINS PUBLISHERS, INC.<br>and TODD LEWAN,<br><br>               Defendants. | ) <br> ) <br> ) <br> ) Case No. A05- 118 CV (JKS) <br> ) <br> ) <br> ) <br> ) NOTICE OF FILING <br> ) TELEFAXED SIGNATURE <br> ) <br> ) |

    Attached hereto is the Declaration of Todd Lewan in Support of Defendants' Motion for Summary Judgment Against Plaintiff Phillip Wiley with the telefaxed signature of Todd Lewan, defendant in this matter. The original is being mailed to counsel for defendants, and will be filed with the court immediately upon receipt by counsel.

/

/

/

Dated this  7th  day of June, 2006.

                                    DAVIS WRIGHT TREMAINE LLP
                                    Attorneys for Defendants

By:   s/ Jon S. Dawson
        Jon S. Dawson, ABA # 8406022
        Eric J. Jenkins, ABA# 0011078
        701 W. 8th Ave., Suite 800
        Anchorage, AK  99501
        Phone: (907) 257-5300
        Fax: (907) 257-5399
        jondawson@dwt.com

Certificate of Service:

I certify that on June 8, 2006, a true and correct copy of the foregoing document was served electronically on:

Michael Hough
3733 Ben Walters Lane #2
Homer, Alaska  99603

  s/ Janet Eastman
Janet Eastman/

NOTICE OF FILING TELEFAXED SIGNATURE - 2
89236v1  3960028-6

Jon S. Dawson
Eric J. Jenkins
Davis Wright Tremaine LLP
701 W. 8th Avenue, Suite 800
Anchorage, Alaska 99501
(907) 257-5300

Attorneys for HarperCollins Publishers, L.L.C.
  and Todd Lewan

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| PHILLIP WILEY,<br><br>            Plaintiff,<br><br>vs.<br><br>HARPER COLLINS PUBLISHERS, INC.<br>and TODD LEWAN,<br><br>            Defendants. | Case No. 3:05 - cv - 00118 (TMB) |

DECLARATION OF TODD LEWAN IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AGAINST PLAINTIFF PHILLIP WILEY

I, Todd Lewan, declare:

1. I am the author of <u>The Last Run</u> and am in all respects qualified to make this declaration.

2. In addition to being an author, I am also a reporter for the Associated Press and have held that position since 1988.

3. In 1998 I traveled to Alaska for the Associated Press ("AP') and began researching the January 1998 sinking of the F/V La Conte. After interviewing a number of persons who were involved in the events surrounding that tragedy, I wrote a five-part serial for the AP that was carried in a number of newspapers across the country. I subsequently decided to expand the serial into a full length book, which was published by HarperCollins Publishers, Inc. as The Last Run.

4. The Last Run is more than simply a book about the sinking of a vessel and the dramatic rescue that followed. The book chronicles the sometimes troubled lives of the men who took part in the events at issue, and traces the circumstances that led five crewmen very different backgrounds to come together to fish a notoriously dangerous patch of ocean in the middle of winter.

5. In preparation for writing The Last Run, I interviewed dozens of persons who were involved in the events at issue, or were family or friends of the key characters. Much of the material for the book came from a series of interviews that I conducted with Robert Doyle ("Doyle") and Michael DeCapua ("DeCapua"), two of the La Conte crewmen.

6. Doyle and DeCapua worked as deckhands aboard the La Conte. They went to work on the La Conte after working for a short time together aboard the F/V Min E, a vessel owned by Plaintiff Phil Wiley ("Wiley"). Wiley was still very much on the minds of Doyle and DeCapua when I interviewed them in 1999 and 2000. Both Doyle and

DeCapua discussed the fact that they made very little money working for Wiley in the period prior to joining the crew of the La Conte, and that this lack of success played a large part in their decision to seek employment aboard the La Conte.

7. Most of the passages that mention Wiley or the Min E are contained in Chapter 7 of The Last Run. The first such passage is on page 45:

> It was a slow time of the year for fishing, and Mike DeCapua was getting a little cranky about having to stay put in port and do boat repairs – busywork he called it – while his skipper waited for a window of clear weather between blows. The boat he'd been on, a longliner called the Min E, hadn't been pulling much and he was in an increasingly evil mood.

The principal source material for this passage consisted of a 1999 interview with Doyle, and an interview I conducted with DeCapua during the year 2000. A true and correct copy of my contemporaneous handwritten notes from the Doyle interview is attached hereto as Exhibit A (Bates Nos. 00070 – 00079). A true and correct copy of my typewritten transcription of those notes is attached hereto as Exhibit B (Bates Nos. 00067 – 00069). The relevant notes appear on the first page of Exhibit B. Doyle told me that DeCapua was in an evil mood, always complaining about the size of the catch in the period of time in and around when they worked together on the Min E. During the interview that I conducted with DeCapua, DeCapua expressed frustration with Wiley's seeming indifference to whether the vessel fished or not, and said he felt that Wiley was purposely limiting the amount of fish that the vessel caught to spite him. My interview with DeCapua was taped. A certified transcript of the interview prepared by Gaylene's

Word Services is attached hereto as Exhibit C (Bates Nos. 03782 – 03792). The relevant portions of the DeCapua interview are located on pages 9 and 24 of Exhibit C.

8. The next passage in The Last Run involving Wiley or the Min E is on page 46 and describes Doyle being told there was an opening on the Min E:

> DeCapua told him that one of the deckhands on the Min E had gotten into a scrap with the skipper over holiday time. The skipper was not letting crewmen go for the holidays. So the deckhand split.
> . . .
>
> "When does the boat leave?"
>
> "New Year's."

TLR at p. 46. The principal source material for this passage is the same 1999 interview with Doyle referenced in paragraph 7. Doyle told me that DeCapua had informed him that a deckhand on the Min E quit because he wanted time off for the holidays to go to the lower 48. The relevant notes appear on page 1 of Exhibit B.

9. The Last Run goes on to describe the first fishing trip that Doyle and DeCapua took with Wiley on New Years Day, and the tasks they performed in preparation for that trip:

> For two days they untangled snarls in longline gear, stocked up on fuel, groceries, and tweaked the engine. Before daybreak on the first day of January 1998, the day of a rockfish opening, the Min E sailed out of Sitka Sound.
>
> It sailed right back one night later. The rockfishing was horrible; after thirty-two hours of haulbacks, they'd barely pulled three hundred pounds.

<u>TLR</u> at p. 46. This passage is also based on the 1999 interview with Doyle referenced in paragraph 7. Doyle indicated that the crew spent a couple of days working on the boat and repairing gear, and then left for the fishing trip on January 1. Doyle indicated that the Min E returned to port with about 300 pounds of fish, and that the crew received almost no money for the catch. The relevant notes appear on page 2 of Exhibit B (Bates No. 00068). Doyle also described the January 1, 1998 trip in another interview that I conducted with him which I believe also took place in 1999. A true and correct copy of my handwritten notes from that interview are attached hereto as Exhibit D (Bates Nos. 03938 – 03951). The relevant passages appear on page 2 of Exhibit D.

10.   The next scene in <u>The Last Run</u> involving Wiley describes events following the conclusion of the January 1, 1998 fishing trip:

> Bob Doyle was not nearly as upset as the others. He had made it through his first commercial fishing trip without a major screwup. And he felt he had hit it off with the skipper, Phil Wiley. After they had tied up, Wiley walked up to him and invited him to stay on another month, and to sleep on the boat, too, if he liked.
>
> "Phil's got a crush on you," DeCapua said. He and Bob Doyle were walking back from the ANB to the Basement. "What you do, anyway? Give him something special in his rack?"
>
> "He's a good guy." [by Doyle]
>
> "He's a cocksucker." [by DeCapua]

DECLARATION OF TODD LEWAN IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 5
ANC 89105v2 3960028-6

TLR at pp. 46-47.  The foregoing passage was based on several different sources.  During the 1999 interview referenced in paragraph 7, Doyle stated that he felt Wiley was a good guy, and that Wiley had offered to let him stay on the boat at the conclusion of the January 1, 1998 fishing trip.  Doyle also stated that DeCapua chided him for getting along with Wiley by asking if he was giving Wiley something special in his bunk.  The relevant notes of that interview are on page 2 of Exhibit B (Bates No. 00068).  Doyle also stated during an interview that took place in the year 2000 that DeCapua frequently referred to Wiley as a bastard or cocksucker.  My contemporaneous handwritten notes from this 2000 interview with Doyle are attached hereto as Exhibit E (Bates Nos. 00023 – 00041).  A typewritten transcription of those interview notes is attached hereto as Exhibit F (Bates Nos. 00062 – 00066).  The relevant notes are on page 1 of Exhibit F.

12. DeCapua's denunciation of Wiley as a "cocksucker" was followed in the book by a description of a dispute that DeCapua had with Wiley regarding pay:

> Wiley, he explained, had shortchanged him out of three hundred dollars after a trip the previous year.  Once they had beached and the rest of the crew had split their shares and gone to the Pioneer Bar, DeCapua pulled Wiley aside.
> He told him, "Okay, I don't care what you do to the rest of the crew.  They're not here.  It's just you and me."
>
> "Go on."
>
> "You owe me three hundred dollars.  I want my three hundred dollars.  You give me my three hundred dollars and I keep my mouth shut and go home.  You don't give me my three hundred dollars and I'm going to the crew.  First I'll tell them what a retro check is.  Then I'll tell them you owe them a

DECLARATION OF TODD LEWAN IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 6
ANC 89105v2 3960028-6

> retro check. Don't think I won't. I got all the catch figures. I want my money and I want it now."
>
> Wiley looked blankly at him. "Is that it?"
>
> "That's it."
>
> "Fuck off." [by Wiley]

TLR at p. 47. This passage was based on an interview that I conducted with DeCapua during the year 2000. The notes from that interview that involve the retro dispute are on pages 22-24 of Exhibit C (Bates No. 03788). Doyle confirmed during a 2000 interview that DeCapua had told him about the dispute he had had with Wiley over pay. The relevant notes from my 2000 interview with Doyle are located on page 4 of Exhibit F (Bates No. 00065).

    13.    <u>The Last Run</u> next describes DeCapua retaliating against Wiley for refusing to pay him the retro check by contacting Wiley's insurance company and telling the company that the Min E was in need of repairs.

> So Mike DeCapua marched back to the Basement, pulled out a phone book and called every marine insurance company listed in the yellow pages until he found Wiley's. He told the agent that his client was a high risk.
>
> The agent asked him why.
>
> "Well your guy is not paying the crew, which makes the crew mad. And they're going to retaliate by hurting the vessel when Mr. Wiley is not around. And you are the ones who are insuring him."
>
> "I see."

> "You guys are going to wind up paying off the boat to the bank because it's going to get lost at the dock sometime because of his behavior."
>
> "I see," the agent said.
>
> "And what's more, the vessel ain't safe. Her mast is unsteady, her deck is loose from the rails, and she needs extensive hull work. And he ain't doing it."
>
> Three days later, a marine architect showed up to inspect the Min E. He took some notes, made out a report and sent a letter to Phil Wiley not long after. It said that unless repairs were affected, the boat would no longer be insured.
>
> The repairs, DeCapua said, set Phil Wiley back a bundle. Still, he did not fire DeCapua.

TLR at p.47-48. This passages was based on my interview with DeCapua in 2000. The relevant portions of that transcript are pages 23-24 of Exhibit C (Bates No. 03788).

14. In November 2003, I called Wiley to ask him about the retro pay dispute with DeCapua, and various other matters. Wiley said that he vaguely recalled the dispute, but could not remember any details. Wiley did confirm that DeCapua had called his insurer to lodge a complaint about the Min E. Based on my conversation with Wiley, I drafted the footnote that appears on page 48 of The Last Run.

15. Chapter 7 concludes with DeCapua claiming that Wiley was getting back at him for contacting the insurance company by making sure the boat did not catch enough fish to give DeCapua a good paycheck:

DECLARATION OF TODD LEWAN IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 8
ANC 89105v2 3960028-6

"But he sure made me pay," DeCapua muttered.

"How do you mean?" [by Doyle]

"Well, when Phil takes me out, we work just enough to get a small catch, to cover some expenses he's got, and then we come right back in. There's never enough left over for me to get a good paycheck."

"Oh."

"He can be a bastard, all right."

The Min E sailed again on January 15. Bob Doyle and Mike DeCapua were on it. They worked the lower half of the Chatham Strait and returned to Sitka with one thousand pounds of black cod.

"That bastard," DeCapua muttered. He and Bob Doyle were walking up the dock. "That fucking bastard did it to me again."

"Listen Mike," Bob Doyle said. "I don't know if he's doing it on purpose, I mean, I don't see the sense in it."

"In what?"

"In shooting himself in the foot," Bob Doyle said. "I mean, why would he do that?"

Mike DeCapua laughed.

"People do it all the time," he said.

TLR at p.48. DeCapua provided much of the information for this passage during my 2000 interview with him. The relevant portion of the interview is located at page 24 of Exhibit C (Bates No. 03788). Doyle also mentioned this dispute during my 2000

DECLARATION OF TODD LEWAN IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 9
ANC 89105v2 3960028-6

Davis Wright Tremaine LLP
LAW OFFICES
Suite 800 · 701 West 8th Avenue
Anchorage, Alaska 99501
(907) 257-5300 · Fax: (907) 257-5399

interview with him. The relevant portions of the Doyle interview are located on page 4 of Exhibit F (Bates No. 00065). Doyle also stated during an interview that the Min E had caught 1,000 pounds of black cod on the January 15, 1998 trip. The relevant portions of that interview are on page 2 of Exhibit D (Bates No. 03939).

15. Wiley's name is next mentioned in the book in conjunction with Doyle and DeCapua discussing whether to go to work on the La Conte:

> "Well," Bob Doyle said, "it could be just what we need to get us through the winter."
>
> A smirk flickered across DeCapua's lips. "It would be something to see Phil's face after we tell him that we're splitting."

TLR at pp. 51.

> "I guess we'll stick with Phil then," Bob Doyle said.
>
> "Like hell we will," said DeCapua.

TLR at p. 63. Source materials for these passages included my 1999 and 2000 interviews with Doyle, and my 2000 interview with DeCapua. The relevant portions of my 1999 interview with Doyle are on page 2 of Exhibit B (Bates No. 00068). The relevant portions of my 2000 interview on are pages 2 and 4 of Exhibit F (Bates No. 00063 and 65). DeCapua confirmed during our 2000 interviews that he wanted to leave the Min E because of personal disputes he had had with Wiley, and because he felt the Min E was performing poorly. The relevant portions of the DeCapua interview are on pages 9 and 24 of Exhibit C (Bates Nos. 03784 and 03788).

16. On page 132 of The Last Run, DeCapua is portrayed as paying Wiley a compliment by saying that he made more money fishing with Wiley than the skipper of the La Conte:

> "This is make-work. Make-work for the crew. Hell, I just quit Phil Wiley. This is Phil crap all over again. Except when I was with that Phil, I made money. This is Phil Junior, and he don't make money."

TLR. at p.132. This passage was based on a 2000 interview with DeCapua. The relevant portions of the interview are located on page 35 of Exhibit C (Bates No. 03791).

17. On page 149 of The Last Run, when the La Conte was catching fish at the Fairweather Grounds, DeCapua is portrayed as suggesting that Wiley could have done just as well if he had been more aggressive:

> "This," DeCapua told Bob Doyle in the bait shed, "is how the Min E could have produced, Bob, if Phil had ever decided to bust his ass."
>
> "Think so?"
>
> "Oh, I know so. That lazy prick."

TLR at p. 149. This scene is based upon interviews with both DeCapua and Doyle. Doyle stated during a 1999 interview that DeCapua had told him while they were experiencing success aboard the La Conte that the Min E could have caught just as many fish if Wiley had "worked his ass a little." The relevant portions of the 1999 interview are located on page 2 of Exhibit B (Bates No. 00068). During another interview, which was taped, Doyle made similar statements. A certified transcript of that interview

prepared by Gaylene's Word Service is attached hereto as Exhibit G. The relevant portions of the transcript are on page 84 of Exhibit G (Bates No. 03902). Doyle's attribution of this statement to DeCapua was consistent with sentiments that DeCapua expressed to me during our 2000 interviews. Relevant portions of the DeCapua interviews are located on pages 9 and 24 of Exhibit C.

18. The final reference to Wiley in The Last Run occurs on page 354 and takes place following the sinking of the La Conte:

> "What are you going to do now?" Bob Doyle asked him.
>
> "Try to get back on with the Min E," DeCapua said. "Maybe Phil will cut me a break."
>
> "Think he will?"
>
> "If I grovel enough, I guess," DeCapua said. "Skippers like it when you grovel."
>
> Bob Doyle nodded.
>
> "Besides, you were the one who pissed him off with that stupid fucking note."
>
> "I guess."

TLR at p. 354. This passage was based on interviews with Doyle and DeCapua. Doyle told me during my 1999 interview that DeCapua was planning on trying to go back to work for Wiley after the La Conte sank, and that DeCapua had told Doyle that a note Doyle had left for Wiley when he went to work aboard the La Conte was unnecessary and "stupid." The relevant portions of this interview are located on page 2 of Exhibit B

(Bates No. 00068). DeCapua in turn told me during a 2000 interview that he had made a trip on the Min E with Wiley after the La Conte sank. That interview was recorded. A certified transcript of that interview prepared by Gaylene's Word Service is attached hereto as Exhibit H (Bates Nos. 03723 – 03781). The relevant portions of that transcript are located on page 217 of Exhibit H (Bates No. 03777).

19. During the course of my interviews with Doyle and DeCapua, I paid careful attention to their respective manner of expression, an to the words they used to express themselves. In reconstructing the dialogue that appears in <u>The Last Run</u>, I wrote as I heard them speak

20. At no time while writing <u>The Last Run</u>, or at the time it was published, did I entertain any serious doubts regarding the truth of any statements of fact about Wiley that are contained in the book. It is my practice to always carefully research what I write.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED at _____, this _6_ day of June, 2006.

_____
Todd Lewan

DECLARATION OF TODD LEWAN IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 13
ANC 89105v2 3960028-6